**Connell Foley LLP**
56 Livingston Avenue
Roseland, New Jersey 07068
973-535-0500
Attorneys for Plaintiffs, Howard Johnson International, Inc. and Wyndham Hotel Group, LLC

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOWARD JOHNSON INTERNATIONAL, INC., a Delaware Corporation; and WYNDHAM HOTEL GROUP, LLC, a Delaware Limited Liability Company, | Civil Action No. 26- |
| Plaintiffs, | **VERIFIED COMPLAINT** |
| v. | |
| 5858 INTERNATIONAL DRIVE LLC, a Florida Limited Liability Company; SHMUEL BONNARDEL, an individual; HARDIK PATEL, an individual; DYLAN JAG PARTHIRANA, an individual; and DYLAN AMIN, an individual, | |
| Defendants. | |

Plaintiffs Howard Johnson International, Inc. and Wyndham Hotel Group, LLC, by their attorneys, Connell Foley LLP, complaining of defendants, 5858 International Drive LLC, Shmuel Bonnardel, Hardik Patel, Dylan Jag Pathirana, and Dylan Amin, says:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Howard Johnson International, Inc., ("HJI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2. Plaintiff Wyndham Hotel Group, LLC ("WHG") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

HJI 9575
18101603-1

3. WHG is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. ("WHR"), which is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

4. Since WHR is the sole member of WHG, WHG is a citizen of the States of Delaware and New Jersey.

5. Defendant 5858 International Drive LLC ("5858"), on information and belief, is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 5858 International Drive, Orlando, Florida 32819.

6. Defendant Shmuel Bonnardel ("Bonnardel"), on information and belief, is a member of 5858 and a citizen of the State of Florida, having an address at 2827 Forest Mill Lane, Jacksonville, Florida 32257.

7. Defendant Hardik Patel ("Patel"), on information and belief, is a member of 5858 and a citizen of the State of Georgia, having an address at 1135 East King Avenue, Kingsland, Georgia 31548.

8. Defendant Dylan Jag Pathirana ("Pathirana"), on information and belief, is a member of 5858 and a citizen of the State of California, having an address at 5950 Canoga Avenue, Suite 500, Woodland Hills, California 91367.

9. Defendant Dylan Amin ("Amin"), on information and belief, is a member of 5858 and a citizen of the State of Georgia, having an address at 300 Warren Mason Boulevard, Brunswick, Georgia 31520.

10. Upon information and belief, Bonnardel, Patel, Pathirana, and Amin are the only constituent members of 5858.

11.     The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over 5858 by virtue of, among other things, section 17.6.3 of the March 30, 2024 franchise agreement by and between 5858 and HJI (the "Franchise Agreement"), described in more detail below, pursuant to which 5858 has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

14.     This Court has personal jurisdiction over Bonnardel, Patel, Pathirana, and Amin by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Bonnardel, Patel, Pathirana, and Amin acknowledged that they were personally bound by section 17 of the Franchise Agreement.

15.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by 5858 of any objection to venue in this District.

### ALLEGATIONS COMMON TO ALL COUNTS

#### The Howard Johnson® Marks

16.     HJI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services.

17.     HJI owns and has the exclusive right to license the use of the service mark HOWARD JOHNSON® and various related trade names, trademarks, and service marks (certain

of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Howard Johnson® Marks"), as well as the distinctive HOWARD JOHNSON® System, which provides guest lodging services to the public under the HOWARD JOHNSON® name and certain services to its franchisees, including a centralized reservation system, advertising, publicity, and training services.

18.    HJI or its predecessors first used the HOWARD JOHNSON® mark in connection with guest lodging services in 1954 and the Howard Johnson® Marks are in full force and effect. Certain of the registered Howard Johnson® Marks are incontestable pursuant to 15 U.S.C. § 1065.

19.    HJI has given notice to the public of the registration of the Howard Johnson® Marks as provided in 15 U.S.C. § 1111.

20.    HJI uses or has used the words "Howard Johnson," "Howard Johnson Plaza-Hotels," "Hojo Express," and "HoJo Inn," among others, as abbreviations of its brand name.

21.    HJI has registered the Howard Johnson® Marks as service marks with the US Patent and Trademark Office ("USPTO") and owns, among others, the following valid service mark registrations for the Howard Johnson® Marks:

| MARK | DESIGN | REGISTRATION NO | REGISTRATION DATE | CLASS |
|---|---|---|---|---|
| 1-800-I-GO-HOJO | | 2077076 | Jul-8-1997 | 42 |
| HOJO | | 3744506 | Feb-2-2010 | 43 |
| HOWARD JOHNSON | | 2010109 | Oct-22-1996 | 35 |
| HOWARD JOHNSON & FLOURISH DESIGN | *Howard Johnson* | 2351850 | May-23-2000 | 42 |

| | | | | |
|---|---|---|---|---|
| HOWARD JOHNSON HOME OFFICE & DESIGN | | 2413621 | Dec-19-2000 | 42 |
| HOWARD JOHNSON RISE & DINE | | 3169462 | Nov-7-2006 | 43 |
| HOWARD JOHNSON RISE & DINE & Design | | 3074608 | Mar-28-2006 | 43 |
| HOWARD JOHNSON STYLIZED & SMALL SHIELD DESIGN | | 2239260 | Apr-13-1999 | 35, 42 |
| HOWARD JOHNSON STYLIZED & SMALL SHIELD DESIGN | | 2351849 | May-23-2000 | 35, 42 |
| HOWARD JOHNSON STYLIZED & SMALL SHIELD DESIGN | | 2351852 | May-23-2000 | 35, 42 |
| "ROOFTOP & SUNBURST DESIGN" | | 2351851 | May-23-2000 | 35, 42 |

22.     The USPTO registrations for the Howard Johnson® Marks are valid, subsisting and in full force and effect and appear on the Principal Trademark Register of the USPTO.  All of the Howard Johnson® Marks have achieved incontestable status pursuant to the Lanham Act, 15 U.S.C. § 1065.  Such incontestable federal registrations for the Howard Johnson® Marks constitute

conclusive evidence of the validity of the Howard Johnson® Marks and HJI's ownership of the Howard Johnson® Marks and the exclusive right to use the marks nationwide.

23. Through its franchise system, HJI markets, promotes, and provides services to its guest lodging licensees throughout the United States. In order to identify the origin of their guest lodging services, HJI allows its licensees to utilize the Howard Johnson® Marks and to promote the Howard Johnson® brand name.

24. HJI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Howard Johnson® Marks as distinctly designating HJI guest lodging services as originating with HJI.

25. The value of the goodwill developed in the Howard Johnson® Marks does not admit of precise monetary calculation, but because HJI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of HJI's goodwill exceeds hundreds of millions of dollars.

26. The Howard Johnson® Marks are indisputably among the most famous in the United States.

<u>**The Agreements Between The Parties**</u>

27. On or about March 30, 2024, HJI entered into the Franchise Agreement with 5858 for the operation of a 264-room Howard Johnson® guest lodging facility located at 5858 International Drive, Orlando, Florida 32819, designated as Site No. 09575-25157-08 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as <u>Exhibit A</u>.

28. On or about March 30, 2024, HJI and 5858 entered into a Master Information Technology Agreement (the "MITA"), which governs 5858's access, use and display of certain

computer technology services, software, and products provided by HJI or HJI's authorized third-party product or service providers. A true copy of the MITA is attached hereto as Exhibit B.

29.     On or about March 30, 2024, WHG and 5858 entered into a Signature Reservation Services Agreement (the "SRS Agreement"), pursuant to which WHG provided 5858 the option to utilize the services of reservation agents to handle calls from guests seeking to make reservations at the Facility. A true copy of the SRS Agreement is attached hereto as Exhibit C.

30.     Pursuant to section 5 of the Franchise Agreement, 5858 was obligated to operate a Howard Johnson® guest lodging facility for a fifteen-year term, during which time 5858 was permitted to use the Howard Johnson® Marks in association with the operation and use of the Facility as part of HJI's franchise system.

31.     Pursuant to section 3.4 of the Franchise Agreement, 5858 was required to operate the Facility in compliance with HJI's "System Standards," as defined in the Franchise Agreement, including HJI's operational requirements.

32.     Pursuant to section 7 and Schedule C of the Franchise Agreement, section 4 and related scheduled of the MITA, and section 1 and related schedules of the SRS Agreement, 5858 was required to make certain periodic payments to HJI and WHG for royalties, system assessment fees, MITA fees, SRS Fees, taxes, interest, and other fees (collectively, "Recurring Fees").

33.     Pursuant to section 7.3 of the Franchise Agreement, 5858 agreed that interest is payable "on any past due amount payable to [HJI] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

34.     Pursuant to section 3.6.4 of the Franchise Agreement, 5858 was required to prepare and submit monthly reports to HJI disclosing, among other things, the amount of gross room

7

revenue earned by 5858 at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to HJI.

35.     Pursuant to section 3.6 of the Franchise Agreement, 5858 agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to section 3.6 and section 4.8 of the Franchise Agreement, 5858 agreed to allow HJI to examine, audit, and make copies of the entries in these books, records, and accounts.

36.     Pursuant to section 3.2.1 of the Franchise Agreement, 5858 agreed that it would "operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility…to the public in compliance with all federal, state and local laws, regulations and ordinances, as well as the System Standards" and "keep the Facility in a clean, neat, and sanitary condition."

37.     Pursuant to section 3.3 of the Franchise Agreement, 5858 agreed to attend training programs designated as mandatory for franchisees and general managers.

38.     Pursuant to section 3.8 of the Franchise Agreement, 5858 agreed to obtain and maintain insurance coverage required under the System Standards Manual from insurers meeting the standards established in the System Standards Manual and 5858 was required to submit to HJI, annually, a copy of the certificate of or other evidence of renewal or extension of each such insurance policy as required by the System Standards.

39.     Pursuant to section 3.11 of the Franchise Agreement, 5858 agreed to "use reasonable efforts to protect, maintain and promote the name "Howard Johnson" or "Howard Johnson by Wyndham" and its distinguishing characteristics, and the other Marks [and] not permit

8

or allow [5858's] officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System."

40.     Pursuant to section 11.2 of the Franchise Agreement, HJI could terminate the Franchise Agreement, with notice to 5858, for various reasons, including 5858's: (a) failure to pay any amount due to HJI under the Franchise Agreement, (b) failure to remedy any other default of its obligations or warranties under the Franchise Agreement within thirty (30) days after receipt of written notice from HJI specifying one (1) or more defaults under the Franchise Agreement, and/or (c) receipt of two (2) or more notices of default under the Franchise Agreement in any one (1) year period, whether or not the defaults were cured.

41.     Pursuant to section 12.1 of the Franchise Agreement, 5858 agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to HJI in accordance with a formula specified in the Franchise Agreement.

42.     Section 12.1 of the Franchise Agreement specifically set liquidated damages for the Facility at $2,000.00 for each guest room of the Facility 5858 was authorized to operate at the time of termination.

43.     Section 13 of the Franchise Agreement specified 5858's obligations in the event of a termination of the Franchise Agreement, including its obligation to immediately cease using all of the Howard Johnson® Marks.

44.     Pursuant to section 17.4 of the Franchise Agreement, 5858 agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

45.     Effective as of the date of the Franchise Agreement, Bonnardel, Patel, Pathirana, and Amin provided HJI with a Guaranty of 5858's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit D.

46.     Pursuant to the terms of the Guaranty, Bonnardel, Patel, Pathirana, and Amin agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause [5858] to perform, each unpaid or unperformed obligation of [5858] under the [Franchise] Agreement."

47.     Pursuant to the terms of the Guaranty, Bonnardel, Patel, Pathirana, and Amin agreed to pay the costs, including reasonable attorneys' fees, incurred by HJI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

48.     In connection with entering into the Franchise Agreement and effective as of March 30, 2024, 5858 made, and Bonnardel, Patel, Pathirana, and Amin co-made, a Development Incentive Note in the amount of $400,000.00 (the "Note").  A true copy of the Note is attached hereto as Exhibit E.

49.     Pursuant to the terms of the Note, "[o]n each anniversary of the Opening Date that follows the Funding Date (or on each anniversary of the Opening Date, if the Development Incentive [Note] is funded as of the Opening Date), an amount equal to the original amount of the Development Incentive [Note] divided equally by the number of complete Franchise Years remaining, as of the Funding Date, between the Funding Date and the conclusion of the Term, will be forgiven without payment, such that the Note will have been completely forgiven without payment at the conclusion of the Term."

50.     The Note provides that if the Franchise Agreement terminates for any reason, the Note shall be accelerated and the "outstanding, unamortized principal balance of this Note shall be immediately due and payable without further notice, demand or presentment."

51.     Pursuant to the terms of the Note, "[i]f this Note is accelerated and is  not paid in full within ten (10) days after it is due, the outstanding principal balance shall bear simple interest at a rate equal to the lesser of eighteen (18%) percent per annum or the highest rate allowed by applicable law from its due date until paid."

52.     The Note also provides that "[i]f this Note is collected by or through an attorney at law, [HJI] shall be entitled to collect reasonable attorneys' fees and all costs of collection."

**The Defendants' Defaults and Premature Termination of the Franchise Agreement**

53.     5858 failed to meet its operational, financial, insurance, and training obligations under the Franchise Agreement, the MITA, and the SRS Agreement.

54.     By letter dated July 7, 2025, a true copy of which is attached hereto as <u>Exhibit F</u>, HJI advised 5858 that: (a) it was in breach of the Franchise Agreement because it owed HJI approximately $112,760.24 in outstanding Recurring Fees, (b) it had thirty (30) days within which to cure this monetary default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

55.     By letter dated August 14, 2025, a true copy of which is attached hereto as <u>Exhibit G</u>, HJI advised 5858 that: (a) it was in breach of the Franchise Agreement because (a) the City of Orlando deemed the Facility unsafe for occupancy and ordered all individuals to vacate, (b) it owed HJI approximately $132,328.80 in outstanding Recurring Fees, (b) it had thirty (30) days within which to cure this monetary default, and (c) if the defaults were not cured, then the Franchise Agreement might be subject to termination.

56.     By letter dated September 22, 2025, a true copy of which is attached hereto as Exhibit H, HJI advised 5858 that: (a) it remained in breach of the Franchise Agreement because (a) the City of Orlando deemed the Facility unsafe for occupancy and ordered all individuals to vacate, (b) it owed HJI approximately $141,076.38 in outstanding Recurring Fees, (b) it failed to provide evidence of the required minimum insurance coverage required by the Franchise Agreement, (c) it was not in compliance with the requirements to complete human trafficking prevention and awareness training, (d) it had thirty (30) days within which to cure these defaults, and (e) if the defaults were not cured, then the Franchise Agreement might be subject to termination.

57.     By letter dated October 30, 2025, a true copy of which is attached as Exhibit I, HJI terminated the Franchise Agreement, effective October 30, 2025, due to 5858's failure to cure its defaults, and advised 5858 that: (a) it was to immediately discontinue the use of all trade names, service marks, signs, and other forms of advertising, and other indicia of operation as a Howard Johnson® System facility, and to discontinue the use of other materials on the premises effectively to distinguish the same from its former appearance as a Howard Johnson® System facility, (b) all items bearing the Howard Johnson® Marks had to be removed, (c) all signs and any listings in directories and similar guides in which the Facility was identified as a Howard Johnson® had to be changed, (d) it was required to pay to HJI as liquidated damages for premature termination the sum of $528,000.00 as required under section 12.1 of the Franchise Agreement, all outstanding Recurring Fees through the date of termination, and the outstanding principal balance of the Note in the amount of $373,333.33, and (e) it had to de-identify the Facility within ten (10) days from the receipt of the notice.

58.     The termination of the Franchise Agreement precludes 5858 from any further use of the Howard Johnson® Marks in or around the Facility.

59.     The termination of the Franchise Agreement also precludes 5858 from any further use of the Howard Johnson® Marks to induce the traveling public to use the Facility in any way.

60.     Since the termination of the Franchise Agreement, 5858 has continued to use the Howard Johnson® Marks to induce the traveling public to rent guest rooms at the Facility.

61.     Since the termination of the Franchise Agreement, 5858 has failed to remove Howard Johnson® signage and continues to identify the Facility as a Howard Johnson® guest lodging facility.

62.     Pursuant to the terms of the Note, 5858, Bonnardel, Patel, Pathirana, and Amin were obligated to pay HJI the principal sum of $373,333.33.  Despite their obligation to do so, 5858, Bonnardel, Patel, Pathirana, and Amin have not made any payment on account of the Note.

63.     5858 has continued to misuse the Howard Johnson® Marks despite receiving notification from HJI to cease and desist from the misuse of the Howard Johnson® Marks.

64.     Plaintiffs have satisfied all of their obligations under the Franchise Agreement, the MITA, and the SRS Agreement, including without limitation, providing [5858] the right to use the Howard Johnson® trade name, trademarks, and service marks.

## FIRST COUNT

65.     HJI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 64 of the Verified Complaint.

66.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the

sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

67.    5858 continues to display the Howard Johnson® Marks at the Facility, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

68.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

69.    The acts of 5858 in displaying the Howard Johnson® Marks at the Facility constitute:

        a)    a false designation of origin;

        b)    a false and misleading description of fact; and

        c)    a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of 5858's Facility with HJI, and to cause confusion, or to cause mistake, or deception, to the effect that HJI sponsors or approves of the guest lodging services that 5858 provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

70.    Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon

such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

71.     5858's use of the Howard Johnson® Marks in connection with goods and services at the Facility, after the Howard Johnson® Marks became famous, caused and will continue to cause dilution and disparagement of the distinctive quality of the Howard Johnson® Marks, and lessened and will continue to lessen the capacity of the Howard Johnson® Marks to identify and distinguish the goods and services of HJI, all in violation of Section 43(c) of the Lanham Act.

72.     5858's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

73.     5858's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on HJI.

74.     HJI has no adequate remedy at law.

75.     No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), HJI demands judgment against 5858:

a)     Preliminarily and permanently restraining and enjoining 5858, its affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act in concert or participation with them, from marketing, promoting, or selling guest lodging services at the Facility through and with the Howard Johnson® Marks; and

15

b)      Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

76.      HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 75 of the Verified Complaint.

77.      Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, 5858 agreed to allow HJI to examine, audit, and make copies of 5858's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

78.      5858 has engaged in acts and practices, as described, which amount to infringement of the Howard Johnson® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

79.      As a result, 5858 owes restitution and the disgorgement of profits, in an amount unknown to HJI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from 5858.

**WHEREFORE**, HJI demands judgment ordering that 5858 account to HJI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Howard Johnson® Marks.

## THIRD COUNT

80.      HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 79 of the Verified Complaint.

81.      On October 30, 2025, HJI terminated the Franchise Agreement due to 5858's failure to cure its defaults under the Franchise Agreement, the MITA, and the SRS Agreement.

16

82. Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to the action of the Franchisee, 5858 shall pay liquidated damages to HJI within ten (10) days of termination.

83. As a result of the termination of the Franchise Agreement, 5858 is obligated to pay HJI liquidated damages in the amount of $528,000.00, as calculated pursuant to section 12.1 of the Franchise Agreement.

84. Notwithstanding HJI's demand for payment, 5858 has failed to pay HJI the liquidated damages as required in section 12.1 of the Franchise Agreement.

85. HJI has been damaged by 5858's failure to pay liquidated damages.

**WHEREFORE**, HJI demands judgment against 5858 for liquidated damages in the amount of $528,000.00, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

86. HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 85 of the Verified Complaint.

87. By virtue of the premature termination of the Franchise Agreement, HJI sustained a loss of future revenue over the remainder of the fifteen-year term of the Franchise Agreement.

88. If the Court determines that 5858 is not liable to pay HJI liquidated damages as required by section 12.1 of the Franchise Agreement then, in the alternative, 5858 is liable to HJI for actual damages for the premature termination of the Franchise Agreement.

89. HJI has been damaged by 5858's breach of its obligation to operate a Howard Johnson® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, HJI demands judgment against 5858 for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

90.    Plaintiffs repeat and make a part hereof each and every allegation contained in paragraphs 1 through 89 of the Verified Complaint.

91.    Pursuant to section 7 and Schedule C of the Franchise Agreement, section 4 and related schedules of the MITA, and section 1 and related schedules of the SRS Agreement, 5858 was obligated to remit Recurring Fees to Plaintiffs.

92.    Despite its obligation to do so, 5858 failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, the MITA, and the SRS Agreement, in the current amount of $186,800.64.

93.    5858's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment against 5858 for the outstanding Recurring Fees due and owing under the Franchise Agreement, the MITA, and the SRS Agreement, in the current amount of $186,800.64, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

94.    Plaintiffs repeat and make a part hereof each and every allegation contained in paragraphs 1 through 93 of the Verified Complaint.

95.    5858 utilized Plaintiffs' services, trade names, trademarks, and service marks to earn revenue at the Facility.

96.    5858 did not adequately compensate Plaintiffs for the use of their services, trade names, trademarks, and service marks to earn revenue at the Facility.

97.    5858's failure to compensate Plaintiffs constitutes unjust enrichment and has damaged Plaintiffs.

18

**WHEREFORE**, Plaintiffs demand judgment against 5858 for an amount equal to the value of the services provided by Plaintiffs, and all royalties and other Recurring Fees that should be paid to compensate HJI for any period during which 5858 misused the Howard Johnson® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

## SEVENTH COUNT

98.    Plaintiffs repeat and make a part hereof each and every allegation contained in paragraphs 1 through 97 of the Verified Complaint.

99.    Pursuant to the terms of the Guaranty, Bonnardel, Patel, Pathirana, and Amin agreed, among other things, that upon a default under the Franchise Agreement, the MITA, and the SRS Agreement, they would immediately make each payment and perform each obligation required of 5858 under the Franchise Agreement, the MITA, and the SRS Agreement.

100.    Despite their obligation to do so, Bonnardel, Patel, Pathirana, and Amin have failed to make any payments or perform or cause 5858 to perform each obligation required under the Franchise Agreement, the MITA, and the SRS Agreement.

101.    Pursuant to the Guaranty, Bonnardel, Patel, Pathirana, and Amin are liable to Plaintiffs for 5858's liquidated damages in the amount of $528,000.00, or actual damages in an amount to be determined at trial, and 5858's outstanding Recurring Fees due and owing under the Franchise Agreement, the MITA, and the SRS Agreement in the current amount of $186,800.64, and for those additional Recurring Fees attributable to any time period during which 5858 has misused the Howard Johnson® Marks.

**WHEREFORE**, Plaintiffs demand judgment against Bonnardel, Patel, Pathirana, and Amin for damages in the amount of:

19

a)      All liquidated damages or actual damages and outstanding Recurring Fees due and owing under the Franchise Agreement, the MITA, and the SRS Agreement, together with interest, attorneys' fees, and costs of suit; and

b)      All profits, royalties, and other Recurring Fees that should be paid to compensate HJI for the time period during which 5858 misused the Howard Johnson® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

## EIGHTH COUNT

102.    HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 101 of the Verified Complaint.

103.    Pursuant to the terms of the Note, 5858, Bonnardel, Patel, Pathirana, and Amin were obligated to pay HJI the principal sum of $373,333.33 immediately upon termination of the Franchise Agreement.

104.    Despite their obligation to do so, 5858, Bonnardel, Patel, Pathirana, and Amin have failed to make the payment due and owing to HJI under the Note.

105.    5858's failure to make the agreed payment on the Note constitutes a breach of the Note and has damaged HJI.

106.    5858's failure to make the agreed payment on the Note constitutes unjust enrichment and has damaged HJI.

**WHEREFORE**, HJI demands judgment against 5858, Bonnardel, Patel, Pathirana, and Amin for damages in the amount of the principal sum of $373,333.33 due and owing under the Note, together with interest, attorneys' fees, and costs of suit.

## NINTH COUNT

107.   HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 106 of the Verified Complaint.

108.   On October 30, 2025, HJI terminated the Franchise Agreement due to 5858's failure to cure its defaults.

109.   Section 13.2 of the Franchise Agreement provides that, when the Franchise Agreement is terminated, HJI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [5858 did] not remove[] or obliterate[] within five days after termination."

110.   5858 continues to market, promote, and display the Howard Johnson® Marks at the Facility through the unauthorized use of the Howard Johnson® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers.

111.   5858's unauthorized use of the Howard Johnson® Marks has inflicted and continues to inflict irreparable harm on HJI.

**WHEREFORE**, HJI demands judgment declaring that HJI, or its authorized agent(s), has the right, without prior notice to Defendants, to enter the property at the Facility and remove any and all exterior signage, exterior items, and other exterior materials displaying the Howard Johnson® Marks.

**Connell Foley LLP**
Attorneys for Plaintiffs,
Howard Johnson International, Inc. and
Wyndham Hotel Group, LLC

By:_____

**BRYAN P. COUCH**

Dated:  April 15, 2025

21

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action

pending in any court or of any pending arbitration or administrative proceeding.

**Connell Foley LLP**
Attorneys for Plaintiffs,
Howard Johnson International, Inc. and
Wyndham Hotel Group, LLC

By:_____
    **BRYAN P. COUCH**

Dated:  April 15, 2025

## VERIFICATION

STATE OF NEW JERSEY        )
                                ) ss:
COUNTY OF MORRIS          )

**KENDRA MALLET**, of full age, being duly sworn according to law, upon her oath, deposes and says:

I am the Vice President of Global Franchise Administration for Howard Johnson International, Inc. and Wyndham Hotel Group, LLC, which are the Plaintiffs in this action.

I have read the foregoing Verified Complaint and all the allegations contained therein. Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of Howard Johnson International, Inc. and Wyndham Hotel Group, LLC and/or information available through employees of Howard Johnson International, Inc. and Wyndham Hotel Group, LLC.

                                                **KENDRA MALLET**

Sworn and subscribed to before me
this 13th  day of April , 2026

_____
            NOTARY PUBLIC

ANDRELYNE PIERRE
NOTARY PUBLIC – NEW JERSEY
COMMISSION #50182702
MY COMM. EXPIRES 01/19/2027

HJI 9575

# **<u>Exhibit A</u>**

DocuSign Envelope ID: 3249E3B7-DA99-40DE-8401-C8DF682D177A

Location**: Orlando, FL**
Unit No.: **09575-25157-08-HOJ**

## HOWARD JOHNSON INTERNATIONAL, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated _____March 30_____, 20_24_, is between HOWARD JOHNSON INTERNATIONAL, INC., a Delaware corporation ("we", "our" "us" or "Franchisor"), and **5858 INTERNATIONAL DRIVE LLC**, a Florida limited liability company ("you" or "Franchisee"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

1. **Franchise.** We have the exclusive right to franchise to you the distinctive "Howard Johnson" System for providing transient guest lodging services. We grant to you and you accept the Franchise, effective and beginning on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The Franchise is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Howard Johnson Inn" or a "Howard Johnson Inn by Wyndham." You may adopt addition or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

2. **Protected Territory.** We will not own, operate, lease, manage, franchise or license any party but you to operate a Chain Facility in the "Protected Territory", as defined below, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant protected territories that overlap your Protected Territory to other Chain Facilities. While this Agreement is in effect, neither you, any of your affiliates, nor any of your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. You acknowledge that the Protected Territory fairly represents the Facility's trading area, and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section. You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. You further acknowledge and agree that notwithstanding the foregoing, we may operate, lease, manage, or license any other party to operate a Chain Facility in the Protected Territory beginning (a) six months prior to the expiration of this Agreement, or (b)

1

HOJ EX-C1
Q1/2023

DocuSign Envelope ID: 3249E3D7-DA99-40DE-8401-C8DF682D177A

as of the date that a date for the premature Termination of this Agreement has been confirmed in writing by us. The covenants in this Section are mutually dependent. The Protected Territory means the Location only.

## 3. Your Improvement and Operating Obligations.

3.1 **Pre-Opening Improvements.**  You must select, acquire, construct and/or renovate the Facility as provided in Schedule D.

3.2 **Operation.**

3.2.1   You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those required by System Standards or as specified on the PIP) to the public in compliance with all federal, state and local laws, regulations and ordinances as well as System Standards.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards.

3.2.2   The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities.  If the Facility is managed by a management company, the management agreement between you and the management company for the Facility shall be subject and subordinate to this Agreement and in the event of any conflict between the management agreement and this Agreement, the controlling contract shall be this Agreement.  The management agreement shall not release you of any obligations set forth in this Agreement.

3.2.3   The Facility will accept payment from guests by all credit and debit cards or other forms of payment we designate in the System Standards Manual.  The Facility will comply with the Payment Card Industry Data Security Standard (PCI DSS) concerning  cardholder information, as well as applicable laws and regulations, and such other requirements as we may include in the System Standards Manual or as we may otherwise communicate from time to time for such purpose.

3.2.4   You may add to or discontinue the amenities, services and facilities as required by System Standards or as specified on the PIP, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay.  Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.  You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement.

3.2.5   Upon our reasonable request, you will provide us with then-current copies of the documents evidencing your ownership of, or right to possess, the Facility and/or the real property upon which the Facility is located, and a complete and accurate list of all of your owners and their Equity Interests.

HOJ EX-C1
Q1/2023

3.3 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees and general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.4 **Marketing.**

3.4.1 You will participate in System marketing programs, including the Chain Websites, if any, and the Reservation System, guest loyalty programs and marketing programs approved by the INOC Board of Directors. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, outdated or misleading advertising materials if we so request.

3.4.2 You will participate in any supplemental marketing training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area or in a similar market segment. We may assist the cooperative with collecting contributions. You may be excluded from cooperative programs and benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.4.3 The Facility must participate in all mandatory Internet and distribution marketing activities and programs in accordance with the System Standards Manual, including any arrangements we make with third party distribution channels. You must provide us with information about the Facility and utilize our approved photographer for taking photographs of the Facility for posting on the Chain Websites, third party travel websites and various marketing media. The content you provide us or use yourself for any Internet or distribution marketing activities must be true, correct and accurate, and you will promptly notify us in writing, in accordance with our processes that are then in effect, when any correction to the content becomes necessary. You must promptly modify, at our request, the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet or distribution marketing activities that conflict, in our reasonable discretion, with Chain-wide Internet or distribution marketing activities. You must honor the terms of any participation agreement you sign for Internet or distribution marketing activities. You will pay when due any fees, commissions, charges and reimbursements relating to Internet or distribution marketing activities (i) in which

3

HOJ EX-C1
Q1/2023

you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis. We may suspend the Facility's participation in Internet and/or distribution marketing activities if you default under this Agreement.

3.4.4    You will participate in the Wyndham Rewards program or any successor guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C. The Wyndham Rewards Front Desk Guide sets forth additional standards, which you agree to follow. The Front Desk Guide, including fees assessed and reimbursements rates, may be revised by us or our affiliates at any time upon thirty (30) days' prior notice.

3.4.5    As a requirement of your participation in the Reservation System, you must participate in our Signature Reservation Service ("SRS") program during the Term of the Agreement. Under the SRS program, you will pay the fees associated with certain calls answered by our agents on behalf of the Facility. The program terms and fees associated with the program are described in the SRS agreement that you will sign and deliver to us at the same time as you sign this Agreement.

3.5 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.6 **Financial Books & Records; Audits.**

3.6.1    The Facility's transactions must be timely and accurately recorded in accounting books, and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Lodging Association, as modified by this Agreement and System Standards. You acknowledge that your accurate and timely accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.6.2    Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility but such notice is not required. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may require access to the property

4

HOJ EX-C1
Q1/2023

including guest rooms. We may also perform an audit of the Facility's books and records remotely or electronically without advance notice or your knowledge. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.6.3    We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.6.2 within 30 days after the date of the initial audit, (ii) you cancel two or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.6, an "Accounting Procedure Notice." The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year. You must also pay any deficiency in Recurring Fees, any Audit Fee, as defined in Section 4.8, we assess you for your default of Section 3.6 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit.

3.6.4    You will, at your expense, prepare and submit to us by the third day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all Gross Room Revenues and such other data or information as we may require. You must submit your statements to us using our on-line reporting and payment tool or through such other technology or means as we may establish from time to time.

3.7 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the representative performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our representative, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our representative incurs for a reinspection. You will also be charged the Reinspection Fee if we must return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the PIP, as set forth in Schedule D. We may also include the results of paper and electronic customer satisfaction surveys of your guests as well as unsolicited feedback received from your guests in your final quality assurance score. We may publish and disclose the results of quality assurance

5

inspections and guest surveys. We may, at our discretion, implement a Chain-wide quality assurance/mystery shopper inspection program to be performed by a reputable third party. You must provide free lodging for the inspector(s) when he/she visits your Facility.

3.8 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the System Standards Manual. Unless we instruct you otherwise, your liability insurance policies will name as additional insureds Howard Johnson International, Inc., Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, their current and former subsidiaries, affiliates, successors and assigns as their interests may appear. All policies must be primary and non-contributory with or excess of any insurance coverage that may be available to an additional insured. You must submit to us, annually, a copy of the certificate of or other evidence of renewal or extension of each such insurance policy as required by the System Standards. If you fail to procure or maintain the required insurance, then we will have the right (without any obligation) to procure such insurance at your cost plus a reasonable fee.

3.9 **Conferences.** You or your representative and your general manager will attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we or the INOC Board of Directors hold a Chain conference. The Chain conference may be held as part of a Wyndham Hotel Group, LLC multi-brand conference with special sessions and programs for our Chain only. Mandatory recurrent training for franchisees and general managers described in Section 4.1.4 may be held at a conference. The Fee we set will be the same for all Chain Facilities that we franchise in the United States. You will pay one Conference Fee for each of the Chain Facilities you own. We will invoice and charge you for the Conference Fee even if you do not attend the Chain Conference. You will receive reasonable notice of a Chain conference.

3.10   **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.11   **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Howard Johnson" or "Howard Johnson by Wyndham" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You agree that, in event that you or any of your principals or guarantors is or is discovered to have been, convicted of a felony or any other offense likely to reflect adversely upon us, the System or the Marks, such conviction is a material, incurable breach of this Section. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will participate in good faith in Chain-wide guest service and satisfaction guarantee programs we require for all Chain Facilities. You shall use your best efforts to promote usage of other Chain Facilities by members of the public. Without our prior written consent, which may be withheld in our sole discretion, you shall ensure that no part of the Facility or the System is used to further or promote a different or competing business, including without limitation, advertising or

6

HOJ EX-C1
Q1/2023

promotion for guest lodging facilities other than those franchised by us or our affiliates and marketing, advertising or promoting any timeshare or vacation ownership resort not affiliated with us, our affiliates, or Wyndham Destinations, Inc. and its affiliates.

3.12    **Facility Modifications.**  You may not materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) until you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility before you begin construction of any expansion.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.13    **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives and members of their immediate family.  You are not required to provide more than two standard guest rooms at this rate on any given night.

3.14    **Material Renovations.**  Beginning five years after the Opening Date, we may issue a "Material Renovation Notice" to you that will specify a Material Renovation for the Facility, to be commenced no sooner than 90 days after the notice is issued.  You will perform the Material Renovations as and when the Material Renovation Notice requires.  We will not issue a Material Renovation Notice within five years after the date of a prior Material Renovation Notice.

3.15    **Technology Standards & Communications.**  You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology, including communications and entertainment.  You must purchase, acquire, or subscribe to the computer system and other equipment and software that we specify, including preventative maintenance software.  We may modify System Standards to require new or updated technology at all Chain Facilities.  At our request, you shall participate in any intranet or extranet system developed for use in connection with the System.  Such intranet or extranet system may be combined with that of our affiliates.  You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things:  (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system.  You shall pay any fee imposed from time to time by us or a third-party service provider in connection with hosting such system.

**4.  Our Operating and Service Obligations.**  We will provide you with the following services and assistance:

4.1 **Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager training, remedial training, re-certification training, and supplemental training.

7

HOJ EX-C1
Q1/2023

4.1.1    **General Manager Training.** We will offer general manager certification training for your general manager in our Hospitality Management Program, which may be held in i) a hybrid, in-person and virtual format or ii) a virtual-only format. The program will cover such topics as operating a Chain Facility, marketing and sales, financial management, guest services and people management.   Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date.   Any replacement general manager must complete the training program to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in the training program within the above time frame, your replacement general manager must complete the next program held at which we offer a place. Your general manager for the Facility must complete the training even if you employ managers at other Chain Facilities who have already received this training.  We charge you tuition for our Hospitality Management Program which is set forth on Schedule D.  If he/she does not complete the training within 90 days after the Opening Date, and for any replacement general manager, you must pay a separate tuition at the rate then in effect for the program when your manager attends the program. If you, or any other employee at the Facility wishes to participate in the training in addition to your general manager, you can do so and you must pay the Additional Attendee Fee, currently $1,400, which is payable by the scheduled date for the program and is in addition to the tuition due for your general manager. We may charge you full or discounted tuition for "refresher" training for your general manager or for additional staff members who complete the training program with your general manager.  You must also pay for your, your general manager and/or additional staff member's travel, lodging, meals, incidental expenses, compensation and benefits for any in-person components.

4.1.2    **Remedial Training.**  We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a failing score on a quality assurance inspection, a failing score on quality assurance electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our customer care department or posted on third-party travel websites, distribution channels, blogs, social networks and other forums, as determined by us in our sole discretion.  This training may be offered at our corporate offices, at a regional location, on-line or at the Facility.  The training may be in the form of one or more classes held at different times and locations as we may require. You must pay the tuition in effect for this program when it is offered to you.  If the training is provided at the Facility, you must provide lodging for our trainers.  In addition, if at the time of your quality assurance inspection, you receive (i) a failure rating on guest room cleanliness and (ii) an average quality assurance score of F on cleanliness of guestroom category or cleanliness of bathroom category (based on a minimum of 10 electronic quality assurance guest surveys), then we may require you to take a one day, on-site remedial class on housekeeping within 60 days after the inspection.  The tuition for an on-line class is currently up to $250, but is subject to increase in the future.  The fee for an on-site customer experience assessment or training class is currently $1,250 but is subject to increase in the future.

4.1.3    **Ongoing Training and Support.** You must subscribe and pay an annual fee for access to our learning management system, Wyndham University, which includes training via live workshops, e-learning modules, webinars, online courses, videos and other educational resources,

accessible by you and your staff via the Internet, including the Chain's intranet website.  All general managers must complete recertification training at such intervals as we may establish in the System Standards Manual.  You must pay us the tuition then in effect for any such program.  We may offer other mandatory or optional training programs for reasonable tuition or without charge. The above training could be offered as i) a hybrid, in-person and virtual format or ii) a virtual-only format. If in person, training will be held in our corporate offices or other locations, or held in conjunction with a Chain conference.  If you are attending a hybrid training, you will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you other on-site training aids and materials, or require you to buy them at reasonable prices.

4.1.4    **No Show and Cancellation Fees.**  If you or your general manager, or any other member of your staff you designate, fails to register for a required training program within the required time period, or registers for a training program but fails to attend such program as scheduled without, notifying us in advance, whether such attendance is required or optional, we may charge you a no-show fee of up to 100% of the tuition for the program.  If you, your general manager or any other member of your staff cancels participation in any training program less than fourteen (14) days before it is scheduled to be held, we may charge you a "cancellation fee" of up to 50% of the tuition for the program. No-show and cancellation fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional no-show or cancellation fees for continued failures by you under this Section 4.1.

4.2 **Reservation System.**  We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion.  We will use the Room Sales Charge for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System.  We or our Approved Supplier will provide software maintenance and support for any software we or an Approved Supplier license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us, an affiliate or the supplier, as applicable. During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation.  The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  You shall own and be responsible for compliance with all applicable laws, regulations or standards concerning all Guest Information within your possession or any service provider holding such information on your behalf, and we shall own and be responsible for compliance with all applicable laws, regulations or standards concerning all Guest Information within our possession or any service provider holding such information on our behalf.  To the extent that you and we both possess identical Guest Information, your and our respective ownership rights and related compliance obligations with regard to such Guest Information shall be separate and independent from one another.  We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

9

DocuSign Envelope ID: 3249E3B7-DA99-40DF-8401-C8DF682D177A

4.3 **Marketing.**

4.3.1   We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs and related activities as we deem appropriate. We will determine in our discretion, after consultation with and the approval of the INOC Board of Directors: (i) the nature and type of media placement; (ii) the allocation (if any) among international, national, regional and local markets; and (iii) the nature and type of advertising copy, other materials and programs.   We or an affiliate may be reimbursed from Marketing Contributions for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System franchisees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) as we deem appropriate and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.   We may require your participation in marketing programs approved by the INOC Board of Directors, and administer those programs on behalf of the INOC.

4.3.3   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fee.

4.4 **Purchasing and Other Services.**   We may offer for a reasonable fee other optional assistance to you with purchasing items used at or in the Facility.  Our affiliates may offer this service on our behalf.  We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts.  We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.**  We will control and establish requirements for all aspects of the System.  We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions.  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.  We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation wherever it appears. We will not be liable to you for any expenses, losses or damages you may sustain as a result of any Mark addition, modification, substitution or discontinuation.

4.6 **Consultations and Standards Compliance.**   We will assist you to understand your obligations under System Standards by telephone, mail, during any visits by our employees to the Facility inspections, through the System Standards Manual, at training sessions and during conferences, meetings and visits we conduct.  We will provide telephone and mail consultation on Facility operation and marketing through our representatives.  We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services,

HOJ EX-C1
Q1/2023

subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium. You will at all times comply with the System Standards. You acknowledge that the System Standards and the System Standards Manual are designed to protect the System and the Marks, and not to control the day-to-day operation of your business. We will provide you with access to the System Standards Manual promptly after we sign this Agreement. We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.6. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a Reinspection Fee and will charge you for our costs as provided in Section 3.7. In connection with an audit, you will pay us any understated amount plus interest under Section 3.6. If the understated amount is three percent (3%) or more of the total amount owed during a six-month period, you will also pay us an "Audit Fee" equal to the costs and expenses associated with the audit. Our inspections are solely for the purposes of checking compliance with System Standards.

4.9 **Revenue Management.** We offer optional revenue management services ("RMS") for additional fees. RMS is currently offered at two levels of service each of which offers a different frequency of inventory management, strategic positioning, future demand strategy and targeted promotions and packages. We reserve the right to evaluate a variety of factors, including but not limited to, your Facility's room count, occupancy rate, trends, and market to determine the most suitable level of service. Based on our assessment of your Facility and its performance, we may limit the levels of optional services available to your Facility. You are required to sign a Hotel Revenue Management Agreement for the applicable level of service in order to participate in RMS.

**5. Term.** The Term begins on the date that we insert in the preamble of this Agreement after we sign it (the "Effective Date") and expires at the end of the fifteenth (15th) Franchise Year. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS. However, if applicable law requires us to offer renewal rights, and you desire to renew this Agreement, then you will apply for a renewal franchise agreement at least six months, but not more than nine months, prior to the expiration date, and subject to such applicable law, you will have to meet our then-current requirements for applicants seeking a franchise agreement, which may include (i) executing our then-current form of license and other agreements, which license and other agreements may contain materially different terms and provisions (such as operating standards and fees) from those contained in this Agreement, (ii) executing a general release of us and our affiliates, in form and substance satisfactory to us, (iii) completing a property improvement plan, and (iv)

11

HOJ EX-C1
Q1/2023

paying a standard renewal fee, if then applicable.

**6.** **Application and Initial Fees.** You must pay us a non-refundable Application Fee of $2,500 which shall be applied to your Initial Fee or Relicense Fee. If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee. If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee. The amount of your Initial Fee or Relicense Fee is **$12,500.00**, $2,500 of which shall be applied from your Application Fee, all of which shall be paid pursuant to the attached Initial Fee Note.

**7.** **Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain Recurring Fees each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Royalty, Marketing Contribution and Room Sales Charges described in Sections 7.1.1 and 7.1.2 are payable three days after the month in which they accrue, without billing or demand. Other Recurring Fees are payable at the times set forth in the Systems Standards. Recurring Fees include the following:

7.1.1 A "Royalty" equal to four and one half percent (4.5%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "Marketing Contribution" as set forth in Schedule C for advertising, marketing, and training and a "Room Sales Charge" for the Reservation System and other related services and programs, accrue from the Opening Date until the end of the Term including during reservation suspension periods. We may use the Marketing Contribution and Room Sales Charges we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services. You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as commissions we pay to travel and other agents for certain reservation and marketing services to generate reservations at the Facility plus a reasonable service fee, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Chain Websites, and/or other reservation systems distribution channels and networks, and fees for additional services and programs. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may change, modify, add or delete the Marketing Contribution and Rooms Sales Charge and/or Additional Fees in accordance with Schedule C.

7.2 You will pay to us "taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes (collectively "Taxes") assessed against us on the Recurring Fees and basic charges by the jurisdictions where the Facility is located, but not including any income tax, franchise or other similar tax for our privilege of doing business in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

HOJ EX-C1
Q1/2023

7.4 If a Transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

7.5 You will report and pay to us all Recurring Fees and other fees and charges on-line via our self-service electronic invoice presentment and payment tool accessible through our Chain intranet. In the electronic on-line environment, payments can be made either through the electronic check payment channel or the credit card payment channel. We reserve the right to change, from time to time, the technologies or other means for reporting and paying fees to us by amending the System Standards Manual.

## 8. Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license

of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.  **Your Assignments, Transfers and Conveyances.**

9.1 **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).  We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.  You may finance the Facility and grant a lien, security interest or encumbrance on it (but not in this Agreement) without notice to us or our consent.  If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your Franchise is subject to Termination when the Transfer occurs.  The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility.  The transferee may not operate the Facility under the System, and you are responsible for performing the post-Termination obligations in Section 13.  You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise.  As a condition of our consent, if your interest in this Agreement is proposed as the collateral of a security interest, then we may require that you and your lender execute a comfort letter in the form described in our then-current disclosure document and that you pay our then-current fee for processing such a request.  Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Financing Documents.**  Neither you, nor any of your Equity Interest owners, shall represent in any proposed financing arrangement to any proposed lender or participant in a private or public investment offering that we or any of our affiliates are or shall be in any way responsible for your obligations or financial projections, if any, set forth in such financing arrangement or investment offering or that we or any of our affiliates are or shall be participating in such private or public investment offering. In addition, any proposed financing arrangement where the service mark "Howard Johnson" appears, or a reference to this Agreement appears, shall contain a disclaimer in bold face type substantially as follows:  THE BORROWER IS A PARTY TO AN AGREEMENT WITH HOWARD JOHNSON INTERNATIONAL, INC. TO OPERATE HOTELS USING THE SERVICE MARK "HOWARD JOHNSON."  NEITHER HOWARD JOHNSON INTERNATIONAL, INC. NOR ITS AFFILIATES OWN ANY SUCH HOTELS OR ARE A PARTY TO THIS FINANCING AND HAVE NOT PROVIDED OR REVIEWED, AND ARE NOT RESPONSIBLE FOR, ANY DISCLOSURES OR OTHER INFORMATION SET FORTH HEREIN.  Also, at least fifteen (15) days prior to closing such financing, you shall submit to us a written statement certifying that you have not misrepresented or overstated your relationship with us and our affiliates or your rights to use the Marks.

9.3 **Conditions.**  We may condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions; however, we will not unreasonably withhold, delay or condition our consent to a Transfer if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment.  If a Transfer is to occur, the transferee (or you, if an Equity Transfer

14

HOJ EX-C1
Q1/2023

is involved) must first complete and submit our application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application Fee and Relicense Fee then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a PIP of improvements we will require after we receive the transferee's Application. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in the alternative, condition our approval of the Transfer on limiting the transferee's term to the balance of your Term, or adding a right to terminate without cause exercisable by either party after a period of time has elapsed. Our consent to the transaction will not be effective until these conditions are satisfied. If we do not approve the Transfer, we may, in our sole discretion, allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12.1. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to a Transfer is not a waiver of (i) any claims we may have against you; or (ii) our right to demand strict compliance from the Transferee with the terms of its agreement.

9.4 **Permitted Transferee Transactions.** Provided that you comply with this section 9.4 you may (i) transfer an Equity Interest to a Permitted Transferee or (ii) effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any guaranty of this Agreement. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained will be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

15

HOJ EX-C1
Q1/2023

**10. <u>Our Assignments</u>.**  We may transfer, assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent.  You are not the third-party beneficiary of any contract with a third party to provide services to you under this Agreement.  We may dissolve, terminate and wind up our business under applicable law but we will transfer the System and this Agreement to a party that will perform the franchisor's obligations and that will assume this Agreement in writing.  We will have no obligations to you with respect to any assigned right or duty after you are notified that our transferee has assumed such rights or duties under this Agreement except those that arose before we assign this Agreement

**11. <u>Default and Termination</u>.**

11.1    **Default.**  You will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement under or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement.  If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2.  We will not exercise our right to terminate if you have completely cured your default during the time allowed for cure, or until any waiting period required by law has elapsed.  In the case of a default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection.  If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection.  We may terminate the this Agreement and any or all rights granted hereunder if you do not timely perform that improvement agreement.

11.2    **Termination.**  We may terminate this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a "Howard Johnson" or "Howard Johnson by Wyndham", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose ownership possession or the right to possession of the Facility or otherwise lose the right to conduct the franchised business at the Location, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material

16

fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests. (14) if a threat to public health or safety exists at the Facility and we reasonably determine that an immediate shut down of the Facility to be necessary to avoid substantial risk of liability or goodwill, (15) you disclose any Confidential Information in violation of this Agreement.

**11.3    Casualty and Condemnation.**

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to Termination and follow the post-Termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient guest lodging facility for 2 years after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority but you will be liable for condemnation payments set forth in Section 12.2.

11.3.3  Any protected territory covenants will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

**11.4    Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue reservation referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Reconnection Fee specified on Schedule C to

17

reimburse us for our costs associated with service suspension and restoration. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. We may also suspend or terminate any temporary or other fee reductions we may have agreed to in this Agreement and/or any stipulations in Section 18 below, and/or cease to provide any operational support until you address any failure to perform under this Agreement. You agree that our exercise of any rights in this Section will not constitute an actual or constructive Termination of this Agreement. All such remedies are cumulative and not in lieu of any other rights or remedies we may have under this Agreement. If we exercise our right not to terminate this Agreement but to implement such suspension and/or removal, we reserve the right at any time after the appropriate cure period under the written notice has lapsed, to, upon written notice to you, Terminate this Agreement without giving you any additional corrective or cure period (subject to applicable law). You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief, without the need for posting any bond. We may litigate to collect amounts due under this Agreement without first issuing a default or Termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults. Once a Termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may cease accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date including or following the Termination or expiration of the Agreement.

**11.5    Your Remedies.**

11.5.1 If or approval or consent is required under this Agreement and we fail to issue our approval or consent within a reasonable time, but in any event not less than 30 days after we receive all of the information we request, and you believe our failure to approve or consent is wrongful, then you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy.

11.5.2 You (and your owners and guarantors) waive, to the fullest extent permitted by law, any right to, or claim for, any punitive or exemplary damages against us and against any affiliates, owners, employees or agents of us, and agree that in the event of a dispute, you will be limited to the recovery of any actual damages sustained and any equitable relief to which you might be entitled.

**12. Liquidated Damages.**

12.1    **Generally.** If we terminate this Agreement under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 10 days following the date of Termination, as Liquidated Damages, an amount equal to the average monthly accrued Recurring Fees during the immediately preceding 12 full calendar months multiplied by 24 (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of Termination, whichever is less). If the Facility has been open for fewer than 12 months, then the amount shall

18

be the average monthly Recurring Fees since the Opening Date multiplied by 24.  You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 10 days after the date of Termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms that you are authorized to operate under Schedule B of this Agreement as of the Termination. In the event that we authorize you to reduce the number of rooms at the Facility after the Opening Date, then we reserve the right to charge Liquidated Damages for those rooms on a per-room basis, either at the time they are removed from the Facility's inventory or at Termination. If we terminate this Agreement under Schedule D before the Opening Date, then you will pay us, within 10 days after you receive our notice of Termination, Liquidated Damages in an amount equal to $1,000 per guest room described on Schedule B. If any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Agreement limits your ability to pay, and our ability to receive, the Liquidated Damages you are obligated to pay hereunder, you shall be liable to us for any and all damages which we incur, now or in the future, as a result of your breach of this Agreement. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2    **Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer (the "Notice Period").  You will pay us Liquidated Damages equal to the average daily Recurring Fees for the one-year period preceding the date of your condemnation notice to us multiplied by 365 less the number of days in the Notice Period. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority).  You will pay no Liquidated Damages if the Condemnation is completed after Notice Period expires. For the sake of clarity, you must continue to pay when due the fees, set forth in this Agreement including under Section 7, and all other agreements with us or our affiliates pertaining to the Facility until Condemnation is completed.

**13. <u>Your Duties At and After Termination</u>.**  When a Termination occurs for any reason whatsoever:

13.1    **System Usage Ceases.**  You must comply with the following "de-identification" obligations. You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual or other brand directives for changing the identification of the Facility.  You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.  If you do not strictly comply with all of the de-identification requirements above, in the System Standards Manual and in our other brand directives, you agree to pay us a royalty equal to $2,000 per day until de-identification is completed to our satisfaction.

13.1.1 **Cancel Assumed Name Certificate.**  You shall take such action as may be necessary to

19

DocuSign Envelope ID: 3249E3B7-DA99-40DE-8401-C8DF682D177A

cancel any assumed name or equivalent registration which contains the name "Howard Johnson" or any variation thereof or any other Mark. You shall provide us with evidence to our satisfaction of compliance with this obligation within thirty (30) days after Termination or expiration of this Agreement.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement and any related ancillary agreements with us or our affiliates pertaining to the Facility within 10 days after Termination. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours. If you have not completed you de-identification obligations to our satisfaction, we may paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after Termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you. You will transfer to us any domain names you own that include any material portion of the Marks.

13.3 **Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to Termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions. You acknowledge and agree that once a Termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may stop accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date on or after the Termination or expiration of this Agreement. In addition, when this Agreement terminates or expires for any reason, we have the right to contact those individuals or entities who have reserved rooms with you through the Central Reservation System to inform them that your lodging facility is no longer part of the System. We further have the right to inform those guests of other facilities within the System that are near your Facility in the event that the guests prefer to change their reservations. You agree that the exercise of our rights under this Section will not constitute an interference with your contractual or business relationship.

13.4 **Survival of Certain Provisions.** Sections 3.6 (as to audits, for 2 years after Termination), the first two sentences of Section 3.11, Section 7 (as to amounts accruing through Termination), and Sections 8, 11.3.2, 11.4, 12, 13, 15, 16 and 17 survive Termination of this Agreement. Additionally, all covenants, obligations and agreements of yours which by their terms or by implication are to be performed after the Termination or expiration of the Term, shall survive such Termination or expiration.

HOJ EX-C1
Q1/2023

**14. <u>Your Representations and Warranties</u>.**  You expressly represent and warrant to us as follows:

14.1  **Quiet Enjoyment and Financing.**  You own, or will own prior to commencing improvement, or lease, the Location and the Facility.  You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility.  You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.  If you are an entity, all of your owners or any of the individuals disclosed on Schedule B, including any subsequent person or entity that becomes an owner at any time after the Effective Date, shall sign our then-current form of personal guaranty guaranteeing all of your obligations under this Agreement, unless expressly waived by us in our sole discretion.

14.2  **This Transaction.** You have received our FDD at least 14 days before signing this Agreement or paying any fee to us. You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement.  You have obtained all necessary approvals of your owners, Board of Directors and lenders.  No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement.  Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject.  Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application.  You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.  You represent and warrant to us that the information you provided in your Application is true, correct and accurate.  To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3  **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

**15. <u>Proprietary Rights</u>.**

21

15.1    **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing, provided such filing is for the full name of the property, including any secondary designation. You agree (i) to execute any documents we request to obtain or maintain protection for the Marks; (ii) use the Marks only in connection with the operation of the Facility as permitted by the System Standards; and (iii) that your unauthorized use of the Marks shall constitute both an infringement of our rights and a material breach of your obligations under this Agreement. You shall not, and shall not assist other to, challenge or otherwise contest the validity or ownership of the System or Marks.

15.2    **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No good will shall attach to any secondary designator that you use.

15.3    **Other Locations and Systems.**  We and our affiliates each reserve the right to own, (including through a joint venture or otherwise) in whole or in part, manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee), or provide services to (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, Approved Supplier lists, franchise sales personnel (or independent franchise sales representatives).

15.4    **Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon Termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and

HOJ EX-C1
Q1/2023

for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone have the right to control any proceeding or litigation involving use of all or any part of the System, including settlement. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material. We also have the right to keep all sums obtained in settlement or as a damages award in any proceeding or litigation without any obligation to share any portion of the settlement sums or damages award with you. You will cooperate with our efforts to resolve these disputes.

15.6 **The Internet and other Distribution Channels.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a Mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards or with our written consent. You will assign to us any such identification at our request without compensation or consideration. You may not purchase any key words for paid search or other electronic marketing that utilizes any Mark without our written consent. You must make available through the Reservation System and the Chain Website all rates you offer directly to the general public or indirectly via Internet marketing arrangements with third parties. You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet or distribution marketing materials must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. <u>Relationship of Parties.</u>

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment,

23

HOJ EX-C1
Q1/2023

selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2    **Joint Status.**  If you are comprised of two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly.  The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1    **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect.  If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected.  However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2    **Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3    **Notices.**  Notices will be effective if in writing and delivered  (i) by delivery service, with proof of delivery; (ii) by first class, prepaid certified or registered mail, return receipt requested; (iii) by electronic mail, posting of the notice on our Chain intranet site or by a similar technology; or (iv) by such other means as to result in actual or constructive receipt by the person or office holder designated below, to the appropriate party at its address stated below or as it may otherwise designate by notice.  You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Howard Johnson International, Inc.:
22 Sylvan Way, Parsippany, New Jersey  07054
Attention: Vice President - Contracts Compliance
E-mail address: Suzanne.Fenimore@wyndham.com

Your Name: **5858 INTERNATIONAL DRIVE LLC**
Your Address: **1135 E King Ave, Kingsland, GA 31548**
Attention: **Hardik Patel**
Your E-Mail Address: **hpatel@namishllc.com**

17.4    **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement

24

HOJ EX-C1
Q1/2023

or collect amounts owed under this Agreement.

17.5    **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

17.6    **Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation which shall be conducted by a mutually acceptable and neutral third-party organization.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4  **WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5  Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action.  You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

17.7    **Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

17.7.1  **You have read our disclosure document for prospective franchisees ("FDD") and independently evaluated and investigated the risks of investing in the hotel industry generally and purchasing this franchise specifically, including such factors as current and potential market conditions, owning a franchise and various competitive factors**.

17.7.2  **Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement**

25

that is not written in this Agreement or in the FDD. **You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

17.7.3 **This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise other than the representations set forth in the FDD. Notwithstanding the foregoing, no provision in any franchise or membership agreement, or any related agreement, is intended to disclaim the express representations made in the FDD.**

17.7.4 **You acknowledge that no salesperson has made any promise or provided any information to you about actual or projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement and signed by us.**

17.8    **Force Majeure**. Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from any of the following events which first occur following the Effective Date: (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, acts of terrorism or riot; (c) legal restrictions that prohibit or prevent performance; or (d) any other similar event or cause beyond the control of the party affected. Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

17.9    **No Right to Offset**. You acknowledge and agree that you will not withhold or offset any liquidated or unliquidated amounts, damages or other monies allegedly due you by us against any Recurring Fees or any other fees due us under this Agreement.

**18. Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1 **Development Incentive**

18.1.1 You will be eligible to participate in our Development Incentive program if (i) you have signed and delivered this Agreement by March 30, 2024; (ii) you and your guarantors, as co-makers, have signed and returned to us the Development Incentive Note (the "Note") that accompanies this Agreement; (iii) you have accepted the PIP, if we have provided you with one;

26

HOJ EX-C1
Q1/2023

and (iv) you open the Facility in compliance with the PIP and Schedule D. The anticipated amount of the Development Incentive will be $400,000, based on a formula of $1,515 per guest room multiplied by the number of guest rooms specified on Schedule B. The actual amount of the Development Incentive to be disbursed, if any, will be based on the number of guest rooms at the Facility on the Opening Date. If the number of guest rooms changes with our consent, we will adjust the amount of the Development Incentive accordingly. You authorize us to modify the principal amount of the Note based on this Section and the number of guest rooms at the Facility, as well as our assessment of your investment in the Facility.

18.1.2 The Development Incentive will be disbursed after (i) you have passed a final credit/financial review with no material adverse changes in your or your guarantors' business, finances, legal, litigation, or bankruptcy status or the finances or the financial viability of the Facility since preliminary approval; (ii) the Facility has officially opened with our consent; and (iii) you have completed all required pre-opening improvements specified in this Agreement. The date on which we have disbursed the Development Incentive is the "Funding Date."

18.1.3 The Development Incentive is a loan that is not subject to repayment, and will not bear interest, except in the case of default or acceleration. Your guarantors must co-sign the Note with you. If any of your guarantors is a resident of a community property state or certain other states, his or her spouse also must co-sign the Note. On each anniversary of the Opening Date that follows the Funding Date, an amount equal to the original amount of the Development Incentive divided equally by the number of complete Franchise Years remaining, as of the Funding Date, between the Funding Date and the conclusion of the Term, will be forgiven without payment, such that the Note will have been completely forgiven without payment at the conclusion of the Term. If you engage in or suffer a Transfer, you must repay the balance of the Note unless the transferee and its principals assume the obligation to repay the Development Incentive and provide us with such other security as we may require in our sole discretion. We reserve the right to conduct a credit investigation of the transferee and its owners at all times and withdraw the offer of the Development Incentive before we issue or disburse the Development. Incentive. If there is a conflict between the terms of Section 18.1 and the Note, the terms of the Note will prevail.

18.2 **Prior Affiliation.** You agree that, prior to the Opening Date, you will provide us with a copy of the written termination notice (or other written evidence satisfactory to us in our sole discretion) that any prior hotel or brand affiliation for the Facility and the Location has terminated. You acknowledge that we will not authorize you to open the Facility under the System until you have provided such notice. In addition, the Opening Date will not occur before March 30, 2024, the date you have indicated is the date you cease operation as part of another hotel chain. We may, in our sole discretion (subject to applicable law), terminate this Agreement by giving written notice to you if you do not provide satisfactory proof of termination of the prior hotel affiliation prior to the Opening Date.

18.3 **Conversion to Trademark Collection and Days Inn.** You have requested the right to convert the Facility to a dual brand facility franchised by two of our affiliates, TMH WORLDWIDE, LLC. and DAYS INNS WORLDWIDE, INC. (the "Dual Brand Franchisors"). Accordingly, on or before the Effective Date, you will also execute franchise agreements with the Dual Brand Franchisors to convert the Facility to a Trademark Collection ®

27

HOJ EX-C1
Q1/2023

DocuSign Envelope ID: 3249E3B7-DA99-40DE-8401-C8DF682D177A

and Days Inn ® guest lodging facility (the "Trademark Collection Agreement" and "Days Inn Agreement"). You acknowledge your obligation to maintain and operate the Facility in compliance with System Standards at all times including, but not limited to, your obligation to perform any routine or necessary maintenance. Notwithstanding the foregoing, we acknowledge that the Facility will undergo renovations pursuant to Property Improvement Plans attached to the Trademark Collection and Days Inn Agreements (the "Trademark Collection PIP" and " Days Inn PIP"). Provided that you are completing renovations in accordance with the Trademark Collection PIP and Days Inn PIP, then such renovations shall not constitute a default of this Agreement. However, if the Trademark Collection Agreement or Days Inn Agreement is terminated and this Agreement remains in full force and effect, then we will require you to comply with all System Standards under this Agreement and shall have the right to issue a PIP under this Agreement for any improvements required to bring the Facility into compliance with System Standards.

18.4 **Your Renovation Obligation Deadlines.** Notwithstanding anything to the contrary in the Schedule D, the PIP or elsewhere in this Agreement, your deadline to complete the conversion and renovation of the Facility and open the Facility will be September 30, 2025. If we terminate this Agreement as a result of your failure to timely complete your renovation obligations and open by the date herein, then you will be required to pay Liquidated Damages as specified in Section 12.1. Our right to receive other amounts due under this Agreement is not affected by your obligation to pay Liquidated Damages. In addition, your obligation to pay Liquidated Damages under this Section shall not affect any requirement you may have to pay Liquidated Damages for any termination of its franchise agreement with the Dual Brand Franchisors with respect to the Facility. For the avoidance of doubt, all pre-opening PIP items must be timely completed before you are authorized to open the Facility under this Agreement and are separate and independent from your renovation obligations under the Trademark Collection PIP and Days Inn PIP.

**[SIGNATURES FOLLOW NEXT PAGE]**

28

HOJ EX-C1
Q1/2023

IN WITNESS WHEREOF, the parties have executed this Agreement on this <u>30</u> day of <u>March</u>, 20 <u>24</u> and agree to be bound by the terms and conditions of this Agreement as of the Effective Date.


**WE:**
**HOWARD JOHNSON INTERNATIONAL, INC**.

By: _____
      Shilpan Patel
      Executive Vice President
      North America Franchise Operations


**YOU**, as franchisee
**5858 INTERNATIONAL DRIVE LLC**

By: _____
Name: Hardik Patel
Title: (Managing) Member

29

**APPENDIX A**

DEFINITIONS

Additional Fees means the fees charged under Section 7.1.2 other than the Marketing Contribution and Room Sales Charge.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Chain Websites means any current or future consumer or business websites, mobile websites or mobile applications that we or our affiliates develop for booking reservations for and/or providing information about Chain Facilities, and any future equivalent technology.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes all other system standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the property management system software and other applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and

Appendix A - 30

DocuSign Envelope ID: 3249E3D7-DA99-40DF-8401-C8DF682D177A

configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Effective Date means the date we insert in the preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction or series of transactions in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes in one transaction or a series of transactions. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner in one transaction or a series of transactions. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date in one transaction or a series of transactions. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority in one transaction or a series of transactions.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Appendix A - 31

HOJ EX-C1
Q1/2023

DocuSign Envelope ID: 3249E3B7-DA99-40D5-8401-C8DF682D177A

<u>Franchise</u> means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

<u>Franchise Year</u> means:

   (i)   *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one-year period; or

   (ii)   *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one-year period.

<u>Gross Room Revenues</u> means gross revenues attributable to or payable for rentals of guest (sleeping) rooms at the Facility, including all credit transactions, whether or not collected, guaranteed no-show revenue, net of chargebacks from credit card issuers, any proceeds from any business interruption or similar insurance applicable to the loss of revenues due to the non-availability of guest rooms and any miscellaneous fees charged to all guests regardless of the accounting treatment of such fees.  Excluded from Gross Room Revenues are separate charges to guests for Food and Beverage (including room service);  actual telephone charges for calls made from a guest room; key forfeitures and entertainment (including Internet fees and commissions); vending machine receipts; and federal, state and local sales, occupancy and use taxes.  Gross Room Revenue is further described in System Standards.<u>Guest Information means </u>any names, email addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including without limitation stay information, that either you or we or a person acting on behalf of you, us, or both you and us, receives from or on behalf of the other or any guest or customer of the Facility or any other third party.

<u>Improvement Obligation</u> means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in  Schedule D.

<u>Indemnities</u> means us, our direct and indirect parent, subsidiary and affiliate entities, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

<u>Initial Fee</u> means the fee you are to pay for signing this Agreement as stated in Section 6 if the Agreement is for a new construction or conversion franchise.

<u>INOC</u> means the International Operators' Council, Inc., a Georgia non-profit corporation, its successors and assigns as the official organization of Chain franchisees.

<u>Liquidated Damages</u> means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Appendix A - 32

HOJ EX-C1
Q1/2023

<u>Location</u> means the parcel of land situated at **5858 International Dr, Orlando, FL 32819-8204,** as more fully described in Schedule A or such other documentation that reflects the legal description of the land on which the Facility is located.

<u>Losses and Expenses</u> means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnities, including guest refunds, or (ii) incurred by any and all Indemnities to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($100.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

<u>Loyalty Program Charge</u> means the fee you pay us under Section 3.4.4 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities.

<u>Maintenance Standards</u> means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

<u>Marketing Contribution</u> means the fee you pay to us under Section 7.1.2 and Schedule C, as amended, for advertising, marketing, training and other services.

<u>Marketing Standards</u> means the standards specified from to time in the System Standards for marketing programs in which the Facility participates and your use of the Marks in marketing or promoting the Facility.

<u>Marks</u> means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Howard Johnson" and other marks (U.S. Reg. Nos.714,495; 2,010,109; 2,239,260; 2,351,850; 2,351,852; 2,351,849; 2,413,621; 2,351,851; 3,663,546; 3,744,506; 5,507,203; 5,608,685; and 5,624,202) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

<u>Marks Standards</u> means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

<u>Material Renovation</u> means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.14.

<u>Material Renovation Notice</u> means the written notice from us to you specifying the Material Renovation to be performed and the dates for commencement and completion given under Section 3.14.

Appendix A - 33

Opening Date has the meaning specified in Schedule D.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Property Improvement Plan or PIP means the list of upgrades, updates, improvements, repairs, repainting, refurbishing, replacements, and other requirements we prepare that are required to be completed pursuant to this Agreement.

Prototype Plans has the meaning specified in Schedule D for New Construction Facilities.

Reconnection Fee means the fee you pay us when we restore the Central Reservation System service after such service has been suspended because you default under this Agreement or for any other reason, in the amount specified in Schedule C.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, Marketing Contributions, Room Sales Charges, and other reservation fees and charges as stated in Section 7.

Reinspection Fee means the fee you must pay to us under Section 3.7 if you do not complete your PIP on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Relicense Fee means the fee your transferee pays to us when a Transfer occurs or the fee you pay to us if you are renewing an existing franchise.

Reservation System or "Central Reservation System" means back end technology platform and application used by us to accept, store and/or communicate reservations for the Chain Facilities. The Reservation System is separate from, but enables, the booking of reservations for Chain Facilities through various distribution channels such as the Chain Websites, the GDS and other distribution channels.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Room Sales Charge means the fees set forth in Section 7.1.3 and Schedule C, as modified in accordance with this Agreement for reservation services and other charges.

Appendix A - 34

Royalty means the monthly fee you pay to us for use of the System under Section 7.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for participating in the Chain and using the System published in the System Standards Manual, or elsewhere, including but not limited to Design Standards, FF&E Standards, Marks Standards, Marketing Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Manual, and any other manual or written directive or communication we issue or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

Appendix A - 35

HOJ EX-C1
Q1/2023

"We", "Our" and "Us" means and refers to Howard Johnson International, Inc., a Delaware corporation, its successors and assigns.

HOJ EX-C1
Q1/2023

# SCHEDULE A

(Legal Description of Facility)

Schedule A - 37

## SCHEDULE B

PART I:        YOUR OWNERS:

Name                                    Ownership
                                        Percentage

**Dylan Jag Pathirana**        **20%**
**Shmuel Bonnardel**           **20%**
**Dylan Amin**                 **20%**
**Hardik Patel**               **40%**

PART II:        THE FACILITY:

Primary designation of Facility: Howard Johnson Inn

Number of approved guest rooms: **264**

DS
HP
_____
Initial

Schedule B - 38

**HOWARD JOHNSON INTERNATIONAL, INC.**
**SCHEDULE C**
**April 2023**

## I.    Marketing Contribution

The Marketing Contribution is two percent (2%) of Gross Room Revenues. We may increase or adjust such Marketing Contribution from time to time to cover costs (including reasonable direct or indirect overhead costs) related to the services and programs referenced in Section 7.1.2 if either approved by the Board of Directors of the INOC or its successor sanctioned as such by us or approved by a majority vote (which shall be counted on the basis of one Facility, one vote) of INOC members in good standing, present and voting at a general membership meeting or at a special meeting called for that purpose by the Board of Directors upon at least 15 days' notice from us.

## II.    Room Sales Charge

The Room Sales Charge is two percent (2%) of Gross Room Revenues. Notwithstanding the above, we may change the Room Sales Charge on a Chain-wide basis, after 60 days written notice to franchisees, to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs.

## III.    Additional Fees

### A.    Loyalty Program Fees

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is 4.25% - 5.5% of any amounts on which members of the Loyalty Program earn points or other program currency at the Facility as defined in the Front Desk Guide or any other program rules, which are System Standards. The Loyalty Program Charge may vary within the stated range based on the number of Wyndham Rewards valid enrollments obtained by the Facility during a defined measurement period, as described in the Front Desk Guide. We will proactively match and award members with points or other program currency they earn at the Facility even if they do not present their Wyndham Rewards membership card upon check–in. You will be billed monthly in arrears for points or other program currency awarded to members during the preceding month. If you do not achieve a certain number of Wyndham Rewards valid enrollments, you must pay us a Missed Valid Enrollment Fee of up to $400 per month as described in the Front Desk Guide. If you do not process a member's points in a timely manner and we must resolve the issue with the member, we will charge you a Loyalty Member Services Administration Fee as described in the Front Desk Guide.

### B.    Customer Care Fee

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. We may also contact you, at our discretion, if we become aware of any other complaints about the Facility

Schedule C - 39

HOJ EX-C1
Q1/2023

including complaints which are posted on third-party travel websites, distribution channels, blogs and social networks, or other forums to which you do not respond. If you do not respond to and resolve any complaint to the satisfaction of the guest within the time frame we establish in System Standards  after we refer it to you, we will charge you a "Customer Care Fee" of $195, plus the costs we incur to settle the matter with the guest. The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages.   All guest complaints remain subject to indemnification under this Agreement.

## C.      Best Rate Guarantee Program

You must (i) make available to us through the Central Reservation System and the Chain Websites room rates for the Facility equivalent to those you offer to the general public directly or indirectly via third parties that you authorize to offer and sell reservations for the Facility's guest rooms, and (ii) participate in the Chain's Best Rate Guarantee Program according to its published requirements. If we, or a guest, identifies a publicly available rate for the Facility that is lower than the rate that you have provided to us for the same date, then we may charge you a Processing Fee, currently $195, to reimburse us for our administrative charges to process each discrepancy.

## D.      Reconnection Fee

If we suspend Central Reservation System service because of your default under this Agreement or for any other reason, then you must pay us the Reconnection Fee set forth in the System Standards before we restore service. Currently, the Reconnection Fee is $4,000.

## E.      Other Fees, Commissions and Charges

You will pay us a fee, as applicable, for reservations for your Facility from certain distribution partners processed through various reservation channels. "GDS Fees" are assessed for qualified reservations processed through any global distribution system ("GDS") or through any Internet website or other booking source powered by a GDS. "Internet Booking Fees" are assessed for qualified reservations processed through an Internet website connected through an alternate distribution system. "Third Party Channel Fees" are assessed for qualified reservations coming from our partners directly or indirectly to our distribution platform. We will establish the amount of the GDS, Internet Booking Fees, and Third-Party Channel Fees from time to time based on the fees these channels charge us and/or our own costs (including overhead) for providing these services.  Some of our distribution partners may charge a commission on reservations you receive through these reservation channels and, if we pay such commission on your behalf, you will reimburse us and pay our service charge of 1.5% of commissionable revenue. Upon written notice to you, we may alter, change, modify, remove or add new fees as existing reservation channels are modified or partners are added to existing channels or new reservation channels are established.

You will also pay commissions for (a) reservations booked by "Agents" and/or (b) qualified reservations consumed by members of affinity groups and organizations that participate

Schedule C - 40

HOJ EX-C1
Q1/2023

in our Member Benefits program. You must pay our service charge of 1.5% of commissionable revenue, if applicable. "Agents" include, but are not limited to, travel agents, on-line travel and referral websites, travel consortia, travel management companies, and global sales agents, as well as digital media linking to Chain websites and unique call center numbers purchased by the pay-for-performance program ("PFP"). These commission payments may go to the Agent, affinity group or organization in whole or a portion of the payment may be allocated to various marketing activities and/or to our Global Sales Organization to offset its administrative and overhead costs for supporting the Member Benefit Program and other programs that generate room nights at Chain Facilities, or, in the case of the PFP program, to fund purchases of additional digital media directing consumers to Chain websites and unique call center numbers.

Under our Everyone Sells Group Referrals Program, Chain Facilities may receive leads from other Chain Facilities, facilities of our affiliates and employees of our parent company or its predecessor. For this business, we charge you a referral commission of 10% of the commissionable revenue on qualifying reservations. When the referring party is a Chain Facility or facility of an affiliate 7% of the referral commission is paid to the referring facility; and when the referring party is an employee of our parent company or its predecessor, 6% of the referral commission is paid to the employee. The remaining 3% and 4%, as applicable, is distributed to our Global Sales Organization to offset its administrative and overhead costs for supporting Everyone Sells Group Referrals Program.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services, programs and distribution channels at any time upon not less than thirty (30) days' written notice.

Schedule C - 41

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

This Addendum applies if you are converting an existing guest lodging facility to a Chain Facility.

## 1. YOUR IMPROVEMENT OBLIGATION.

**1.1 Generally.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with this Agreement and System Standards. You must provide us with proof that you own or lease the Facility by the earlier to occur of (a) 30 days after the Effective Date or (b) the Opening Date. You must maintain control of the Facility consistent with such documentation during the Term. You must begin renovation of the Facility no later than 30 days after the Effective Date. Time is of the essence for the completion of the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted. All renovations must comply with System Standards, any Approved Plans, this Agreement and the PIP. Your general contractor or you must carry the insurance required under this Agreement during renovation.

**1.2 Pre-Opening Improvements.** You must complete all renovations specified as "prior to opening" on the PIP before we consider the Facility to be ready to open under the System. The deadline for completing the pre-opening phase of conversion and the renovations shall be as specified on any PIP attached to this Agreement, but is otherwise 90 days from the Effective Date. You must continue renovation and improvement of the Facility after the Opening Date if the PIP so requires. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening improvements of the Facility by the dates specified on the PIP or otherwise and you fail to do so within five days after we send you written notice of default, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System in violation of this Schedule and you fail to cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. If we choose to grant an extension of any deadline, including the Facility's Opening Date, you will pay us a non-refundable extension fee of $5,000 .  This fee will be payable to us within ten (10) days of the Opening Date. You must also pay us the Reinspection Fee described in Section 3.7 if you fail to complete the Improvement Obligation by the deadline established in the PIP or otherwise and our representatives must return to the Facility to inspect it. In limited circumstances, you may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our prior written approval. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Section 11, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

Schedule D Conversion - 42

DocuSign Envelope ID: 3249E3B7-DA99-40DF-8491-C8DF682D177A

### 1.3    Improvement Plans.

(a) <u>Generally</u>.  You will create plans and specifications for the work described in Section 1.1 of this Schedule D (based upon System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like, who must exercise their own independent professional care, skill and diligence in the design and renovation of your Facility.  Our review does not cover technical, architectural or engineering factors relating to the existing structure at the Location, the validity of conversion given the existing structure, or compliance with federal, state or local laws, regulations or code requirements, for which your architect is responsible.  You must allow for 10 days of our review each time you submit plans to us.  We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after the renovation.  Any material variation from the Approved Plans requires our prior written approval.  Approved Plans must incorporate design elements as set forth in System Standards.  You may purchase furniture, fixtures, equipment and other supplies that you may need during renovation of the Facility through our affiliate, Worldwide Sourcing Solutions, Inc.'s "Approved Supplier" program.  If you choose to purchase certain design items from a supplier other than an Approved Supplier, we may charge you a Custom Interior Design Review Fee, currently $6,000.  This fee will be assessed for our review of custom interior design drawings which you must submit to us to ensure compliance with our interior design standards.   We may offer other optional architectural and design services for a separate fee.  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request.

(b)  <u>Deviation from Approved Plans</u>. We may inspect the work while in progress without prior notice.  We may direct you to change the work in progress if it deviates from the Approved Plans or System Standards and may terminate this Agreement if you fail to comply with any such direction.  If you encounter unexpected issues with demolition, renovation, reconstruction or refurbishment of the existing structure which make continuation of the project using the Approved Plans not commercially feasible, you must notify us immediately and provide a complete written report on the matter, including any proposal to modify the Approved Plans you believe is appropriate together with your estimate of the projected costs of meeting the Approved Plans.  We will evaluate the report, your proposal and the situation and respond within 30 days to any request to vary the Approved Plans, or provide suggestions for resolving the issues in such a manner as will be acceptable to us.  Neither party shall terminate this Agreement unless and until such notice is given and the 30-day period shall have elapsed without agreement on modifying the Approved Plans.  If either party then decides to terminate this Agreement, you will pay, if then not paid, and we will retain, the full Initial Fee. Provided that we determine in our reasonable discretion that continuation of the project using the Approved Plans or any modification of the Approved Plans is not commercially feasible then Liquidated Damages shall not be owed.

### 2.  ONBOARDING AND MANDATORY SERVICES AND FEES

Schedule D Conversion - 43

**2.1 Onboarding Services**. We will provide training through various on-line courses on subjects such as quality assurance, housekeeping, preventative maintenance, customer service, and the request for proposal process. A member of our field team will also assist with property operations topics including Systems Standards and use of the Chain's intranet site. These onboarding services are provided as part of the Initial Fee required in Section 6.

**2.2 Mandatory Support Services and Fees.** We will arrange for delivery of an initial supply of key property supplies that assist the Facility with meeting System Standards and/or participating in key marketing initiatives as reasonably determined by us. You will pay $500 for your initial supplies. We will arrange to have our preferred photography provider take digital photographs of the in accordance with System Standards for use on our Chain Websites, third party travel websites and various marketing media and such photographs will be owned by us. You will pay $2,450 for the required photo package, plus $225 for each additional room type that must be photographed. If we allow you to open the Facility before your installation of permanent signage, we will arrange for one of our Approved Suppliers to provide temporary exterior signage for the Facility in the form of a Mark-bearing bag to cover your existing primary free standing sign. You will pay $1,000 for this temporary signage. If you install permanent signage from an Approved Supplier for the Facility on or before the Opening Date, or if within thirty (30) days of the Opening Date you sign a quote and pay the required deposit for permanent signage from the vendor assigned to provide temporary signage for the Facility, then we shall issue you a credit of $1,000. We will provide training for your general manager as set forth in Section 4.1 of the Agreement if he/she attends the training by the deadline set forth in Section 4.1. The tuition for this mandatory training program is currently $2,250. If you are required to complete an architectural PIP, we will provide training for your staff at your Facility. This training is conducted on site at your Facility and depending on your room count will last between 1- 5 days and cost between $750 - $3,750. If you have not previously owned a Chain facility or any hotel licensed by one of our affiliates, and are required to complete an architectural PIP, we will also provide owner training. There is no fee for the first attendee of the program, which may run for up to 3 days at a location we designate. You may choose to send additional attendees for a charge of $1,000 each. You are also responsible for facilitator, or your, travel, lodging and meal expense for on-site and owner training. We will provide a comprehensive curriculum of hotel operations training. The cost of ongoing learning and development support for your entire hotel team is $600 per year.

## 3. DEFINITIONS.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

HOJ EX-C1
Q1/2023

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES


**[Property Improvement Plan Attached]**

HOJ EX-C1
Q1/2023

## GUARANTY

To induce Howard Johnson International, Inc., its successors, assigns and affiliates ("you") to sign the franchise agreement with the party named as the "Franchisee" (the "Franchise Agreement") to which this Guaranty is attached pertaining to the Unit indicated above, and the ancillary agreements to the Franchise Agreement (such ancillary agreements and the Franchise Agreement, collectively, the "Agreements") the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreements are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreements, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform each unpaid or unperformed obligation of Franchisee under the Agreements. Without affecting our obligations under this Guaranty, without notice to us, you may extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. We waive notice of amendment of the Agreements. We acknowledge that the provisions of Section 17 of the Franchise Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, apply to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Franchise Agreement.

GUARANTORS:

Name: Shmuel Bonnardel
Address: 2827 Forest Mill Lane, Jacksonville, FL 32257

Name: Hardik Patel
Address: 1135 E King Ave, Kingsland, GA 31548

Name: Dylan Jag Pathirana
Address: 5950 Canoga Ave
Suite 500, Woodland Hills, CA 91367

HOJ EX-C1
Q1/2023

DocuSigned by:

574E50D5D270447...

Name: Dylan Amin

Address: 300 Warren Mason Blvd, Brunswick, GA 31520

HOJ EX-C1
Q1/2023

# Exhibit B

Facility: **Orlando, FL**
Unit No.: **09575-25157-08-HOJ**
Brand: **Howard Johnson**

## MASTER INFORMATION TECHNOLOGY AGREEMENT

This Master Information Technology Agreement ("**Agreement**"), effective as of March 30 , 20 24 (the "**Effective Date**"), by and between **Howard Johnson International, Inc.,** a Delaware corporation, (including its Affiliates, "**Service Provider,**" "**we,**" "**our,**" or "**us**"), and **5858 INTERNATIONAL DRIVE LLC**, a Florida limited liability company ("**Franchisee,**" "**you,**" or "**your**"), governs your access to and use of the Products and/or Services as described herein. We and you shall each be referred to herein as a "**Party**" and together as the "**Parties**" to this Agreement. This Agreement pertains exclusively to the lodging facility located at **5858 International Dr, Orlando, FL 32819-8204** (the "Location").

For and in consideration of the mutual covenants, representations and promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the foregoing and as follows:

1.    **GENERAL**

**1.1**    **Definitions.** Capitalized terms used herein shall have the meanings ascribed to them in this Agreement, including Attachment 1.1, or in any Schedules attached hereto, which may be updated or supplemented by us from time to time. All other capitalized terms used but not defined herein shall have the meanings ascribed to them in the Franchise Agreement between us and you and are incorporated herein by reference.

**1.2**    **Conflicts in Interpretation.** The following order of precedence shall be followed in resolving any inconsistencies between the terms of this Agreement and the terms of any Schedules attached hereto: (a) first, the terms of the Schedules attached to this Agreement; and (b) second, the terms contained in the body of this Agreement, provided that no order of precedence shall be applied among such Schedules.

2.    **DESCRIPTION OF PRODUCTS AND SERVICES; SCHEDULES; ACTIVITIES**

**2.1**    **Products and Services**. During the Term of this Agreement, and in exchange for you paying us the Fees described in this Agreement, we (or our authorized Third-Party Product or Service providers) will (a) perform for you various consulting, information technology, development, data processing, webhosting, maintenance, and support services ("**Services**"); and/or (b) license, lease, sell or otherwise provide you with equipment, materials, software (including Software-as-as Service and/or cloud-based software ("**SaaS**")), and other such items ("**Products**"), as are more fully described in this Agreement (including any applicable Schedule). The Products and Services consist of Products and/or Services that (x) we provide to you directly (including our Hotel Technology Client Support team); or (y) we provide to you on behalf of our Third-Party Product or Service providers.

**2.2**    **Schedules**. Any and all Products and/or Services provided by us to you under this Agreement shall be set forth in a written schedule(s) to be mutually agreed-upon and signed by you and us ("**Schedule**"). Such Schedule shall, at a minimum: (a) incorporate this Agreement by reference; (b) describe the Products and/or Services being provided to you; (c) describe the applicable Fees for such Products and/or Services; and (d) detail any special terms and conditions applicable to you or your use of the applicable Products and/or Services.

MITA
Q1/2023

1

**2.3    Collection of Fees.** We have entered, or in the future may enter, into an arrangement with Third-Party Product or Service providers wherein we will collect fees from you for those respective Third-Party Products and/or Services. If we do so, you will see such fees reflected on the monthly invoice you receive from us and, we may retain a percentage of fees collected to reimburse us for our costs associated with such collection. We may modify this payment arrangement in our sole discretion from time to time.

**3.    <u>GRANT OF RIGHTS</u>.**

**3.1    License.** Subject to payment of all applicable Fees, we hereby grant you a limited, non-transferable, non-exclusive license, to access, use and display the Products and/or Services, as applicable, solely for the Permitted Use, solely by your Permitted Users, and solely in accordance with the terms and conditions set forth in this Agreement and/or any applicable Schedule(s).  For Products and/or Services that have a term associated with them, the license granted to you shall be limited to the term identified in an applicable Schedule.

**3.2    Restrictions.** In addition to any terms, conditions or restrictions set forth in this Agreement and any applicable Schedule, you shall not: (a) permit any person or entity, other than a Permitted User, to access or use the Products and/or Services; (b) create or attempt to create any derivate works based on the Products and/or Services; (c) copy, frame or mirror any part or content of the Products and/or Services; (d) disassemble, decompile, reverse engineer or otherwise attempt to recreate the Products and/or Services; or (e) access, use or otherwise manipulate the Products and/or Services in order to create a competitive product or service or to copy any features, functions or graphics of the Products and/or Services. Service Provider may, at its sole discretion and without prior notice to you, conduct audits of your hardware, computer systems and applications, including audits by electronic and remote means, to verify conformance with this Agreement and/or any Schedule.  You shall not load, store or otherwise use any products and/or software on or with the Products and/or Services, without Service Provider's prior written consent, as the use of such products and/or software may adversely affect the operation and functionality of the Products and/or Services. If you violate this Section, the warranties set forth in this Agreement shall be void, and you shall be solely responsible for the cost of repair or replacement of the Products and/or Services, if any.

**3.3    Title.** Except as provided in Section 3.1, all rights, title, interests in and to, and ownership of, the Products and/or Services, including all Intellectual Property rights therein, are and shall remain with us, our Affiliates and/or any Third-Party Product or Service providers who license or otherwise provide Products and/or Services to us or you. You shall at all times protect and defend us, our Affiliates, and/or any Third-Party Product or Service providers who license or otherwise provide Products and/or Services, at your own cost and expense, against all claims, liens and legal processes of your creditors arising out of your use of the Products and/or Services.

**3.4    Suggestions.** Any suggestions and feedback relating to the Products and/or Services or relating to any desired or recommended additional features, enhancements or modifications to the Products and/or Services that are provided by or through you or your Affiliates to us or our Third-Party Product and Service providers shall be the exclusive property of us or our Third-Party Product and Service providers, as applicable, as of the date it is offered to us or our Third-Party Product and Service providers, as applicable, and you and your Affiliates hereby assign all rights and interests in and to such suggestions and feedback to us or our Third-Party Product and Service providers, as applicable, as of the date it is offered to us or our Third-Party Product and Service providers, as applicable.

**3.5    Access Credentials.** We, directly or indirectly, may provide Access Credentials to you. We may, from time to time and in our sole discretion, change or require you to change your Access

MITA
Q1/2023

2

Credentials. You must follow all security procedures and protocols that we may from time to time establish or modify. You shall not permit the Products and/or Services to be accessed in violation of the security procedures and protocols as set forth herein or as we may otherwise establish. You shall safeguard any Access Credentials that we provide to you as a trade secret, and shall reveal such information only to Permitted Users on a need-to-know basis. You shall immediately inform us if you have knowledge or a reasonable basis to believe that your Access Credentials have been lost, stolen, misappropriated or compromised in any way or manner, and you shall strictly follow our instructions regarding any replacement Access Credentials. You shall be responsible for all access or use through your Access Credentials.

**3.6    Your Responsibilities.** You shall: (a) be fully responsible for your Permitted Users' compliance with this Agreement and any applicable Schedule; (b) be responsible for the accuracy, quality and legality of Guest Information, to the extent collected by you or your employees, agents or representatives, and for the means by which you or your employees, agents or representatives acquires Guest Information; (c) prevent unauthorized access to or use of the Products and/or Services, and notify us promptly of any such unauthorized access or use; and (d) use the Products and/or Services only in accordance with this Agreement, any applicable Schedule, and applicable laws and government regulations. You shall not: (i) make the Products and/or Services available to anyone other than your Permitted Users, unless expressly permitted in an applicable Schedule; (ii) sell, resell, rent or lease the Products and/or Services; (iii) use the Products and/or Services to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of the privacy rights of any Third Party; (iv) use the Products and/or Services to store or transmit software viruses, malicious code or other harmful files; (v) interfere with or disrupt the integrity or performance of the Products and/or Services or the data of any Third Party contained therein; or (vi) attempt to gain unauthorized access to the Products and/or Services or any related networks.

**4.    FEES AND PAYMENTS**

**4.1    Fees.** You shall pay all amounts specified in the applicable Schedule(s) for the Products and/or Services ("**Fees**"), for the duration of the applicable Schedule Term and in accordance with this Agreement. If your franchise or membership involves the transfer of an existing Chain Facility to you or changing affiliation of the Facility from one Wyndham Hotels & Resorts, Inc.-owned franchise or membership system to another, you may be charged a transfer fee, which transfer fee shall be set forth in an applicable Schedule ("**Transfer Fee**").

**4.2    Payments.** Unless otherwise set forth in an applicable Schedule, you shall pay us the Fees each month of the Schedule Term. Except as otherwise noted, all Fees and charges described in this Agreement are expressed and payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). All Fees are payable by you three (3) days after the month in which they accrue, without billing or demand. We may apply any amounts received to any outstanding invoices in any order. If you do not make all payments to us when due, then, upon written notice to you, we may withhold implementation, suspend the provision of Products and/or Services (subject to Section 4.4 below) or terminate this Agreement or any applicable Schedule, at our sole discretion. We may increase the ongoing Fees on an annual basis, providing we make the same change to similarly-situated chain Facilities; provided, however, that we shall notify you no less than thirty (30) days prior to any such increase taking effect.

**4.3    Overdue Charges.** If any Fees or charges are not received from you by the due date, then, at our sole discretion, (a) such Fees and/or charges may accrue late interest at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid, and/or (b) we may condition future order or

MITA
Q1/2023

3

subscription renewals on payment terms shorter than those specified herein.

**4.4      Suspension of Service and Acceleration.** You will be in default of this Agreement if you do not pay us when a payment is due under this Agreement.  If your default is not cured within ten (10) days after you receive written notice from us that you have not paid us any Fees or amount that is due, we may, without limiting any other rights and remedies we may have, accelerate your unpaid payment obligations under this Agreement so that all such obligations become immediately due and payable, and/or suspend the Products and/or Services to you until such amounts are paid in full.

**4.5      Taxes.** Unless otherwise stated, our Fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including but not limited to value-added, sales, use or withholding taxes, assessable by any local, state, provincial, federal or foreign jurisdiction (collectively, "**Taxes**"). You are responsible for paying all Taxes associated with its purchases hereunder. If we have the legal obligation to pay or collect Taxes for which you are responsible under this section, the appropriate amount shall be invoiced to and paid by you, unless you provide us with a valid tax exemption certificate authorized by the appropriate taxing authority. For clarity, we are solely responsible for taxes assessable based on our income, property and employees.

## 5.      <u>TECHNICAL SPECIFICATION REQUIREMENTS</u>

**5.1      Minimum Technical Requirements.** In order to access and/or use the Products and/or Services, you may be required to satisfy and/or maintain certain minimum technical requirements. Any such requirements shall be set forth in the applicable Schedule, or as may be agreed upon in writing by us and you from time to time. If any Third-Party Product or Service provider(s) (including without limitation, any Third-Party Product or Service provider made available by us), at your request, attempts to integrate hardware or other products and/or services with the Products and/or Services we provide to you, we shall not be liable for any injury or damage to either the hardware or such Third-Party Products or Services, unless such injury or damage is due to our gross negligence or willful misconduct. For the avoidance of doubt, the warranties and support described in this Agreement do not apply to any hardware or products and/or services not provided to you by us.

## 6.      <u>ADDITIONAL OFFERINGS</u>

**6.1      Acquisition of additional Products and/or Services.** We or a Third Party may from time to time make available to you offerings designed to interoperate with the Products and/or Services ("**Additional Offerings**"). Any acquisition by you of such Additional Offerings from a Third Party, and any exchange of data between you and any Third-Party provider of such Additional Offerings, is solely between you and the Third Party that provides the applicable Additional Offerings.

**6.2      No Representation or Warranty.** We do not warrant or support any Third-Party Additional Offerings. Any Third-Party Additional Offerings shall be governed exclusively by any agreement entered into between you and the Third Party that offers the applicable Additional Offerings. If the provider of any Additional Offerings ceases to make such Additional Offerings available for interoperation with the Products and/or Services on reasonable terms, we may, in our sole discretion, cease providing access to such Additional Offerings without entitling you to any refund, credit, or other compensation.

## 7.      <u>CONFIDENTIALITY</u>

MITA
Q1/2023

4

**7.1    Definition of Confidential Information.** As used herein, "**Confidential Information**" means all confidential information disclosed by a Party ("**Disclosing Party**") to the other Party ("**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Service Provider's Confidential Information shall include the Products and/or Services. Confidential Information of each Party shall include the terms and conditions of this Agreement, the terms and conditions of any and all Schedules, as well as business and marketing plans, technology and technical information, product plans and designs, Personal Information, and business processes disclosed by such Party (or a Party's Affiliate). However, Confidential Information shall not include any information that: (a) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (b) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (c) is received from a Third Party without breach of any obligation owed to the Disclosing Party; or (d) was independently developed by the Receiving Party. "**Personal Information**" means any information about an identifiable individual. Examples of Personal Information include, but are not limited to, names, phone numbers, addresses, credit card information, social security numbers, and/or account or financial information of Service Providers or its Affiliates, employees, franchisees, members, sales associates, brokers, or customers.

**7.2    Protection of Confidential Information.** The Receiving Party shall: (a) use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but in no event less than reasonable care); (b) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement (including any and all Schedules); and (c) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees, contractors and agents who need such access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections no less stringent than those herein. Neither Party shall disclose the terms of this Agreement (including any and all Schedules) to any Third Party, other than its Affiliates and their legal counsel and accountants without the other Party's prior written consent.

**7.3    Compelled Disclosure.** The Receiving Party may disclose Confidential Information of the Disclosing Party if it is compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to such Confidential Information.

**7.4    Equitable Relief.** The Parties acknowledge and agree that, given the unique and proprietary nature of the Confidential Information, monetary damages may not be calculable or a sufficient remedy for any breach of this Section 7 by the Receiving Party, and that the Disclosing Party may suffer great and irreparable injury as a consequence of such breach. Accordingly, each Party agrees that, in the event of such a breach or threatened breach, the Disclosing Party shall be entitled to seek equitable relief (including, but not limited to, injunction and specific performance) in order to remedy such breach or threatened breach. Such remedies shall not be deemed to be exclusive remedies for a breach by the Receiving Party but shall be in addition to any and all other remedies provided hereunder or available at law or equity to the Disclosing Party.

**7.5    Regulatory Considerations.** Notwithstanding anything set forth to the contrary, an employee

MITA
Q1/2023

5

of the Disclosing Party, including an individual who would be considered an employee pursuant to 18 U.S.C. §1833(b)(4), shall not be held criminally or civilly liable under any U.S. federal or state trade secret law for the disclosure of Confidential Information if such disclosure is made in confidence to a government official, either directly or indirectly, or to that individual's attorney, if such disclosure is made solely for the purpose of reporting or investigating a suspected violation of law or if the disclosure is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Moreover, an individual who files a lawsuit for retaliation claiming that retaliation against said individual for reporting a suspected violation of law may disclose Confidential Information to his or her attorney and may use it in the court proceeding, provided any document containing the Confidential Information is filed under seal and the individual does not disclose the Confidential Information, except pursuant to court order.

8.    **DATA PRIVACY**

**8.1    Data Policies.** You shall at all times comply with all applicable privacy laws and our and our Affiliates' guidelines for privacy, information protection, and data and systems security, including any data and privacy policy or policies we may establish from time to time (the "**Data Policies**"). Service Provider may, at its sole discretion and without prior notice, update from time to time. If there is a conflict between the Data Policies and applicable law, you should comply with applicable law and immediately notify us in writing of such conflict.

**8.2    Guest Information.** We and/or our Affiliates shall own all Guest Information that is within our possession and/or the possession of our Affiliate or any service provider holding such information on our or our Affiliate's behalf, and you shall own all Guest Information that is within your possession or the possession of any service provider of yours holding such information on your behalf. To the extent that we (including our Affiliates) and you both possess identical Guest Information, our (including our Affiliates') and your respective ownership rights with regard to such Guest Information shall be separate and independent from one another. You acknowledge and agree that: (a) you shall take all commercially reasonable steps to assure the timely and accurate collection, recording, processing and transmittal of the Guest Information to the Products and/or Services at all times; and (b) with respect to your use of the Guest Information, you shall comply with all applicable laws, our Data Policies and any contract or promise you make with or to any of the guests of the Facility.

**8.3    Non-Owned Information.** Other than the Guest Information, you shall not use any information you obtain from any Service, including but not limited to any information that we append to the Guest Information ("**Non-Owned Information**"), for the benefit of any business, enterprise or activity other than the business of the Facility, and in accordance with all applicable laws and our Data Policies. You shall not disclose, copy, assign, transfer, lease, rent, sell, donate, disseminate or otherwise commercialize any Guest Information or any Non- Owned Information for any other purpose without our prior written consent, which we may withhold at our sole discretion.

**8.4    Dummy Information.** Any information provided to you from the Products and/or Services may contain "dummy" information, special codes or other devices to ensure compliance with this Agreement and monitor possible unauthorized use of the Products and/or Services. You shall be conclusively presumed to have violated this Agreement if we discover any unauthorized mail or contacts from information provided only to you or the Facility.

**8.5    Improper Access.** If you should obtain access to Non-Owned Information in violation of the Data Policies or this Agreement, you shall be a trustee of that information and must act in a fiduciary capacity to protect the information from further unauthorized use or disclosure, and take

MITA
Q1/2023

6

all commercially reasonable efforts to return the information to us as soon as possible.

## 9.    NO WARRANTIES

**9.1**    EXCEPT AS MAY OTHERWISE BE SET FORTH IN AN APPLICABLE SCHEDULE AND/OR WHERE SUCH WARRANTIES OR REPRESENTATIONS ARE REQUIRED TO BE GIVEN OR MADE BY APPLICABLE LAW, (A) WE MAKE NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE PRODUCTS AND/OR SERVICES, THEIR MERCHANTABILITY, THEIR FITNESS FOR ANY PARTICULAR PURPOSE, OR THEIR CONFORMANCE TO THE PROVISIONS AND SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION; (B) WE MAKE NO REPRESENTATION OR WARRANTY REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT YOU MAY ATTAIN THROUGH THE USE OF THE PRODUCTS AND/OR SERVICES OR THAT YOUR RESERVATIONS OR REVENUE WILL INCREASE; AND (C) WE MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY OF THE DATA THAT YOU MAINTAIN OR THE PREVENTION OF ANY VIRUSES OR MALWARE, AND WE ARE NOT RESPONSIBLE FOR THE LOSS OF ANY DATA OR THE INTRODUCTION OF ANY VIRUSES OR MALWARE, EVEN IF SUCH LOSS OR INTRODUCTION RESULTS FROM AND PRODUCTS AND/OR SERVICES HEREUNDER. YOU ARE RESPONSIBLE FOR ENSURING THAT YOUR DATA IS ADEQUATELY BACKED UP AND THAT YOU MAINTAIN CURRENT UPDATED ANTI-VIRUS/ANTI-MALWARE SOFTWARE.

**9.2**    YOU, ON BEHALF OF YOURSELF, YOUR SUCCESSORS AND ASSIGNS, HEREBY WAIVE, RELEASE AND RENOUNCE ALL CLAIMS OR CAUSES OF ACTION THAT YOU MAY HAVE AGAINST US, OUR AFFILIATES, OR OUR OR THEIR OFFICERS, DIRECTORS OR AGENTS, ARISING OUT OF THE PRODUCTS AND/OR SERVICES UNLESS DUE TO OUR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

## 10.    INDEMNIFICATION

**Indemnification.** You shall indemnify, defend and hold harmless us, our Affiliates, our licensors and their successors and assigns and each of the respective directors, officers and employees associated with them against all claims, actions or proceedings, arising out of or related to your operation, use or non-use of the Products and/or Services (including your failure to comply with this Agreement and any applicable Schedules); your use of the Guest Information; any Third-Party data or system security breaches; and/or any Additional Offerings or agreements for such Additional Offerings. We shall not be liable to you or any other person or entity for personal injury or property loss, including but not limited to, damage to the Facility. You are not obligated to indemnify us for our own intentional misconduct.

## 11.    NO LIABILITY FOR INFORMATION

WE SHALL NOT BE LIABLE FOR ANY CLAIMS OR DAMAGES RESULTING FROM ANY INCORRECT INFORMATION GIVEN TO US OR INPUT INTO THE PRODUCTS AND/OR SERVICES BY ANY PERSON THAT IS NOT US. SUPPORT OR SERVICES HEREUNDER NECESSITATED BY COMPUTER VIRUSES, OR BY ANY FAILURE OR BREACH OF YOUR SECURITY FOR ITS SYSTEMS OR DATA, INCLUDING, WITHOUT LIMITATION, DAMAGE CAUSED BY PERSONS LACKING AUTHORIZED ACCESS, ARE NOT COVERED UNDER THIS AGREEMENT. YOU WAIVE ANY CLAIMS HEREUNDER AGAINST US TO THE EXTENT ARISING FROM YOUR FAILURE TO HAVE OR MAINTAIN CURRENT VIRUS

MITA
Q1/2023

7

PROTECTION, OR TO THE EXTENT ARISING FROM A FAILURE OR BREACH OF YOUR SECURITY FOR ITS SYSTEMS OR DATA, OR AS A RESULT OF ANY UNAUTHORIZED ACCESS TO YOUR SYSTEMS.

**12.    DAMAGE LIMITATION**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NEITHER WE NOR OUR AFFILIATES SHALL BE LIABLE TO YOU FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, INCLUDING,BUT  NOT LIMITED TO, LOST PROFITS OR LOST REVENUE (COLLECTIVELY REFERRED TO AS "**INDIRECT DAMAGES**") IN CONNECTION WITH THE PRODUCTS AND/OR SERVICES OR THIS AGREEMENT, EVEN IF WE HAD BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE REASONABLY FORESEEN SUCH DAMAGES. IN ADDITION, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, FOR DIRECT DAMAGES CAUSED BY US (AND ANY INDIRECT DAMAGES TO THE EXTENT THAT THE ABOVE LIMITATION IS NOT RECOGNIZED BY A COURT OR OTHER AUTHORITY) ANY CLAIM SHALL BE LIMITED TO THE TOTAL AMOUNT PREVIOUSLY PAID BY YOU TO FOR THE PREVIOUS TWELVE (12) MONTH PERIOD. THE ABOVE LIMITATIONS ON LIABILITY APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE.

**13.    TERM: TERMINATION AND SUSPENSION**

**13.1    Term.** This Agreement shall be effective as of the Effective Date and shall continue in full force and effect until expiration and/or termination of the Franchise Agreement, unless earlier terminated in accordance with the terms and conditions of this Agreement ("**Agreement Term**"). The Schedule(s) shall commence as of the effective date(s) set forth therein, and shall continue in full force and effect until expiration and/or termination of such applicable Schedule(s), unless earlier terminated or extended in accordance with the terms and conditions of the applicable Schedule(s), this Agreement or the Franchise Agreement ("**Schedule Term**").

**13.2    Our Right to Terminate.** If any one of the following events occurs, then to the extent permitted by applicable law, we shall have the right, at our option and without liability or further obligation to you, to immediately terminate this Agreement (including any of the applicable Schedule(s)): (a) you fail to make any payment when due under this Agreement (including any of the applicable Schedule(s)), the Franchise Agreement or any other agreement between you and us; (b) you breach any covenant, warranty or terms and conditions set forth in this Agreement (including any of the applicable Schedule(s)), the Franchise Agreement or any other agreement between you and us; (c) we cease to provide the Products and/or Services; (d) the Franchise Agreement expires or terminates for any reason; or (e) we assign, transfer, dissolve, terminate, or wind-down  our business, under applicable law.  We may terminate this Agreement for convenience at any time provided that we shall provide you with no less than sixty (60) days' advance notice.

**13.3    Termination Due to Bankruptcy or Insolvency**.  Either Party shall have the right to immediately terminate this Agreement in the event (a) a bankruptcy, reorganization, receivership, insolvency or other similar proceeding for the arrangement of such Party's obligations is instituted by such Party, or involuntarily against such Party and not dismissed within ninety (90) days; (b) the other Party is unable to pay its debts as they become due or admits in writing its inability to pay its debts generally; or (c) the other Party becomes subject to any statutory, administrative or court order or other official action which prevents either from continuing to fulfill its obligations under this Agreement.

**13.4    Suspension.** In addition to the right to terminate this Agreement, we may suspend your access

MITA
Q1/2023

8

to the Products and/or Services upon the occurrence of any of the events described in Section 13.2 until your violation is cured and you have agreed in writing to engage in no conduct that will cause a repeat violation to occur. If you violate such a restoration agreement, we may suspend or terminate your access to the Products and/or Services permanently or for an indefinite period. Because we still incur costs on your behalf, you must continue to pay all Fees associated with Products and/or Services under this Agreement (including any of the applicable Schedule(s)) during any such suspension period.

**13.5     Upon Termination.** Upon termination of this Agreement: (a) Any and all licenses granted to you under this Agreement shall end and you shall immediately cease using any Products and/or Services licensed to you by us or a Third Party pursuant hereto; (b) you shall immediately cease using any and all Access Credentials that provided access and use of the Products and/or Services; (c) you shall promptly (but in no event later than thirty (30) days) return or destroy any and all Confidential Information of ours, whether in written or electronic form, and neither you nor any of your employees or agents shall retain any copies, extracts, derivatives, or other reproductions of our Confidential Information (in whole or in part) in any form whatsoever; and (d) you shall take reasonable steps to assure that any and all documents, memoranda, notes, and other writings or electronic records prepared or created by us, which include or reflect our Confidential Information, are destroyed. Within thirty (30) days after expiration and/or termination of this Agreement, you shall certify to us in writing that the original and all copies have been returned to us or destroyed. YOU EXPRESSLY WAIVE ANY RIGHT TO NOTICE OF OR ANY HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY OUR AGENTS OR REPRESENTATIVES OR ANY PREMISES WHERE ANY PRODUCTS AND/OR SERVICES THAT ARE RENTED BY YOU FROM US OR A THIRD-PARTY PROVIDER MAY BE LOCATED AND REMOVING THEM WITHOUT JUDICIAL PROCESS. If you fail or refuse to permit the peaceable entry by our agents to take possession of such Products and/or Services, you shall be liable for rental of the Products and/or Services at the rate of $500.00 per week from the date that we first attempt to retake the Products and/or Services. We may, in our sole discretion, embed within the Products and/or Services various security devices that will render the Products and/or Services unusable and the data stored by the hardware or the Products and/or Services inaccessible if this Agreement terminates.

**14.    NOTICES**

**14.1     General.** All notices and other communications in connection with this Agreement shall be in writing and shall be sent to the respective Parties at the addresses set forth below or to such other addresses as may be designated by each Party in writing from time to time in accordance with this section. All notices and other communications shall be sent by registered or certified air mail, postage prepaid, or by express courier service, service fee prepaid. All notices and other communications shall be deemed received: (a) immediately upon delivery, if hand delivered; (b) five business days after depositing in the mail, if delivered by mail; or (c) the next business day after delivery to express courier service, if delivered by express courier service.

**If to Us:**
**Howard Johnson International, Inc.**
22 Sylvan Way
Parsippany, NJ 07054
Attn: Suzanne Fenimore, VP, Contracts Compliance

MITA
Q1/2023

9

**With a copy to:**
Wyndham Hotel Group, LLC
22 Sylvan Way
Parsippany, NJ 07054
Attn: General Counsel

**If to You:**
**5858 INTERNATIONAL DRIVE LLC**
1135 E King ave, Kingsland, GA 31548
Attn: Hardik Patel

15.    **MISCELLANEOUS**

15.1    **Force Majeure.** If performance by either Party is delayed or prevented (excluding the obligation to make payments under this Agreement) because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or communications systems, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the Party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay.  Delays or failures to pay resulting from lack of funds will not be deemed delays beyond your reasonable control.

15.2    **Entire Agreement.** This Agreement and any attachments hereto, constitutes the entire, final and exclusive agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous statements, representations, negotiations, discussions, understandings and agreements, whether oral or written, with respect to the subject matter of this Agreement. Nothing in the foregoing, no provision in this or any related agreement is intended to disclaim the express representations made in any Franchise Disclosure Document provided to you by us or one of our Affiliates.

15.3    **Your Forms.** We are not bound by any terms of your purchase order forms or notices of acceptance which attempt to impose any conditions at variance with the terms and conditions of this Agreement or with our invoices, standards manuals or technical specifications. Our failure to object to any provision contained in your printed form is not a waiver of any provision of this Agreement.

15.4    **No Third-Party Beneficiary.** The Agreement is intended for the sole benefit and protection of the named Parties, their successors and permitted assigns, and no Third Party shall have any cause of action or right to payments made or received herein except for any owners of any Products and/or Services who have licensed or authorized us to provide the same to you.

15.5    **Prevailing Party Attorneys' Fees.** In the event of an alleged breach of this Agreement, the prevailing Party shall be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, incurred in connection with such dispute, claim or litigation, including any appeal therefrom.  For purposes of this Section, the determination of which Party is to be considered the prevailing Party shall be decided by the court of competent jurisdiction that resolves such dispute, claim or litigation.

15.6    **Other Relief.** We may obtain the remedy of injunctive relief without the posting of a bond if you violate its obligations regarding confidentiality, non-disclosure, transfer or limitations on the

DocuSign Envelope ID: 3249E3B7-DA99-40DF-8401-C8DF682D177A

Products and/or Services use under this Agreement. Notwithstanding anything contained in this Agreement to the contrary, each Party shall be entitled to seek injunctive or other equitable relief whenever the facts or circumstances would permit such Party to seek such equitable relief in a court of competent jurisdiction.

**15.7    Modifications.** This Agreement may not be amended, modified or rescinded except in writing, signed by both Parties, and any attempt to do so shall be void and of no effect. This Agreement may be modified or amended only pursuant to a separate writing mutually agreed upon and signed by both Parties. The Parties expressly disclaim the right to claim the enforceability or effectiveness of: (a) any oral modifications to this Agreement; and (b) any other amendments that are based on course of dealing, waiver, reliance, estoppel or other similar legal theory. The Parties expressly disclaim the right to enforce any rule of law that is contrary to the terms of this Section.

**15.8    Governing Law; Exclusive Jurisdiction.** The validity, construction and performance of this Agreement, and the legal relations among and any disputes between the Parties to this Agreement, shall be governed by and construed in accordance with the laws of the State of New Jersey, excluding that body of law applicable to conflicts of law that would apply the substantive law of another jurisdiction. Any suit or proceeding relating to this Agreement shall be brought only in the state and federal courts located in the State of New Jersey. The Parties hereby expressly consent to the exclusive personal jurisdiction of the New Jersey state courts situated in Morris County, New Jersey, and the United States District Court for the District of New Jersey. Each Party hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue with respect to any suit or proceeding brought under this Agreement.

**15.9    Waiver.** If either Party fails to exercise any right or option at any time under this Agreement, such failure will not be deemed a waiver of the exercise of such right or option at any other time or the waiver of a different right or option. Termination of this Agreement by either Party will not waive your obligation to make any payments to us under this Agreement.

**15.10    Headings.** The division of this Agreement into sections and the use of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "Agreement," "herein," "hereof," "hereunder" and similar expressions refer to this Agreement and not to any particular section or other portion hereof and include any Schedules or agreements supplemental hereto. Unless something in the subject matter or context is inconsistent therewith, references herein to sections are to sections of this Agreement.

**15.11    No Construction Against Drafter.** The Parties agree that any principle of construction or rule of law that provides that an agreement shall be construed against the drafter of the agreement in the event of any inconsistency or ambiguity in such agreement shall not apply to the terms and conditions of this Agreement.

**15.12    Counterparts.** This Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument.

**15.13    Severability.** If any provision of this Agreement is determined to be void or unenforceable, the provision shall be deemed severed from the Agreement and the remainder of this Agreement shall continue in full force and effect.

**15.14    Successors and Assigns.** You agree that we may assign this Agreement or any of our rights

MITA
Q1/2023

11

DocuSign Envelope ID: 3249E3B7-DA99-40DE-8401-C8DF682D177A

and obligations hereunder without your consent.  This Agreement shall inure to the benefit of and be binding upon the Parties, their successors and permitted assigns. Notwithstanding the above, you may not assign this Agreement or any of your rights or obligations hereunder without our express written consent.

**15.15    Mediation.** The Parties agree that all disputes arising under this Agreement or associated with the Products and/or Services may be submitted through non-binding mediation. Either party may request mediation which shall be conducted by a mutually acceptable and neutral Third-Party organization. If the Parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either Party may pursue litigation.

**15.16    Survival.** The provisions of this Agreement that due to their content should have continuing life shall survive the termination of this Agreement.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties hereto have executed, or caused to be executed by their duly authorized representatives, this Agreement as of the Effective Date.

*By signing this Agreement, you represent that you are authorized to enter into this Agreement on behalf the Franchisee or Member named herein.

**Us:**
**Howard Johnson International, Inc.**

By: _Shilpan Patel_

Shilpan Patel
Executive Vice President
North America Franchise Operations

**You:**
**5858 INTERNATIONAL DRIVE LLC**

By: _Hardik Patel_

Name*: Hardik Patel
Title: (Managing) Member
*By signing this Agreement you represent that you are authorized to enter into this Agreement on behalf the Franchisee named herein

MITA
Q1/2023

13

DocuSign Envelope ID: 3249E3D7-DA99-40DE-8401-C8DF682D177A

## ATTACHMENT 1.1

### Definitions

"**Access Credentials**" means any user name, identification number, password, license or security key, security token, PIN or other security code, method, technology or device used, alone or in combination, to verify Permitted Users' identity and authorization to access and use the SaaS Solution.

"**Affiliate**" means any and all subsidiaries, affiliates, corporations, limited liability companies, partnerships, firms, associations, businesses, organizations, and/or other entities that directly or indirectly (either presently or in the future and/or through one or more intermediaries) control, are controlled by, or are under common control with, the subject entity (with respect to us, including our parent company, Wyndham Hotels & Resorts, Inc. and/or such entities).

"**Facility**" means the Location (as defined in the preamble to this Agreement), together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the effective date of the Franchise Agreement.

"**Franchise Agreement**" means the franchise agreement and/or license (however named) between you and us granting to you the non-exclusive right to operate the Facility under the System.

"**Guest Information**" means any names, e-mail addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including, without limitation, stay information, that we or you, or a person acting on behalf of us or you, receives from or on behalf of the other or on behalf of any guest or customer of the Facility.

"**Hardware**" means the computer hardware, peripheral equipment, ancillary equipment, the operating system software and related documentation that you use for purposes of accessing and using the Products and/or Services.

"**Intellectual Property**" means any and all rights existing from time to time under patent law, copyright law, trademark law, trade secret law, and any other proprietary rights laws and regulations as well as any related applications, reissuances, continuations, continuations-in-part, divisionals, renewals, extensions, and restorations thereof, now or hereafter in force and effect anywhere in the world.

"**Permitted Use**" means use of the Products and/or Services by Permitted Users for the benefit of you solely in or for your business operations as contemplated for and in accordance with the Franchise Agreement.

"**Permitted User**" means a person who is authorized by us, or who is otherwise permitted under this Agreement, to access and use the Products and/or Services, including without limitation, You.

"**Third Party**" and "Third-Party" means persons and entities other than us or you or our respective Affiliates.

MITA
Q1/2023

14

Location: **Orlando, FL**
Unit No.: **09575-25157-08-HOJ**
Brand: **Howard Johnson**

## SCHEDULE TO MASTER INFORMATION

## TECHNOLOGY AGREEMENT

## <u>SYNXIS PROPERTY MANAGEMENT SYSTEM</u>

This Schedule ("**Schedule**"), effective as of _____March 30_____, 20_24_____ ("**Schedule Effective Date**"), by and between **Howard Johnson International, Inc.,** a Delaware corporation, ("**Service Provider**," "**we**," "**our**," or "**us**"), and **5858 INTERNATIONAL DRIVE LLC**, a Florida limited liability company ("**you**" or "**your**") is issued pursuant to and incorporates by reference the terms and conditions of the Master Information Technology Agreement, dated as of _____March 30_____, 20_24_____ entered into by and between us and you ("**Agreement**"). We and you shall each be referred to herein as a "**Party**" and together as the "**Parties**" to this Schedule.

1.    **GENERAL**

    **1.1    Definitions.** Capitalized terms used in this Schedule shall have the meanings ascribed to them in this Schedule or the Agreement, as applicable, which may be updated or supplemented by us from time to time. All other capitalized terms used but not defined herein shall have the meanings ascribed to them in the Franchise or Membership Agreement and are incorporated herein by reference.

    **1.2    Conflicts in Interpretation.** The following order of precedence shall be followed in resolving any inconsistencies between the terms of this Agreement and the terms of any Attachments attached hereto: (a) first, the terms contained in this Schedule; and (b) second, the terms of the Agreement, provided that no order of precedence shall be applied among any such Schedules.

    **1.3    Overview**. The purpose of this Schedule is for us to provide you certain Products and/or Services concerning the SynXis Property Management System or in connection with the SynXis Property Management System.

2.    **<u>DESCRIPTION OF PRODUCTS AND/OR SERVICES</u>**

    **2.1    Authorization**. Pursuant to the terms and conditions set forth in the Agreement and this Schedule, you authorize us to provide to you the Products and/or Services that are described in this Schedule and we agree to provide you with the Products and/or Services that are described in this Schedule.

    **2.2    The SaaS Solution.** The "**SaaS Solution**" means the computer program, applications, features and services expressly identified on <u>Attachment 2.2</u> and any and all modifications, corrections, updates and enhancements to such SaaS Solution, including any we may from time to time make available to you. The SaaS Solution does not include any Non-SaaS Solution Services as specified in Section 7. For purposes of clarity, the SaaS Solution shall be considered Products and/or Services as such term is

DocuSign Envelope ID: 3249E3B7-DA99-40DF-8401-C8DF682D177A

used in the Agreement.

**2.3     Elavon Hosting Services.** In order to access and use the SaaS Solution pursuant to this Agreement, on or before ten (10) days following the Effective Date, you shall execute that certain Hosted Services Agreement for Hosted Gateway Services directly with Elavon Inc., or a substantially similar agreement with an alternate vendor designated by us ("**Elavon Agreement**"). The Elavon Agreement exclusively covers the offering provided thereunder (the "**Elavon Non-SaaS Solution Services**").

**2.4     Implementation Services**. On a date after which you have signed both the Elavon Agreement and this Agreement, we shall use reasonable efforts to implement the SaaS Solution as described in Attachment 2.4 attached hereto (the "**Implementation Services**") and you shall follow all of our instructions for preparing the Facility, at your sole expense, for implementation of the SaaS Solution. The SaaS Solution shall be deemed accepted by you ("**Acceptance**") immediately upon implementation of the SaaS Solution by us (the "**Acceptance Date**").

**2.5     Rate and Inventory Consulting Services.** From time to time, we may provide services to you under our Central Rate and Inventory Support Program (the "**CRISP Services**") consistent with Attachment 2.5 attached hereto, which may be updated or supplemented by us from time to time.

**2.6     Maintenance and Support Services.** Subject to you performing all of your Responsibilities identified in this Schedule and Attachment 2.6 ("**Your Responsibilities**"), we shall provide maintenance and support services as set forth on Attachment 2.6 attached hereto ("**Maintenance and Support Services**").

**2.7     Additional Services.** We may perform additional Services agreed to in writing by you and us from time to time, which may include additional fees to be agreed to by you and us.

3.   **GRANT OF RIGHTS**

**3.1     License.** Subject to payment of all applicable Fees, we hereby grant to you the right to access, use and display the use the Products and/or Services, including the SaaS Solution during the Term solely for the Permitted Use, solely by your Permitted Users and solely in accordance with the terms and conditions set forth in the Agreement and this Schedule. Except for the limited right expressly granted by foregoing, all rights, title and interests in and to the Products and/or Services, including the SaaS Solution, are reserved to us or to any Third Party who licenses the Products and/or Services to us or to our Affiliates.

**3.2     Our Responsibilities.** We shall: (a) use commercially reasonable efforts to make the SaaS Solution available twenty-four (24) hours a day, seven (7) days a week, except for: (i) planned downtime, or (ii) any unavailability caused by circumstances beyond our reasonable control, including without limitation, acts of nature, acts of government, floods, fires, earthquakes, civil unrest, acts of terror, labor strikes, Internet service provider failures or delays, or denial of service attacks; and (b) provide the SaaS Solution only in accordance with applicable laws and government regulations that govern the implementation of the SaaS Solution.

**3.3     Your Responsibilities**. You shall: (a) be fully responsible for your Permitted Users' compliance with the Agreement and this Schedule, as applicable; (b) be responsible for the accuracy, quality and legality of Guest Information, to the extent

collected by you or your employees, agents or representatives, and for the means by which you or your employees, agents or representatives acquire Guest Information; (c) prevent unauthorized access to or use of the SaaS Solution, and notify us promptly of any such unauthorized access or use; and (d) use the SaaS Solution only in accordance with the Agreement, this Schedule, and applicable laws and government regulations. You shall not:

(i) make the SaaS Solution available to anyone other than your Permitted Users; (ii) sell, resell, rent or lease the SaaS Solution; (iii) use the SaaS Solution to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of the privacy rights of any Third Party; (iv) use the SaaS Solution to store or transmit software viruses, malicious code or other harmful files; (v) interfere with or disrupt the integrity or performance of the SaaS Solution or the data of any Third Party contained therein; or (vi) attempt to gain unauthorized access to the SaaS Solution or any related networks.

> **3.3.1    RevIQ System Use Restrictions.** In addition to your responsibilities and/or restrictions set forth in the Agreement, your and your Permitted Users' access and/or use of the RevIQ Products and/or Services is also subject to the RevIQ System Use Restrictions set forth in Attachment 3.2 (the "**RevIQ System Use Restrictions**"), and you and your Permitted Users agree to comply with and be bound by such RevIQ System Use Restrictions at all times while accessing or otherwise using the RevIQ Products and/or Services. Any breach by you or your Permitted Users shall be considered a material breach of the Agreement and/or this Schedule.

## 4.    FEES AND PAYMENTS

**4.1    Fees.** You shall pay all fee amounts specified in <u>Attachment 4.1</u> to this Schedule for the SaaS Solution and the Products and/or Services set forth in this Schedule ("**Fees**"), beginning on the Acceptance Date through the duration of the Term. If your franchise or membership involves the transfer of an existing Chain Facility to Franchisee or Member or changing affiliation of the Facility from one Wyndham Hotels & Resorts, Inc.-owned franchise or member system to another, you will be charged a transfer fee ("**Transfer Fee**"). You will also pay for all Additional Services, as applicable.

**4.2    Invoicing and Payments.** Invoicing from us to you for the Product and/or Services under this Schedule shall be in accordance with the Agreement. Payments from you to us for the Product and/or Services under this Schedule shall be in accordance with the Agreement.

## 5.    TECHNICAL SPECIFICATION REQUIREMENTS

**5.1    Minimum Technical Requirements.** To access and use the SaaS Solution, you must use Hardware and subscribe to Communication Services that meet our technical specification requirements set forth on <u>Attachment 5.1</u>.

## 6.    WARRANTY; SUPPORT; DISCLAIMER

**6.1    General.** We warrant that following the Acceptance Date and for a period of sixty (60) days thereafter, the SaaS Solution will perform the functions and operations in a good workmanlike manner provided that you: (a) follow our instructions, updates

and modifications; (b) makes corrections, as directed; (c) pays all applicable Fees when due; and (d) is not otherwise in default under this Agreement or the Franchise or Membership Agreement. Our sole obligation under this warranty shall be to use reasonable efforts to remedy any nonperformance of the SaaS Solution within a reasonable time after you report such nonperformance to us.

**6.2    Intellectual Property.** We have the right to provide you with the rights granted hereunder, and, to the best of our knowledge, the SaaS Solution does not infringe any Intellectual Property rights of any Third Party.

**6.3    Support.** We or our Affiliates will provide a toll-free telephone number for reporting any nonperformance of the SaaS Solution, and we or our Affiliates will use reasonable efforts to diagnose and remedy such nonperformance within a reasonable time after you report such nonperformance to us. You must perform all user- required maintenance specified by the vendor of any Hardware or Communication Services, and obtain required maintenance only from an authorized service provider.

6.4    **DISCLAIMER**. THE WARRANTIES AND REMEDIES DESCRIBED IN THIS SECTION 6 ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES AND REMEDIES FOR THIS SERVICE. THE ABOVE WARRANTIES SHALL BE RENDERED NULL AND VOID IF THE SAAS SOLUTION IS SUBJECTED TO ABUSE, MISUSE, IMPROPER INSTALLATION AT THE FACILITY OR MAINTENANCE BY UNAUTHORIZED SERVICE PERSONNEL, OR IF THE SAAS SOLUTION IS ALTERED WITHOUT OUR EXPRESS CONSENT OR DIRECTION, OR USED FOR A PURPOSE NOT AUTHORIZED UNDER THE AGREEMENT OR THIS SCHEDULE, OR IF THE SAAS SOLUTION IS DAMAGED OR DESTROYED DUE TO ACTS OF NATURE, WAR, TERRORISM, CIVIL UNREST, FIRES, NATURAL DISASTERS, OR OTHER EVENTS BEYOND OUR CONTROL. EXCEPT AS PROVIDED IN THIS SECTION 6, **OR EXCEPT WHERE SUCH WARRANTIES OR REPRESENTATIONS ARE REQUIRED TO BE GIVEN OR MADE BY APPLICABLE LAW, (A) WE MAKE NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE PRODUCTS AND/OR SERVICES, THEIR MERCHANTABILITY, THEIR FITNESS FOR ANY PARTICULAR PURPOSE, NON-INFRINGEMENT, OR THEIR CONFORMANCE TO THE PROVISIONS AND SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION; (B) WE MAKE NO REPRESENTATION OR WARRANTY REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT YOU MAY ATTAIN THROUGH THE USE OF THE PRODUCTS AND/OR SERVICES, OR THAT YOUR RESERVATIONS OR REVENUE WILL INCREASE; (C) WE MAKE NO REPRESENTATION OR WARRANTY THAT THE PRODUCTS AND/OR SERVICES WILL (I) MEET YOUR OR ANY OTHER PERSON'S OR ENTITY'S REQUIREMENTS, (II) OPERATE WITHOUT INTERRUPTION, (III) ACHIEVE ANY INTENDED RESULT, (IV) BE ERROR FREE, OR (V) BE COMPATIBLE, WORK WITH OR CONTINUE TO WORK WITH ANY OF YOUR SYSTEMS OR COMPONENTS, AND THE PRODUCTS AND/OR SERVICES ARE PROVIDED ON AN "AS IS," "WHERE IS," AND "AS AVAILABLE" BASIS; AND (D) WE MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY OF THE DATA THAT YOU MAINTAIN OR THE PREVENTION OF ANY VIRUSES OR MALWARE, AND WE ARE NOT RESPONSIBLE FOR**

**THE LOSS OF ANY DATA OR THE INTRODUCTION OF ANY VIRUSES OR MALWARE, EVEN IF SUCH LOSS OR INTRODUCTION RESULTS FROM OUR PERFORMANCE OF SERVICES HEREUNDER. YOU ARE RESPONSIBLE FOR ENSURING THAT YOUR DATA IS ADEQUATELY BACKED UP AND THAT YOU MAINTAIN CURRENT UPDATED ANTI-VIRUS/ANTI-MALWARE SOFTWARE. YOU, ON BEHALF OF YOURSELF, YOUR SUCCESSORS AND ASSIGNS, HEREBY WAIVE, RELEASE AND RENOUNCE ALL CLAIMS OR CAUSES OF ACTION THAT YOU MAY HAVE AGAINST US, OUR AFFILIATES, OR OUR OR THEIR OFFICERS, DIRECTORS OR AGENTS, ARISING OUT OF THE PRODUCTS AND/OR SERVICES, UNLESS DUE TO OUR GROSS NEGLIGENCE OR WILLFULMISCONDUCT.**

7.    **INDEMNIFICATION**

    **7.1**     **Indemnification**. In addition to your indemnification obligations set forth in the Agreement, you agree that our third-party vendor, IDeaS, shall be a third-party beneficiary of this Schedule and you shall be responsible to, and shall indemnify and hold harmless, both us and IDeaS, for any liability or damage incurred or arising from or related to use of the RevIQ Products and/or Services by you or your Permitted Users in a manner that violates the RevIQ System Use Restrictions.

8.    **TERM AND TERMINATION**

    **8.1**     **Term.** This Schedule shall be effective as of the Schedule Effective Date and shall continue in full force and effect until termination of the Franchise or Membership Agreement, unless earlier terminated in accordance with the terms and conditions of this Schedule ("**Term**").

    **8.2**     **Termination**. This Schedule may be terminated only in accordance with the Agreement.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties hereto have executed, or caused to be executed by their duly authorized representatives, this Schedule as of the Schedule Effective Date.

*By signing this Schedule, you represent that you are authorized to enter into this Schedule on behalf of the Franchisee or Member.

**We:**
**Howard Johnson International, Inc.**

By: _____
       Shilpan Patel
       Executive Vice President
       North America Franchise Operations

**Our address:** 22 Sylvan Way Parsippany, NJ 07054

**You:**
**5858 INTERNATIONAL DRIVE LLC**

By: _____
       Hardik Patel
       (Managing) Member

**Your address:** 5858 International Dr, Orlando, FL 32819-8204

**SCHEDULE**
**TO**
**MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT SYSTEM**

### ATTACHMENT 2.2 – SynXis Property Hub

**The SaaS Solution**

The SaaS Solution means the SynXis Property Management System, which as of the Schedule Effective Date includes the following features and functionality:

- Cloud-based solution
- Community model hosting by Sabre Hospitality Solutions, or an affiliate thereof
- We may also provide an interface with an automated rate audit system.
- In-system training materials

**RevIQ Standard**

RevIQ Standard is the current rate audit system that offers, among other things, the following features and functionality:

- A daily optimization, which generates optimal base-price decisions and hotel-level last room value ("**LRV**") for the next 365 days
- Four (4) intra-day optimizations, which generates, optimal base-price decisions and hotel-level LRV for the next fourteen (14) days
- A daily 365-day hotel-level occupancy forecast
- Permitted User-configured pricing offsets for all non-base room types
- Automated daily price decision upload for all room types to Sabre Central Reservations System ("CRS") and Sabre SynXis Cloud after each optimization
- Automated daily hotel-level LRV decision upload to Sabre CRS and Sabre SynXis Cloud after each optimization
- Permitted User-defined "Special Events" configuration
- Permitted User-defined "Pricing Seasons" configuration
- Permitted User-configured price "floors" and "ceiling" values for base price decisions by pricing season
- Access to RevIQ Standard via both desktop and mobile devices
- Smart alerts functionality for both desktop and mobile devices
- Reporting capability available via desktop
- Competitive set configuration displaying pricing from Permitted User configured hotel competitors via both desktop and mobile devices

**SCHEDULE**
**TO**
**MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT SYSTEM**

## ATTACHMENT 2.4

**Implementation Services**

We will offer Implementation Services consisting of assistance in installation/implementation of the SaaS Solution including the following:

- Assistance with setup of two (2) Elavon tokenization terminals (to be provided in connection with execution of Elavon Agreement)
- Installation of SaaS Solution on a minimum of two (2) workstations for Facility's front desk (Hardware to be provided by Franchisee or Member)
- Training modules regarding features and functionality of SaaS Solution, including video demonstrations and tutorials
- Remote and optional on-site resources including training of Facility's staff

SCHEDULE
TO
MASTER INFORMATION TECHNOLOGY AGREEMENT

SYNXIS PROPERTY MANAGEMENT SYSTEM


ATTACHMENT 2.5

CRISP Services


**Terms of CRISP Services**

Franchisee or Member agrees to establish the best available rate "**BAR**"; provided, however that Franchisee or Member acknowledges and agrees that it will retain ultimate control over all rate audit decisions. Subject to the foregoing, Franchisee or Member explicitly authorizes Franchisor to make adjustments to the Facility's rates, inventory and restrictions in order to comply with the Required Policies and Practices without advance notice to Franchisee or Member. Franchisor shall not, however, change the BAR without authorization from Franchisee or Member. In addition, Franchisee or Member may modify or reverse any change Franchisor may make by notifying Franchisor, provided that such modification or reversal is consistent with the Required Policies and Practices. Franchisee or Member's general manager shall be its primary representative who shall have the authority to make rate audit decisions for the Facility, unless Franchisee or Member designates another Facility representative in writing to Franchisor. Franchisor may communicate with Franchisee or Member's representative by telephone, e-mail or in another manner, and Franchisor may rely on any communication which Franchisor believes, in good faith, is from Franchisee or Member's representative. Any know-how, algorithms, formulae, data, recommendations, documentation, software, or other materials or information that Franchisor furnishes to Franchisee or Member in connection with the CRISP Services shall be deemed "Confidential Information" as defined in the Franchise or Membership Agreement and shall be subject to all prohibitions on disclosure, copying or use of Confidential Information under the Franchise or Membership Agreement.

**Overview of CRISP Services**

Property Audit & Setup

In consultation with the Facility representative, simplify rates and room type structures by:
- Verifying that all required rate plans are loaded correctly in the SaaS Solution;
- Verifying that local rates are available for sale in the distribution channels selected by the Facility;
- Verifying that all brand standard rate plans are available for sale; and
- Verifying that all hotel specific data is accurate and up to date in all systems.

Rate & Inventory Management

Review inventory/rate visibility and consistency across all distribution channels.  Key services include:
- Monitoring Facility inventory and rate settings in the SaaS Solution;
- Identifying and advising Franchisee or Member of erroneous rate plans;
- Monitoring rates across distribution channels and checking for accuracy in third party channels; and
- Coordinating participation in key corporate accounts and marketing programs.

SynXis Schedule to MITA
Q1/2023

**SCHEDULE**
**TO**
**MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT SYSTEM**
**ATTACHMENT 2.6**
**Maintenance and Support Services**

**SYNXIS PROPERTY MANAGEMENT SUPPORT:**

First Level of Support

We will provide first-level support for the SaaS Solution, which shall include:
- SynXis Property Management System;
- Upon availability, the automated rate audit solution
- Any additional interfaces included in the SaaS Solution.

Additionally, we shall field initial inquiries related to the Elavon Non-SaaS Solution Services though support therefor shall be provided as set forth in the Elavon Agreement.

Second Level of Support

In the event first level support fails to resolve any maintenance or support issues (e.g. Defects and DCRs) for the SaaS Solution, we will provide second level support by submitting a case with the appropriate Third Party provider of the SaaS Solution, and provide follow-up.

**REVIQ SUPPORT:**

- Providing initialization services in conjunction with our third-partner partners and/or providers.

- Providing first-level support for the RevIQ Products and/or Services, which shall include:

  o Maintaining tracking system for all significant incidents; and

  o Maintaining staff proficient on current RevIQ Products and/or Services functionality

- In the event our first-level support fails to resolve an incident, we shall partner and/or coordinate with third-party providers, as may be necessary.

- Instructor-led, as well as self-paced, training provided by Wyndham University on the RevIQ Products and/or Services.

**YOUR OBLIGATIONS:**

You shall perform all user-required maintenance procedures specified by the vendor of the specific Hardware components, and obtain required maintenance only from an authorized service provider.

SCHEDULE
TO
MASTER INFORMATION TECHNOLOGY AGREEMENT

REVIQ PRODUCTS AND/OR SERVICES

ATTACHMENT 3.2

RevIQ System Use Restrictions

- In no instance may the output of the RevIQ Products and/or Services be shared with any third parties (other than Service Provider or your Permitted Users).

- Neither you nor your Permitted User may sell, rent, lease, sublicense or otherwise provide access to the RevIQ Products and/or Services to any third parties (other than providing access to Service Provider (including its Affiliates) or your Permitted Users).

- Neither you nor your Permitted User may attempt to disassemble, decompile, reverse engineer, or otherwise attempt to recreate the source code of the RevIQ Products and/or Services.

- Neither you nor your Permitted User may use the RevIQ Products and/or Services to process third party data or as a service provider on behalf of third parties.

- Except to the extent allowed by law, neither you nor your Permitted User may use the RevIQ Products and/or Services or authorize any other party or entity to use the RevIQ Products and/or Services to develop a commercial offering or product directly or indirectly competing with an offering or product from our third-party vendor, IDeaS.

DocuSign Envelope ID: 3249E3B7-DA99-40DE-8401-C9DF682D177A

**SCHEDULE**
**TO**
**MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT**

**ATTACHMENT 4.1 – SynXis Property Hub**

**Fees**

| | |
|---|---|
| **With up to Three Interfaces[1]** | $621.00 per month[2] |
| **One-Time Start-Up Fee** | $4,400.00 |
| **Additional Interfaces\*** | $50.00 per month |
| **One-Time Transfer Fee (if applicable)** | $500.00 |

[1] "**Interface**" means any interface you may choose to include, which may be necessary for features relating to, for example, voicemail, call accounting, etc. The Elavon tokenized credit card interface and, an interface for an automated rate audit solution are included in the monthly price listed above and count towards the three interfaces described above.

The following fees shall be payable by you for the RevIQ Products and/or Services and Our Products and/or Services:

| Fees | RevIQ Standard[2] | RevIQ Premium[3] |
|---|---|---|
| Monthly Recurring Fee | Currently, included in monthly SynXis Fee | $28 per month |

**[3]RevIQ Premium Service is available after three months of participation in RevIQ Standard Service. We reserve the right to assess your Facility and its performance to determine appropriate service level.**

DocuSign Envelope ID: 3249E3B7-DA99-40DF-8401-C8DF682D177A

**SCHEDULE**
**TO**
**MASTER INFORMATION TECHNOLOGY AGREEMENT**


**ATTACHMENT 5.1**


**SYNXIS PROPERTY MANAGEMENT SYSTEM**
**Hardware Minimum Technical Specification**
**Requirements**

1. Windows 10 Pro Recommended

2. Internet Connection: 4G+.  Recommend 10+Mbps

3. Modern Browser:  Chrome, Edge, Safari

4. 2GB+ Available Disk Space

5. PDF Viewer:  Acrobat, Chrome

6. Screen resolution: set to at least 1024x768

7. Belkin 25' Cat 5 Cable- 3 (one per workstation & printer)

8. 1 Smart 750VA 120USB UPS  (this is your battery backup for your master workstation)

9. 8+ GB of RAM on each Workstation

1

## REVIQ PRODUCTS AND/OR SERVICES

### Technical and Operational Requirements

1. At the time of activation of the RevIQ Products and/or Services, you must have access to the Internet.

2. At the time of activation of the RevIQ Products and/or Services, you must be operating on a Sabre SynXis CR and Sabre property management system.

3. You must perform nightly financial audits.

4. Permitted User(s) must have access to Okta Single Sign On ("**SSO**") login functionality.

5. Permitted User(s) must have access to the internet via desktop computer.

6. Permitted User(s) must complete specified required training for the RevIQ Products and/or Services.

# **<u>Exhibit C</u>**

**Franchisee: 5858 INTERNATIONAL DRIVE LLC ("you" or "your")**
**Brand: Howard Johnson**
**Property Location: 5858 International Dr, Orlando, FL 32819-8204 ("Property")**
**Unit Number: 09575-25157-08-HOJ**


### Signature Reservation Services Agreement


This SIGNATURE RESERVATION SERVICES AGREEMENT ("Agreement") is made as of _____ March 30 _____, 20 24 ("Effective Date") by and between Wyndham Hotel Group, LLC, with offices located at 22 Sylvan Way, Parsippany, New Jersey 07054 ("we", "us" or "our") and **5858 INTERNATIONAL DRIVE LLC,** with principal offices located at **1135 E King Ave, Kingsland, GA 31548** ("you" or "your") regarding the Howard Johnson® guest lodging facility located at **5858 International Dr, Orlando, FL 32819-8204**.

**Recitals.** We, through a third-party vendor and as part of our Signature Reservation Service, have developed a call transfer service (the "Service") under which callers inquiring about reservations at the Facility or other hotels operated under a Wyndham Hotels & Resorts brand enrolled in the Service ("SRS Facilities") may have their calls handled by our reservation agents ("Agents") who will book reservations on your behalf. The Service is described in more detail in Schedule A to this Agreement.

You agree to participate, in the Service at all times during the term of this Agreement in accordance with the following:

1.       **Fees.**  Beginning on the "Billing Commencement Date", we will charge you a "Call Transfer Fee" as reflected on Schedule A. The Billing Commencement Date is the date that our Agents book the first room reservation at your Facility.  We will invoice you monthly for the Call Transfer Fees which shall be payable when your Royalties are due under your franchise or membership agreement with us or our affiliate.  We may, in our discretion, increase the Call Transfer Fee to cover our costs provided such fees are increased for all similarly situated SRS Facilities. We shall notify you no less than thirty (30) days prior to any such increase taking effect.

2.       **Term.**  This Agreement will begin when we countersign this Agreement after you sign it and will continue until the expiration or termination of your franchise or membership agreement with us or our affiliate. In addition, we shall have the right to terminate this Agreement at any time without cause upon thirty (30) days' written notice.

3.       **Change to Services.** We reserve the right to amend, cancel, or replace the Service as business circumstances warrant, in our sole discretion, upon 30 (thirty) days' written notice. In the event that we cancel the Service in which you are then currently participating, then we may, at our option, replace the Service with an alternative Service or require you to participate in another Service then currently offered under this Agreement.

**4.    Dispute Resolution.**  Any disputes arising under this Agreement will be resolved in accordance with the dispute resolution procedures under your franchise or membership agreement with us or our affiliate, including but not limited to, the provisions concerning waiver of jury trial, consent to venue and personal jurisdiction, and choice of law.

**5.    No Warranty.    WE MAKE NO REPRESENTION OR WARRANTY REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT THE FACILITY WILL ATTAIN AS A RESULT OF THE SERVICE OR THAT YOUR RESERVATIONS OR REVENUE WILL INCREASE. WE MAKE NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, REGARDING THE SERVICE.  YOU, ON BEHALF OF YOURSELF, YOUR SUCCESSORS AND ASSIGNS, HEREBY WAIVE, RELEASE AND RENOUNCE ALL CLAIMS OR CAUSES OF ACTION THAT YOU MAY HAVE AGAINST US, OUR AFFILIATES, OR OUR OR THEIR OFFICERS, DIRECTORS OR AGENTS, ARISING OUT OF THE SERVICES, UNLESS DUE TO OUR WILFULL MISCONDUCT.**

**6.    Limitation on Liability. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOST REVENUE (COLLECTIVELY REFERRED TO AS "INDIRECT DAMAGES") ARISING FROM, RELATING TO, OR IN CONNECTION WITH THE SERVICE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE FORESEEN SUCH DAMAGES.  IN ADDITION, EACH PARTY'S DIRECT DAMAGES (AND ANY INDIRECT DAMAGES TO THE EXTENT THAT A COURT OF COMPETENT JURISDICTION OR OTHER AUTHORITY DOES NOT RECOGNIZE OR ENFORCE THE ABOVE WAIVER) SHALL BE LIMITED TO THE TOTAL FEES PAID BY YOU TO US DURING THE THEN CURRENT TERM.**

**7.    Force Majeure.**  In no event shall either party be liable for any failure or delay in performance (except for the obligation to remit fees) due to causes or circumstances beyond its reasonable control and without its fault or negligence (including, but not limited to, Acts of God, acts of the public enemy, war or terrorism, acts of the United States of America, or any state, territory or political division of the United States of America, or of the District of Columbia, fires, floods, or other natural disaster, strikes or any other labor disputes, communication line failures, and/or freight embargoes).

**8.    Miscellaneous.**  The parties agree that this Agreement contains the entire agreement between the parties relating to the Service, superseding and terminating any prior representation, warranty or agreement, whether oral or in writing.  Nothing in this or any other related agreement, however, is intended to disclaim any representations we made in the Franchise Disclosure Document that we or our affiliate furnished to you.  No modification, amendment or waiver of this Agreement will be binding upon either party unless the same has been made in writing and executed by both parties.  You agree that we may assign this Agreement or any of our rights and obligations hereunder without your consent.  This Agreement

shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties. Notwithstanding the above, you may not assign this Agreement or any of your rights or obligations hereunder without our express written consent. All facsimile executions shall be treated as originals for all purposes.

**[Signatures on the following page]**

ONLY AN AUTHORIZED REPRESENTATIVE OF THE FACILITY SHOULD SIGN THIS AGREEMENT.  BY SIGNING THIS FORM, you represent that you agree to the above terms and that you are authorized to bind the Facility.


**WE:**                                                      **YOU:**
**Wyndham Hotel Group, LLC**                                 **5858 INTERNATIONAL DRIVE LLC**

By: _____                                By: _____
Shilpan Patel                                                Hardik Patel
Executive Vice President                                     (Managing) Member
North America Franchise Operations

## Schedule A
## Call Transfer Service

1.    **Our Responsibilities.**  We will:

(a) Hire and train Agents at our Central Reservation Center to handle reservation calls on behalf of your Facility, including responding to questions about your Facility and attempting to book reservations at your Facility.  The goal is for the transfer to our Central Reservation Center to appear seamless to the customer and that our Agents appear as an extension of your hotel staff. Our Agents may attempt to make reservations for your Facility regardless of whether a customer initially seeks to make a reservation at your Facility or another SRS Facility.

(b) Through our third-party vendor, provide a new, dedicated telephone number for your Facility to appear on search engines and other digital platforms which will connect to an Interactive Voice Response.  Callers to this telephone number will be able to select a number for reservation inquiries.  All reservation inquiry calls will be directed to our Central Reservation Center.  We will own the telephone number and you must cease all use of it when your participation in the Service ends.  You may not use the telephone number in any advertising or marketing materials or on any websites without our prior written approval.

2.    **Your Responsibilities.**  You will be responsible for:

(a) Working with our team to verify that your Facility information, including Facility description, address, amenities, inventory, and all other content is updated and accurate in our Central Reservation System at all times.

3.    **Fees.**  The Call Transfer Fee is 3.5% of the Gross Room Revenue ("GRR") for each reservation booked by us.

# <u>Exhibit D</u>

## GUARANTY

To induce Howard Johnson International, Inc., its successors, assigns and affiliates ("you") to sign the franchise agreement with the party named as the "Franchisee" (the "Franchise Agreement") to which this Guaranty is attached pertaining to the Unit indicated above, and the ancillary agreements to the Franchise Agreement (such ancillary agreements and the Franchise Agreement, collectively, the "Agreements") the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreements are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreements, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform each unpaid or unperformed obligation of Franchisee under the Agreements. Without affecting our obligations under this Guaranty, without notice to us, you may extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. We waive notice of amendment of the Agreements. We acknowledge that the provisions of Section 17 of the Franchise Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, apply to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Franchise Agreement.

**GUARANTORS**:

Name: Shmuel Bonnardel
Address: 2827 Forest Mill Lane, Jacksonville, FL 32257

Name: Hardik Patel
Address: 1135 E King Ave, Kingsland, GA 31548

Name: Dylan "Jag" Pathirana
Address: 5950 Canoga Ave
Suite 500, Woodland Hills, CA 91367

HOJ EX-C1
Q1/2023

DocuSigned by:

574E50D5D270447...

Name: Dylan Amin

Address: 300 Warren Mason Blvd, Brunswick, GA 31520

# <u>Exhibit E</u>

# DEVELOPMENT INCENTIVE NOTE[1]

**$400,000.00**

Parsippany, New Jersey

Date: March 30, 2024

FOR VALUE RECEIVED, the undersigned, **5858 INTERNATIONAL DRIVE LLC**, a Florida limited liability company ("Maker") and **Shmuel Bonnardel, Hardik Patel, Dylan Jag Pathirana, and Dylan Amin** (each a "Co-Maker" and jointly, the "Co-Makers") promise to pay to the order of **Howard Johnson International, Inc.,** a Delaware corporation, ("Holder"), the principal sum of Four Hundred Thousand Dollars and No Cents ($400,000.00), which amount shall bear no interest unless this Note is accelerated. The principal amount will be disbursed by Holder to Maker, and Maker and Co-Makers will become subject to the obligation to repay or discharge this Note, when and if all of the conditions for disbursement set forth in the Franchise Agreement (as defined below) have been met.

Maker will become subject to the obligation to repay or discharge this Note upon receipt of any portion of the principal amount. On each anniversary of the Opening Date that follows the Funding Date (or on each anniversary of the Opening Date, if the Development Incentive is funded as of the Opening Date), an amount equal to the original amount of the Development Incentive divided equally by the number of complete Franchise Years remaining, as of the Funding Date, between the Funding Date and the conclusion of the Term, will be forgiven without payment, such that the Note will have been completely forgiven without payment at the conclusion of the Term. Maker's obligation to repay the principal of this Note will cease and this Note will be canceled and discharged when the principal is completely forgiven.

This Note shall be accelerated upon any of the following events (each, an "Accelerating Event"): (i) a Termination of the Franchise Agreement occurs for any reason; (ii) a Transfer occurs and the transferee does not assume Maker's obligation under this Note in a writing acceptable to Holder prior to the closing of the Transfer; (iii) the Maker loses ownership or possession or the right to possession of the Facility, or otherwise loses the right to conduct the franchised business at the Facility, whether by foreclosure, deed in lieu of foreclosure, the exercise of the secured party's rights against any pledge of Franchisee's or any parent entity's equity securities, or otherwise; or (iv) if any proceeding for the appointment of a receiver or other custodian for, or seeking marshaling or composition of or for, Maker's business or assets is filed in any court of competent jurisdiction, or otherwise commenced in accordance with legal requirements, and is not dismissed within ninety (90) days. If such an Accelerating Event occurs, the outstanding, unamortized principal balance of this Note shall be immediately due and payable without further notice, demand, or presentment. Any payments shall be first applied to any accrued interest and then to principal. Maker and each Co-Maker have the right to prepay this Note, in whole or in part, at any time, without premium or penalty. Prepayments of principal will be applied without notation on this Note.

If this Note is accelerated and is not paid in full within ten (10) days after it is due, the outstanding principal balance shall bear simple interest at a rate equal to the lesser of eighteen

---

[1] If a Co-Maker is a resident of community property state or certain other states, his or her spouse also must sign the Note as a co-maker.

(18%) percent per annum and the highest rate allowed by applicable law from its due date until paid. The outstanding principal balance of this Note shall be payable in lawful money of the United States of America at 22 Sylvan Way, Parsippany, New Jersey 07054, or at such other place as Holder may direct by written notice to Maker.

This Note is issued pursuant to the franchise agreement between Holder and Maker, and guaranteed by each Co-Maker (the "Franchise Agreement") for the operation of a **Howard Johnson**® System facility located, or to be located at **5858 International Dr, Orlando, FL 32819-8204**, and identified by the Unit number indicated above (the "Facility"). All terms not defined in this Note shall have the same definition as in the Franchise Agreement. If the Franchise Agreement terminates before the Facility opens and Holder has not disbursed any portion of the Development Incentive to Maker, or if Maker fails to meet the conditions for disbursement set forth in the Franchise Agreement, then this Note will be deemed discharged and neither party will have any further obligation to the other under this instrument. Maker's and each Co-Maker's obligation to pay this Note shall be absolute and unconditional, and all payments shall be made without setoff, deduction, offset, recoupment, or counterclaim.

If this Note is collected by or through an attorney at law, the Holder shall be entitled to collect reasonable attorney's fees and all costs of collection. This Note is issued in and shall be governed and construed according to the laws of the State of New Jersey (without the application of conflict of laws principles). Each maker, co-maker, endorser, guarantor, or accommodation party liable for this Note waives presentment, demand, notice of demand, protest, notice of non-payment, notice of protest, notice of dishonor and diligence in collection. Holder reserves the right to modify the terms of this instrument, grant extensions, novations, renewals, releases, discharges, compositions, and compromises with any party liable on this Note, with or without notice to or the consent of, or discharging or affecting the obligations of any other party liable under this instrument.

The terms "Holder," "Maker," and "Co-Maker" shall be deemed to include their respective heirs, successors, legal representatives, and assigns, whether by voluntary action of the parties or by operation of law. All references to "Maker" and "Co-Maker" shall mean and include the named Maker, Co-Makers, and all guarantors, sureties and accommodation parties signing or endorsing this Note.

[Remainder of Page Intentionally Left Blank]

Development Incentive Note - 1

Development Incentive Note
Q1/2023

IN WITNESS WHEREOF, the undersigned have executed this instrument effective as of the date first above written.

ATTEST:

MAKER:

**5858 INTERNATIONAL DRIVE LLC**

_Hardik Patel_

Name: Hardik Patel
Title: (Managing) Member

WITNESS:

CO-MAKERS:

Name: Shmuel Bonnardel

_Hardik Patel_

Name: Hardik Patel

_Dylan "Jag" Pathirana_

Name: Dylan Jag Pathirana

Name: Dylan Amin

Development Incentive Note - 1

Development Incentive Note
Q1/2023

# **Exhibit F**

**WYNDHAM**
**HOTELS & RESORTS**

Contract Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

July 7, 2025

**VIA ELECTRONIC MAIL AND UPS**
hpatel@namishllc.com

Mr. Hardik Patel
5858 International Drive LLC
1135 E. King Ave
Kingsland, GA 31548

**Re:    NOTICE OF MONETARY DEFAULT relating to Howard Johnson® by Wyndham Unit #09575-25157-08 located in Orlando, FL (the "Facility")**

Dear Mr. Patel:

I write on behalf of Howard Johnson International, Inc. ("we," "us," or "our") regarding the Franchise Agreement dated March 30, 2024, between 5858 International Drive LLC ("you" or "your") and us (the "Agreement"). We write to give you formal notice that you are in default under the Agreement.

The Agreement requires you to timely pay us the Recurring Fees and other charges relating to your operation of the Facility under the System. Our Financial Services Department advises us that as of June 27, 2025, your account is past due in the amount of $112,760.24. We have enclosed an itemized statement detailing the fees past due. Although the Agreement permits us to terminate if you do not cure within ten (10) days, we would like to continue our relationship with you and are providing you thirty (30) days to cure. If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Howard Johnson System.

As you no doubt recall, you also executed an Initial Fee Note which requires you to cure any defaults under the Agreement within the time permitted. We remind you that if you fail to cure your default timely, the balance of your Initial Fee Note will become immediately due and payable.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default. By copy of this Notice, we are also informing your Guarantors of your default regarding the Facility.

Also, we note that the Facility's access to our central reservation system has been suspended since April 30, 2025, for your failure to meet your financial obligations.

We hope you will take this opportunity to resolve your monetary default. If you have any questions regarding your default or how it can be timely cured, please contact Anthony Pizzuto at Anthony.Pizzuto@wyndham.com or at (973) 753-6750.

Sincerely yours,

Joe Maida
Senior Director - Contracts Compliance

Enclosure

cc:    Hardik Patel (as Guarantor)
Shmuel Bonnardel (Guarantor) - 2827 Forest Mill Lane Jacksonville, FL 32257
Dylan Jag Pathirana (Guarantor) - 5950 Canoga Ave Suite 500 Woodland Hills, CA 91367
Dylan Amin (Guarantor) - 300 Warren Mason Blvd. Brunswick, GA 31520
Anthony Pizzuto
Doug Emann
Suzanne Fenimore



**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

5858 INTERNATIONAL DRIVE LLC
5858 International Dr,
-, Orlando,
FL 32819-8204, United States

Howard Johnson International, Inc.
22 Sylvan Way
Parsippany, NJ 07054

Payment Terms: 30 Days from date of invoice          Account Number    09575-25157-08-HOJ                    Statement as of:  27-JUN-2025

| Period | Invoice Date | Invoice Number | Invoice Description | Amount Billed (USD) | Tax | Finance Charges | Amount Applied/ Credited | Adjustment | Total (USD) |
|---|---|---|---|---|---|---|---|---|---|
| JUL-24 | 07/31/2024 | 46439196 | Actual-ROYALTY FEE | 8,596.20 | 0.00 | 260.66 | 8,596.20 | 0.00 | 260.66 |
| | | | **Total JUL-24** | **8,596.20** | **0.00** | **260.66** | **8,596.20** | **0.00** | **260.66** |
| AUG-24 | 08/22/2024 | 33191615 | GDS INTERNET CONNECTIVITY FEE July 2024 | 2,182.25 | 0.00 | 177.63 | 0.00 | 0.00 | 2,359.88 |
| | 08/31/2024 | 46454168 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 217.66 | 0.00 | 0.00 | 2,461.66 |
| | 08/31/2024 | 46467041 | Actual-RESERVATION FEE | 3,512.47 | 0.00 | 268.56 | 2,751.64 | 0.00 | 1,029.39 |
| | 08/31/2024 | 46467042 | Actual-MARKETING FEE | 3,512.47 | 0.00 | 344.08 | 0.00 | 0.00 | 3,856.55 |
| | 08/31/2024 | 46467043 | Actual-ROYALTY FEE | 7,903.06 | 0.00 | 403.07 | 7,903.06 | 0.00 | 403.07 |
| | | | **Total AUG-24** | **19,354.25** | **0.00** | **1,411.00** | **10,654.70** | **0.00** | **10,110.55** |
| OCT-24 | 10/01/2024 | 26015694 | SIGNATURE RESERVATION SERVICE | 97.78 | 0.00 | 8.77 | 0.00 | 0.00 | 106.55 |
| | 10/04/2024 | 11291180 | GUEST SATISFACTION- WYNREWARDS | 15.00 | 0.00 | 1.32 | 0.00 | 0.00 | 16.32 |
| | 10/04/2024 | 22177818 | WR MISSING STAY ADMIN FEE | 50.00 | 0.00 | 4.42 | 0.00 | 0.00 | 54.42 |
| | 10/04/2024 | 11287587 | GUEST SATISFACTION | 825.69 | 0.00 | 72.67 | 0.00 | 0.00 | 898.36 |
| | 10/07/2024 | TA3351014 | TRAVEL AGENT COMMISSIONS | 5.53 | 0.00 | 0.49 | 0.00 | 0.00 | 6.02 |
| | 10/07/2024 | TM3351014 | MEMBER BENEFIT COMMISSION | 17.30 | 0.00 | 1.50 | 0.00 | 0.00 | 18.80 |
| | 10/07/2024 | TD3351014 | DIGITAL PFP | 303.53 | 0.00 | 26.23 | 0.00 | 0.00 | 329.76 |
| | 10/07/2024 | TC3351014 | TA COMMISSION SERVICE CHARGE | 3.43 | 0.00 | 0.28 | 0.00 | 0.00 | 3.71 |
| | 10/23/2024 | 33221601 | GDS INTERNET CONNECTIVITY FEE September 2024 | 1,725.50 | 0.00 | 148.41 | 0.00 | 0.00 | 1,873.91 |
| | 10/24/2024 | 22178335 | WYNREWARDS ENROLLMENT FEE CR | -2.34 | 0.00 | 0.00 | 0.00 | 0.00 | -2.34 |
| | 10/24/2024 | 22178405 | WYNDHAM REWARDS BONUS POINTS | 90.25 | 0.00 | 7.72 | 0.00 | 0.00 | 97.97 |
| | 10/24/2024 | 22178239 | WYNDHAM REWARDS FREE NIGHTS RE | -521.85 | 0.00 | 0.00 | 0.00 | 0.00 | -521.85 |
| | 10/24/2024 | 22178336 | WYNDHAM REWARDS 5% | 1,968.38 | 0.00 | 168.30 | 0.00 | 0.00 | 2,136.68 |
| | 10/31/2024 | 46520952 | Actual-ROYALTY FEE | 8,132.36 | 0.00 | 719.07 | 0.00 | 0.00 | 8,851.43 |
| | 10/31/2024 | 46512596 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 184.00 | 0.00 | 0.00 | 2,428.00 |
| | 10/31/2024 | 46520951 | Actual-MARKETING FEE | 3,614.38 | 0.00 | 346.97 | 0.00 | 0.00 | 3,961.35 |
| | 10/31/2024 | 46520950 | Actual-RESERVATION FEE | 3,614.38 | 0.00 | 346.97 | 0.00 | 0.00 | 3,961.35 |
| | | | **Total OCT-24** | **22,183.32** | **0.00** | **2,037.12** | **0.00** | **0.00** | **24,220.44** |
| DEC-24 | 12/06/2024 | 33254261 | GM CERTIFICATION/HMP Khushbu Patel - VHMP - 11/24 | 2,000.00 | 0.00 | 76.79 | 1,049.21 | 0.00 | 1,027.58 |

| | Date | Ref | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2024 | 46585823 | Actual-MARKETING FEE | 4,031.08 | 0.00 | 190.96 | 1,588.82 | 0.00 | 2,633.22 |
| | 12/31/2024 | 46585824 | Actual-ROYALTY FEE | 9,069.92 | 0.00 | 303.52 | 6,316.47 | 0.00 | 3,056.97 |
| | 12/31/2024 | 46585822 | Actual-RESERVATION FEE | 4,031.08 | 0.00 | 264.04 | 0.00 | 0.00 | 4,295.12 |
| | | | **Total DEC-24** | **19,132.08** | **0.00** | **835.31** | **8,954.50** | **0.00** | **11,012.89** |
| JAN-25 | 01/31/2025 | 46620847 | Actual-MARKETING FEE | 3,911.30 | 0.00 | 44.94 | 3,274.49 | 0.00 | 681.75 |
| | | | **Total JAN-25** | **3,911.30** | **0.00** | **44.94** | **3,274.49** | **0.00** | **681.75** |
| MAR-25 | 03/01/2025 | 26016128 | SIGNATURE RESERVATION SERVICE | 474.69 | 0.00 | 13.29 | 0.00 | 0.00 | 487.98 |
| | 03/04/2025 | TR3387080 | TMC / CONSORTIA PFP FEES | 4.37 | 0.00 | 0.12 | 0.00 | 0.00 | 4.49 |
| | 03/04/2025 | TD3387080 | DIGITAL PFP | 308.61 | 0.00 | 8.17 | 0.00 | 0.00 | 316.78 |
| | 03/04/2025 | TP3387080 | AAA PROGRAM COMMISSION | 2.99 | 0.00 | 0.08 | 0.00 | 0.00 | 3.07 |
| | 03/04/2025 | TA3387080 | TRAVEL AGENT COMMISSIONS | 17.50 | 0.00 | 0.46 | 0.00 | 0.00 | 17.96 |
| | 03/04/2025 | TC3387080 | TA COMMISSION SERVICE CHARGE | 5.10 | 0.00 | 0.14 | 0.00 | 0.00 | 5.24 |
| | 03/04/2025 | TM3387080 | MEMBER BENEFIT COMMISSION | 8.00 | 0.00 | 0.21 | 0.00 | 0.00 | 8.21 |
| | 03/06/2025 | 33339531 | SIGNATURE RESERVATION CREDIT SRS Invoice Adjustment | -36.34 | 0.00 | 0.00 | 0.00 | 0.00 | -36.34 |
| | 03/07/2025 | 11310189 | GUEST SATISFACTION | 55.00 | 0.00 | 1.37 | 0.00 | 0.00 | 56.37 |
| | 03/07/2025 | 11309412 | GUEST SATISFACTION- WYNREWARDS | 98.00 | 0.00 | 2.45 | 0.00 | 0.00 | 100.45 |
| | 03/13/2025 | 33360757 | GOVERNMENT RFP PROGRAM | 6.00 | 0.00 | 0.17 | 0.00 | 0.00 | 6.17 |
| | 03/26/2025 | 22182808 | WYNDHAMREWARDS PURCHASE POINTS | 15,000.00 | 0.00 | 345.00 | 0.00 | 0.00 | 15,345.00 |
| | 03/26/2025 | 33384866 | RevIQ - Start Up Feb-2025-RevIQ STND ($177 USD) | 177.00 | 11.50 | 4.33 | 0.00 | 0.00 | 192.83 |
| | 03/26/2025 | 33389495 | GDS INTERNET CONNECTIVITY FEE February 2025 | 1,550.50 | 0.00 | 35.66 | 0.00 | 0.00 | 1,586.16 |
| | 03/26/2025 | 22182857 | WYNDHAM REWARDS 5% | 1,537.32 | 0.00 | 35.36 | | 0.00 | 1,572.68 |
| | 03/26/2025 | 22182810 | WYNREWARDS ENROLLMENT FEE CR | -6.50 | 0.00 | 0.00 | 0.00 | 0.00 | -6.50 |
| | 03/26/2025 | 22182809 | WYNREWARDS 5% INCREASE: 0.50% | 153.86 | 0.00 | 3.53 | 0.00 | 0.00 | 157.39 |
| | 03/26/2025 | 22183193 | WYNDHAM REWARDS FREE NIGHTS RE | -146.54 | 0.00 | 0.00 | 0.00 | 0.00 | -146.54 |
| | 03/31/2025 | 46678015 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 46.00 | 0.00 | 0.00 | 2,290.00 |
| | 03/31/2025 | 46679009 | CONTINUING EDUCATION FEE | 600.00 | 0.00 | 12.30 | 0.00 | 0.00 | 612.30 |
| | 03/31/2025 | 46693137 | Actual-ROYALTY FEE | 6,945.21 | 0.00 | 142.38 | 0.00 | 0.00 | 7,087.59 |
| | 03/31/2025 | 46693318 | Actual-MARKETING FEE | 3,086.76 | 0.00 | 63.27 | 0.00 | 0.00 | 3,150.03 |
| | 03/31/2025 | 46693136 | Actual-RESERVATION FEE | 3,086.76 | 0.00 | 63.27 | 0.00 | 0.00 | 3,150.03 |
| | 03/31/2025 | 33415353 | RATE SHOPS 2-2025 Active (Non-RMS) PCB NAMER | 75.00 | 0.00 | 1.54 | 0.00 | 0.00 | 76.54 |
| | | | **Total MAR-25** | **35,247.29** | **11.50** | **779.10** | **0.00** | **0.00** | **36,037.89** |
| APR-25 | 04/01/2025 | 26016391 | SIGNATURE RESERVATION SERVICE | 473.48 | 0.00 | 5.92 | 0.00 | 0.00 | 479.40 |
| | 04/02/2025 | 33430386 | RATE SHOPS 2-2025 Active (Non-RMS) PCB NAMER | -75.00 | 0.00 | 0.00 | 0.00 | 0.00 | -75.00 |
| | 04/02/2025 | TC3394208 | TA COMMISSION SERVICE CHARGE | 5.53 | 0.00 | 0.07 | 0.00 | 0.00 | 5.60 |
| | 04/02/2025 | TA3394208 | TRAVEL AGENT COMMISSIONS | 21.90 | 0.00 | 0.26 | 0.00 | 0.00 | 22.16 |
| | 04/02/2025 | TD3394208 | DIGITAL PFP | 178.98 | 0.00 | 2.15 | 0.00 | 0.00 | 181.13 |
| | 04/02/2025 | TM3394208 | MEMBER BENEFIT COMMISSION | 14.98 | 0.00 | 0.18 | 0.00 | 0.00 | 15.16 |
| | 04/03/2025 | 22184957 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 14.26 | 0.00 | 0.00 | 764.26 |
| | 04/04/2025 | 33431052 | RevIQ- Service Mar-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 3.27 | 0.00 | 0.00 | 180.27 |

| | Date | Ref # | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 04/07/2025 | 11333918 | GUEST SATISFACTION- WYNREWARDS | 113.00 | 0.00 | 1.07 | 0.00 | 0.00 | 114.07 |
| | 04/10/2025 | 33433479 | NSF RETURN CHRG ACH031525 | 100.00 | 0.00 | 1.55 | 0.00 | 0.00 | 101.55 |
| | 04/23/2025 | 33441957 | GDS INTERNET CONNECTIVITY FEE March 2025 | 1,597.75 | 0.00 | 14.38 | 0.00 | 0.00 | 1,612.13 |
| | 04/24/2025 | 22185446 | WYNDHAM REWARDS 5% | 1,605.31 | 0.00 | 13.65 | 0.00 | 0.00 | 1,618.96 |
| | 04/24/2025 | 22185445 | WYNREWARDS 5% INCREASE: 0.50% | 161.23 | 0.00 | 1.37 | 0.00 | 0.00 | 162.60 |
| | 04/24/2025 | 22185783 | WYNDHAM REWARDS FREE NIGHTS RE | -133.18 | 0.00 | 0.00 | 0.00 | 0.00 | -133.18 |
| | 04/30/2025 | 46733448 | Actual-RESERVATION FEE | 2,032.70 | 0.00 | 11.18 | 0.00 | 0.00 | 2,043.88 |
| | 04/30/2025 | 46725312 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 12.34 | 0.00 | 0.00 | 2,256.34 |
| | 04/30/2025 | 46733449 | Actual-ROYALTY FEE | 4,573.59 | 0.00 | 25.15 | 0.00 | 0.00 | 4,598.74 |
| | 04/30/2025 | 46733450 | Actual-MARKETING FEE | 2,032.70 | 0.00 | 11.18 | 0.00 | 0.00 | 2,043.88 |
| | | | **Total APR-25** | **15,873.97** | **0.00** | **117.98** | **0.00** | **0.00** | **15,991.95** |
| MAY-25 | 05/01/2025 | 26016626 | SIGNATURE RESERVATION SERVICE | 93.73 | 0.00 | 0.00 | 0.00 | 0.00 | 93.73 |
| | 05/07/2025 | TP3401336 | AAA PROGRAM COMMISSION | 8.63 | 0.00 | 0.00 | 0.00 | 0.00 | 8.63 |
| | 05/07/2025 | TD3401336 | DIGITAL PFP | 316.38 | 0.00 | 0.00 | 0.00 | 0.00 | 316.38 |
| | 05/07/2025 | TC3401336 | TA COMMISSION SERVICE CHARGE | 3.70 | 0.00 | 0.00 | 0.00 | 0.00 | 3.70 |
| | 05/08/2025 | 33484037 | NSF RETURN CHRG ACH041525 | 100.00 | 0.00 | 0.15 | 0.00 | 0.00 | 100.15 |
| | 05/09/2025 | 33490690 | WYNDHAM REWARDS 5% ADJUSTMENT Chargeback Credit | -52.24 | 0.00 | 0.00 | 0.00 | 0.00 | -52.24 |
| | 05/14/2025 | 33491532 | RevIQ- Service Apr-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 0.00 | 0.00 | 0.00 | 177.00 |
| | 05/27/2025 | 33513988 | GDS INTERNET CONNECTIVITY FEE April 2025 | 922.25 | 0.00 | 0.00 | 0.00 | 0.00 | 922.25 |
| | 05/27/2025 | 22187843 | WYNDHAM REWARDS FREE NIGHTS RE | -100.00 | 0.00 | 0.00 | 0.00 | 0.00 | -100.00 |
| | 05/27/2025 | 22187452 | WYNDHAM REWARDS 5% | 458.69 | 0.00 | 0.00 | 0.00 | 0.00 | 458.69 |
| | 05/27/2025 | 22187489 | WYNREWARDS ENROLLMENT FEE CR | -23.59 | 0.00 | 0.00 | 0.00 | 0.00 | -23.59 |
| | 05/27/2025 | 22187488 | WYNREWARDS 5% INCREASE: 0.50% | 43.49 | 0.00 | 0.00 | 0.00 | 0.00 | 43.49 |
| | 05/31/2025 | 46762357 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,244.00 |
| | 05/31/2025 | 46797280 | Accrual-MARKETING FEE | 2,066.13 | 0.00 | 0.00 | 0.00 | 0.00 | 2,066.13 |
| | 05/31/2025 | 46797278 | Accrual-RESERVATION FEE | 2,066.13 | 0.00 | 0.00 | 0.00 | 0.00 | 2,066.13 |
| | 05/31/2025 | 46797279 | Accrual-ROYALTY FEE | 4,648.79 | 0.00 | 0.00 | 0.00 | 0.00 | 4,648.79 |
| | | | **Total MAY-25** | **12,973.09** | **0.00** | **0.15** | **0.00** | **0.00** | **12,973.24** |
| JUN-25 | 06/03/2025 | 33534640 | RevIQ- Service May-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 0.00 | 0.00 | 0.00 | 177.00 |
| | 06/03/2025 | 11377549 | GUEST SATISFACTION- WYNREWARDS | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 |
| | 06/03/2025 | TC3408548 | TA COMMISSION SERVICE CHARGE | 4.73 | 0.00 | 0.00 | 0.00 | 0.00 | 4.73 |
| | 06/03/2025 | TM3408548 | MEMBER BENEFIT COMMISSION | 31.52 | 0.00 | 0.00 | 0.00 | 0.00 | 31.52 |
| | 06/03/2025 | TD3408548 | DIGITAL PFP | 167.59 | 0.00 | 0.00 | 0.00 | 0.00 | 167.59 |
| | 06/24/2025 | 33539259 | SIGNATURE RESERVATION SERVICE Adjusted Billing for Jan-Apr 2025 | 6.06 | 0.00 | 0.00 | 0.00 | 0.00 | 6.06 |
| | 06/25/2025 | 22190270 | WYNDHAM REWARDS 5% | 808.03 | 0.00 | 0.00 | 0.00 | 0.00 | 808.03 |
| | 06/25/2025 | 22190238 | WYNREWARDS 5% INCREASE: 0.50% | 78.50 | 0.00 | 0.00 | 0.00 | 0.00 | 78.50 |
| | 06/25/2025 | 22190269 | WYNREWARDS ENROLLMENT FEE CR | -23.31 | 0.00 | 0.00 | 0.00 | 0.00 | -23.31 |
| | 06/26/2025 | 33544989 | GDS INTERNET CONNECTIVITY FEE May 2025 | 120.75 | 0.00 | 0.00 | 0.00 | 0.00 | 120.75 |
| | | | **Total JUN-25** | **1,470.87** | **0.00** | **0.00** | **0.00** | **0.00** | **1,470.87** |

Case 2:26-cv-03980-JXN-AME    Document 1    Filed 04/15/26    Page 119 of 155 PageID: 119

| | | | | | |
|---|---|---|---|---|---|
| **Total Outstanding:** | 138,742.37 | 11.50 | 5,486.26 | 31,479.89 | 0.00 | 112,760.24 |

Case 2:26-cv-03980-JXN-AME   Document 1   Filed 04/15/26   Page 120 of 155 PageID: 120



Howard Johnson International, Inc.
22 Sylvan Way
Parsippany, NJ 07054

**PAYMENT OPTIONS**

**BY WIRE TRANSFER**: Please ensure all transfers costs are settled by yourselves. Please quote the invoice and account number with payment and transfer to:

| | | |
|---|---|---|
| Bank | : | Bank of America, N.A. |
| Branch Address | : | 100 West 33rd Street<br>New York, NY 10001 |
| Account Name | : | Howard Johnson International, Inc. |
| Bank Account Number | : | 4426450683 |
| ABA | : | 026009593 |
| Swift Code | : | BOFAUS3N |

**REMIT CHECKS TO:**

Howard Johnson International, Inc.
15013 Collections Center Drive
Chicago, IL 60693

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

**Additional Information:**

Thank you in advance for your prompt payment and continued business
Please note accrual invoices on your account are estimates and can't be paid until actual revenues are reported
Please ensure you promptly submit your actual revenues and rooms sold in Wynpay

**Contact information:**

For supporting invoice details please visit WynPay and/or Wyndham Community.  For questions please call 1-855-849-3487 or email Financial.Services@wyndham.com

## Billing Glossary

| Catcode Description | Long Description |
|---|---|
| AAA PROGRAM COMMISSION | Commissions related to the AAA global sales program (iata 0092562). Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| CONTINUING EDUCATION FEE | Annual continuing education fee as outlined in your Franchise Disclosure Document. The fee provides access to the Wyndham University training system, training content, and other training opportunities. In Wyndham University, you can also access learning journeys for other hotels roles for added develop into other responsibilities. For questions please contact WyndhamU@wyndham.com. |
| DIGITAL PFP | Commissions related to bookings that are part of the digital pay for performance (DPFP) program. The DPFP is a program designed to reinvest funds into our digital media program to deliver direct bookings to our franchisees. DPFP-eligible channels include Paid Search, Meta, Feeds, Display, Local, and Facebook Retargeting. Please Note: The DPFP commission is not charged on every digital media driven booking. For example, bookings through select member benefits programs (e.g. AAA and AARP) as well as bookings by Platinum, Diamond, and Titanium rewards members, are not charged. For questions please contact central.commissions@wyndham.com. |
| GDS INTERNET CONNECTIVITY FEE | GDS & Internet Connectivity Fees are charged per consumed booking based on the fees outlined in your agreement or subsequent communication. No GDS and internet connectivity fees are due on cancelled or no-show reservations provided they are updated in the reservation system. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Finance" category. For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487 |
| GM CERTIFICATION/HMP | GM Certification/Hospitality Management Program for new and transfer GMs, second attendees from the same site for the same class, and post-90 day-integration-period attendees. The hotel's GM of Record must complete this training no later ninety (90) days after the hotel's opening date. Any replacement GM must complete this training within ninety (90) days after assuming the GM role. The complete course description, including cost can be located in Wyndham University. For questions please contact WyndhamU@wyndham.com. |
| GOVERNMENT RFP PROGRAM | Annual fee for participating in government RFP program. For questions related to this charge, please contact whg_gso_coe@wyndham.com |
| GUEST SATISFACTION | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of a manual check. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| GUEST SATISFACTION-WYNREWARDS | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of Wyndham Rewards points. The invoice is the cost of the Wyndham Rewards points. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| MARKETING FEE | Recurring fee for the advertising and marketing activities of the system, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| MEMBER BENEFIT COMMISSION | Commissions related to Global Sales member benefits program. The Member Benefits Program establishes partnerships with member loyalty and affinity based organizations by providing those organizations' with a proprietary discount. Accounts include but are not limited to AARP, American Legion, Wyndham Destinations, American Farm Bureaus to name a few. This program is used to help keep WHR top of mind with these organizations in order to drive revenue through Wyndham Direct channels. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| Missed Valid Enrollment Fee | The Missed Valid Enrollment Fee is charged when your property enrolls 33% or less than your Quarterly Valid Enrollment Target for two consecutive quarters. Backup for this invoice can be found at the following location: Wyndham Community > Quick Links > Wyndham Rewards eDesk > Loyalty Fee Discount/Increase Detail Report. For questions, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| NSF RETURN CHRG | Fee imposed for a payment that was submitted but there was non-sufficient funds to cover the amount. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com. In the EMEA region please contact operations.emea@wyndham.com or your financial services representative at Financial.Services@Wyndham.com |
| OPERA CLOUD SUPPORT | A fee for HTCS first level support services as detailed in your property management system agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| RATE SHOPS | Fee for rate shop subscription. The subscription was previously OTA Insight and currently is Lighthouse. For questions related to this invoice please open a RMAssist case through Wyndham Community. |
| RESERVATION FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| ROYALTY FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| RevIQ - Start Up | RevIQ revenue management system one time set-up fee per the terms of your executed RevIQ agreement. For questions, please contact reviq@wyndham.com |
| RevIQ- Service | RevIQ revenue management system monthly subscription fee fee per the terms of your executed RevIQ agreement. For questions, please contact reviq@wyndham.com |
| SIGNATURE RESERVATION CREDIT | Credit for hotels on the Signature Reservation Services call transfer program that allows hotels to have reservation calls handled by Contact Center. These credits are issued due to the hotel receiving free promotional months of service. For questions and supporting detail related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |
| SIGNATURE RESERVATION SERVICE | Fee for hotels on the Signature Reservation Services (SRS) call transfer program that allows hotels to have reservation calls handled by our contact center reservation representatives. SRS fees are based on the booking only. If no reservation is made, there is no cost to you. On each reservation made, the fee is a % of GRR or a maximum fee (both outlined in the agreement), whichever is less. Backup for this invoice can be found at the following location Wyndham Community-> Hotel Management -> Reports and filter for "SRS" category. For questions related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |
| TA COMMISSION SERVICE CHARGE | A 1.5% commission service charge based on total commissionable revenue processed for the given month. Supporting detail for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |

Case 2:26-cv-03980-JXN-AME   Document 1   Filed 04/15/26   Page 121 of 155 PageID: 121

# Billing Glossary

| Catcode Description | Long Description |
|---|---|
| TMC / CONSORTIA PFP FEES | Pay for Performance (PFP) program fees related to Global Sales negotiated TMC/Consortia contracts. WHR's GSO has negotiated pay for performance fees that are applicable to certain bookings booked by our various TMC/Consortia partners. These PFP fees typically range from 2%-5% of room revenue and may be assessed on all business or discretionary business only that is booked by these partners, including on non-commissionable rates. The payment of these fees provides WHR higher level biasing in GDS and various marketing opportunities. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| TRAVEL AGENT COMMISSIONS | Commissions related to standard travel agent bookings via GDS, brand.com, voice, internet, or other third party channels for commissionable rate plans. Additional revenues were delivered to your property as a result of these bookings. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| WR MISSING STAY ADMIN FEE | Fee imposed if your property fails to properly post a Member's Earning Stay within 10 days of the Member's check-out date and Member Services must resolve the Member's request for their missing points, you will be subject to a Missing Stay Administration Fee. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% | Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% ADJUSTMENT | Adjustments for Wyndham Rewards 5% member fee. Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS BONUS POINTS | Cost of Wyndham Rewards points awarded to members as result of your property's participation in a select bonus point offer(s). Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS FREE NIGHTS REIMB | Reimbursement for actualized free night stay. Reimbursement is based on your hotel's occupancy and ADR of the day the Free Night is consumed. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAMREWARDS PURCHASE POINTS | Purchase Points Rewards (PPR) tool to buy and issue Wyndham Rewards points to members for marketing and loyalty purposes only. Refer to the PPR tool for the cost per point. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNREWARDS 5% INCREASE: 0.50% | The Wyndham Rewards Loyalty Program assesses a 5% fee on all nights for which member earn points. This Increase is for hotels that missed their Quarterly Valid Enrollment Target, achieving 66% or less of their target during the prior quarter. This means the net Loyalty Program Charge for this quarter is 5.50%. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to this fee, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| WYNREWARDS ENROLLMENT FEE CR | A credit is applied towards the Loyalty Program Charge for all new Member Enrollment Stays. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |

# **<u>Exhibit G</u>**

**WYNDHAM**

**HOTELS & RESORTS**

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

August 14, 2025

**VIA ELECTRONIC MAIL AND UPS**
amie.fielding@sohopmc.com

Ms. Amie Fielding
5858 International Drive LLC
9150 Baymeadows Rd.
Jacksonville, FL 32256

**Re: NOTICE OF OPERATIONAL AND CONTINUING MONETARY DEFAULT relating to Howard Johnson® by Wyndham Unit #09575-25157-08 located in Orlando, FL (the "Facility")**

Dear Ms. Fielding:

I write on behalf of Howard Johnson International, Inc.("we," "us," or "our") regarding the Franchise Agreement dated March 30, 2024, between 5858 International Drive LLC ("you" or "your") and us (the "Agreement"), to advise that you are failing to meet your operational and monetary obligations under the terms of the Agreement. We will address each matter in turn.

**Operational Default**

We have been made aware that the City of Orlando has deemed the Facility unsafe for occupancy, and as a result, all individuals have been ordered to vacate the Facility.

We remind you that Section 3.2.1 of the Agreement reads, in pertinent part, as follows: "You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those required by System Standards or specified on the PIP) to the public in compliance with all federal, state, and local laws, regulations and ordinance, as well as System Standards. You will keep the Facility in a clean, neat, and sanitary condition."

Furthermore, Section 3.11 of the Agreement states, "You will use reasonable efforts to protect, maintain and promote the name "Howard Johnson" or "Howard Johnson by Wyndham" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System."

Your failure to maintain the Facility in compliance with the applicable local laws, regulations, and/or ordinances is a breach of Section 3.2.1 of the Agreement and seriously impacts the goodwill of the Howard Johnson System.

**Continuing Monetary Default**

Additionally, we advised you in the notice dated July 7, 2025, that you were in default for your failure to meet your financial obligations to us. The notice required you to cure the monetary default within thirty (30) days. However, you did not cure your default within the time permitted. Please be advised that as of the date of this Notice, your account is now past due in the amount of $132,328.80. We have enclosed an itemized statement detailing the past due fees.



Ms. Amie Fielding
August 14, 2025
Page 2

As you are aware, the Facility's access to our central reservations system has already been suspended since April 30, 2025 for outstanding monetary issues, and we have now added system standards to the list of reasons for this suspension. The Facility's access to our central reservation system will remain suspended until all defaults have been cured to our satisfaction.

Under the terms of the Agreement, you have thirty (30) days to cure your defaults. If you fail to cure your defaults we reserve all rights under the terms of the Agreement, including, but not limited to, the termination of the Agreement and your right to operate in the Howard Johnson System.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default. By copy of this Notice, we are also informing your Guarantors of your default.

We hope you will take this opportunity to resolve your defaults. If you have any questions regarding your default or how it can be timely cured, please contact our Operations Support Desk at osd@wyndham.com or at (855) 849-3487.

Sincerely,

Suzanne Fenimore
Vice President
Contracts Compliance


Enclosure

cc:    Shmuel Bonnardel (Guarantor) - 2827 Forest Mill Lane, Jacksonville, FL 32257
       Hardik Patel (Guarantor) - 1135 E King Ave, Kingsland, GA 31548
       Dylan Jag Pathirana (Guarantor)- 5950 Canoga Ave., Suite 500, Woodland Hills, CA 91367
       Dylan Amin (Guarantor) - 300 Warren Mason Blvd, Brunswick, GA 31520
       Anthony Pizzuto
       Doug Emann
       Dina DiFranco

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

5858 INTERNATIONAL DRIVE LLC
5858 International Dr,
-, Orlando,
FL 32819-8204, United States

Howard Johnson International, Inc.
22 Sylvan Way
Parsippany, NJ 07054

Payment Terms: 30 Days from date of invoice          Account Number    09575-25157-08-HOJ          Statement as of:  14-AUG-2025

| Period | Invoice Date | Invoice Number | Invoice Description | Amount Billed (USD) | Tax | Finance Charges | Amount Applied/ Credited | Adjustment | Total (USD) |
|---|---|---|---|---|---|---|---|---|---|
| JUL-24 | 07/31/2024 | 46439196 | Actual-ROYALTY FEE | 8,596.20 | 0.00 | 260.66 | 8,596.20 | 0.00 | 260.66 |
| | | | **Total JUL-24** | **8,596.20** | **0.00** | **260.66** | **8,596.20** | **0.00** | **260.66** |
| AUG-24 | 08/22/2024 | 33191615 | GDS INTERNET CONNECTIVITY FEE July 2024 | 2,182.25 | 0.00 | 208.91 | 0.00 | 0.00 | 2,391.16 |
| | 08/31/2024 | 46467043 | Actual-ROYALTY FEE | 7,903.06 | 0.00 | 403.07 | 7,903.06 | 0.00 | 403.07 |
| | 08/31/2024 | 46467041 | Actual-RESERVATION FEE | 3,512.47 | 0.00 | 291.76 | 2,751.64 | 0.00 | 1,052.59 |
| | 08/31/2024 | 46454168 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 286.10 | 0.00 | 0.00 | 2,530.10 |
| | 08/31/2024 | 46467042 | Actual-MARKETING FEE | 3,512.47 | 0.00 | 451.21 | 0.00 | 0.00 | 3,963.68 |
| | | | **Total AUG-24** | **19,354.25** | **0.00** | **1,641.05** | **10,654.70** | **0.00** | **10,340.60** |
| OCT-24 | 10/01/2024 | 26015694 | SIGNATURE RESERVATION SERVICE | 97.78 | 0.00 | 11.76 | 0.00 | 0.00 | 109.54 |
| | 10/04/2024 | 11291180 | GUEST SATISFACTION- WYNREWARDS | 15.00 | 0.00 | 1.78 | 0.00 | 0.00 | 16.78 |
| | 10/04/2024 | 22177818 | WR MISSING STAY ADMIN FEE | 50.00 | 0.00 | 5.95 | 0.00 | 0.00 | 55.95 |
| | 10/04/2024 | 11287587 | GUEST SATISFACTION | 825.69 | 0.00 | 97.86 | 0.00 | 0.00 | 923.55 |
| | 10/07/2024 | TM3351014 | MEMBER BENEFIT COMMISSION | 17.30 | 0.00 | 2.03 | 0.00 | 0.00 | 19.33 |
| | 10/07/2024 | TC3351014 | TA COMMISSION SERVICE CHARGE | 3.43 | 0.00 | 0.38 | 0.00 | 0.00 | 3.81 |
| | 10/07/2024 | TA3351014 | TRAVEL AGENT COMMISSIONS | 5.53 | 0.00 | 0.66 | 0.00 | 0.00 | 6.19 |
| | 10/07/2024 | TD3351014 | DIGITAL PFP | 303.53 | 0.00 | 35.48 | 0.00 | 0.00 | 339.01 |
| | 10/23/2024 | 33221601 | GDS INTERNET CONNECTIVITY FEE September 2024 | 1,725.50 | 0.00 | 201.04 | 0.00 | 0.00 | 1,926.54 |
| | 10/24/2024 | 22178335 | WYNREWARDS ENROLLMENT FEE CR | -2.34 | 0.00 | 0.00 | 0.00 | 0.00 | -2.34 |
| | 10/24/2024 | 22178239 | WYNDHAM REWARDS FREE NIGHTS RE | -521.85 | 0.00 | 0.00 | 0.00 | 0.00 | -521.85 |
| | 10/24/2024 | 22178336 | WYNDHAM REWARDS 5% | 1,968.38 | 0.00 | 228.34 | 0.00 | 0.00 | 2,196.72 |
| | 10/24/2024 | 22178405 | WYNDHAM REWARDS BONUS POINTS | 90.25 | 0.00 | 10.47 | 0.00 | 0.00 | 100.72 |
| | 10/31/2024 | 46520950 | Actual-RESERVATION FEE | 3,614.38 | 0.00 | 457.21 | 0.00 | 0.00 | 4,071.59 |
| | 10/31/2024 | 46520952 | Actual-ROYALTY FEE | 8,132.36 | 0.00 | 967.11 | 0.00 | 0.00 | 9,099.47 |
| | 10/31/2024 | 46512596 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 252.44 | 0.00 | 0.00 | 2,496.44 |
| | 10/31/2024 | 46520951 | Actual-MARKETING FEE | 3,614.38 | 0.00 | 457.21 | 0.00 | 0.00 | 4,071.59 |
| | | | **Total OCT-24** | **22,183.32** | **0.00** | **2,729.72** | **0.00** | **0.00** | **24,913.04** |
| DEC-24 | 12/06/2024 | 33254261 | GM CERTIFICATION/HMP Khushbu Patel - VHMP - 11/24 | 2,000.00 | 0.00 | 105.79 | 1,049.21 | 0.00 | 1,056.58 |

Case 2:26-cv-03980-JXN-AME   Document 1   Filed 04/15/26   Page 126 of 155 PageID: 126

| Period | Date | Invoice | Description | Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Total |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2024 | 46585824 | Actual-ROYALTY FEE | 9,069.92 | 0.00 | 387.50 | 6,316.47 | 0.00 | 3,140.95 |
| | 12/31/2024 | 46585823 | Actual-MARKETING FEE | 4,031.08 | 0.00 | 265.45 | 1,588.82 | 0.00 | 2,707.71 |
| | 12/31/2024 | 46585822 | Actual-RESERVATION FEE | 4,031.08 | 0.00 | 386.99 | 0.00 | 0.00 | 4,418.07 |
| | | | **Total DEC-24** | **19,132.08** | **0.00** | **1,145.73** | **8,954.50** | **0.00** | **11,323.31** |
| JAN-25 | 01/31/2025 | 46620847 | Actual-MARKETING FEE | 3,911.30 | 0.00 | 64.36 | 3,274.49 | 0.00 | 701.17 |
| | | | **Total JAN-25** | **3,911.30** | **0.00** | **64.36** | **3,274.49** | **0.00** | **701.17** |
| MAR-25 | 03/01/2025 | 26016128 | SIGNATURE RESERVATION SERVICE | 474.69 | 0.00 | 27.77 | 0.00 | 0.00 | 502.46 |
| | 03/04/2025 | TD3387080 | DIGITAL PFP | 308.61 | 0.00 | 17.58 | 0.00 | 0.00 | 326.19 |
| | 03/04/2025 | TC3387080 | TA COMMISSION SERVICE CHARGE | 5.10 | 0.00 | 0.30 | 0.00 | 0.00 | 5.40 |
| | 03/04/2025 | TM3387080 | MEMBER BENEFIT COMMISSION | 8.00 | 0.00 | 0.45 | 0.00 | 0.00 | 8.45 |
| | 03/04/2025 | TR3387080 | TMC / CONSORTIA PFP FEES | 4.37 | 0.00 | 0.26 | 0.00 | 0.00 | 4.63 |
| | 03/04/2025 | TP3387080 | AAA PROGRAM COMMISSION | 2.99 | 0.00 | 0.17 | 0.00 | 0.00 | 3.16 |
| | 03/04/2025 | TA3387080 | TRAVEL AGENT COMMISSIONS | 17.50 | 0.00 | 0.99 | 0.00 | 0.00 | 18.49 |
| | 03/06/2025 | 33339531 | SIGNATURE RESERVATION CREDIT SRS Invoice Adjustment | -36.34 | 0.00 | 0.00 | 0.00 | 0.00 | -36.34 |
| | 03/07/2025 | 11309412 | GUEST SATISFACTION- WYNREWARDS | 98.00 | 0.00 | 5.44 | 0.00 | 0.00 | 103.44 |
| | 03/07/2025 | 11310189 | GUEST SATISFACTION | 55.00 | 0.00 | 3.05 | 0.00 | 0.00 | 58.05 |
| | 03/13/2025 | 33360757 | GOVERNMENT RFP PROGRAM | 6.00 | 0.00 | 0.35 | 0.00 | 0.00 | 6.35 |
| | 03/26/2025 | 22182808 | WYNDHAMREWARDS PURCHASE POINTS | 15,000.00 | 0.00 | 802.50 | 0.00 | 0.00 | 15,802.50 |
| | 03/26/2025 | 22182809 | WYNREWARDS 5% INCREASE: 0.50% | 153.86 | 0.00 | 8.22 | 0.00 | 0.00 | 162.08 |
| | 03/26/2025 | 22183193 | WYNDHAM REWARDS FREE NIGHTS RE | -146.54 | 0.00 | 0.00 | 0.00 | 0.00 | -146.54 |
| | 03/26/2025 | 22182810 | WYNREWARDS ENROLLMENT FEE CR | -6.50 | 0.00 | 0.00 | 0.00 | 0.00 | -6.67 |
| | 03/26/2025 | 22182857 | WYNDHAM REWARDS 5% | 1,537.32 | 0.00 | 82.25 | 0.00 | 0.00 | 1,619.57 |
| | 03/26/2025 | 33389495 | GDS INTERNET CONNECTIVITY FEE February 2025 | 1,550.50 | 0.00 | 82.95 | 0.00 | 0.00 | 1,633.45 |
| | 03/26/2025 | 33384866 | RevIQ - Start Up Feb-2025-RevIQ STND ($177 USD) | 177.00 | 11.50 | 10.08 | 0.00 | 0.00 | 198.58 |
| | 03/31/2025 | 46678015 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 114.44 | 0.00 | 0.00 | 2,358.44 |
| | 03/31/2025 | 33415353 | RATE SHOPS 2-2025 Active (Non-RMS) PCB NAMER | 75.00 | 0.00 | 3.83 | 0.00 | 0.00 | 78.83 |
| | 03/31/2025 | 46693137 | Actual-ROYALTY FEE | 6,945.21 | 0.00 | 354.21 | 0.00 | 0.00 | 7,299.42 |
| | 03/31/2025 | 46693136 | Actual-RESERVATION FEE | 3,086.76 | 0.00 | 157.41 | 0.00 | 0.00 | 3,244.17 |
| | 03/31/2025 | 46693318 | Actual-MARKETING FEE | 3,086.76 | 0.00 | 157.41 | 0.00 | 0.00 | 3,244.17 |
| | 03/31/2025 | 46679009 | CONTINUING EDUCATION FEE | 600.00 | 0.00 | 30.60 | 0.00 | 0.00 | 630.60 |
| | | | **Total MAR-25** | **35,247.29** | **11.50** | **1,860.26** | **0.00** | **0.00** | **37,119.05** |
| APR-25 | 04/01/2025 | 26016391 | SIGNATURE RESERVATION SERVICE | 473.48 | 0.00 | 20.36 | 0.00 | 0.00 | 493.84 |
| | 04/02/2025 | 33430386 | RATE SHOPS 2-2025 Active (Non-RMS) PCB NAMER | -75.00 | 0.00 | 0.00 | 0.00 | 0.00 | -75.00 |
| | 04/02/2025 | TM3394208 | MEMBER BENEFIT COMMISSION | 14.98 | 0.00 | 0.63 | 0.00 | 0.00 | 15.61 |
| | 04/02/2025 | TC3394208 | TA COMMISSION SERVICE CHARGE | 5.53 | 0.00 | 0.24 | 0.00 | 0.00 | 5.77 |
| | 04/02/2025 | TA3394208 | TRAVEL AGENT COMMISSIONS | 21.90 | 0.00 | 0.93 | 0.00 | 0.00 | 22.83 |
| | 04/02/2025 | TD3394208 | DIGITAL PFP | 178.98 | 0.00 | 7.60 | 0.00 | 0.00 | 186.58 |
| | 04/03/2025 | 22184957 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 37.14 | 0.00 | 0.00 | 787.14 |
| | 04/04/2025 | 33431052 | RevIQ- Service Mar-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 8.67 | 0.00 | 0.00 | 185.67 |

Case 2:26-cv-03980-JXN-AME   Document 1   Filed 04/15/26   Page 128 of 155 PageID: 128

| | Date | Ref | Description | | | | | | Amount |
|---|---|---|---|---|---|---|---|---|---|
| | 04/07/2025 | 11333918 | GUEST SATISFACTION- WYNREWARDS | 113.00 | 0.00 | 4.52 | 0.00 | 0.00 | 117.52 |
| | 04/10/2025 | 33433479 | NSF RETURN CHRG ACH031525 | 100.00 | 0.00 | 4.60 | 0.00 | 0.00 | 104.60 |
| | 04/23/2025 | 33441957 | GDS INTERNET CONNECTIVITY FEE March 2025 | 1,597.75 | 0.00 | 63.12 | 0.00 | 0.00 | 1,660.87 |
| | 04/24/2025 | 22185783 | WYNDHAM REWARDS FREE NIGHTS RE | -133.18 | 0.00 | 0.00 | 0.00 | 0.00 | -133.18 |
| | 04/24/2025 | 22185446 | WYNDHAM REWARDS 5% | 1,605.31 | 0.00 | 62.61 | 0.00 | 0.00 | 1,667.92 |
| | 04/24/2025 | 22185445 | WYNREWARDS 5% INCREASE: 0.50% | 161.23 | 0.00 | 6.29 | 0.00 | 0.00 | 167.52 |
| | 04/30/2025 | 46733448 | Actual-RESERVATION FEE | 2,032.70 | 0.00 | 73.18 | 0.00 | 0.00 | 2,105.88 |
| | 04/30/2025 | 46733450 | Actual-MARKETING FEE | 2,032.70 | 0.00 | 73.18 | 0.00 | 0.00 | 2,105.88 |
| | 04/30/2025 | 46725312 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 80.78 | 0.00 | 0.00 | 2,324.78 |
| | 04/30/2025 | 46733449 | Actual-ROYALTY FEE | 4,573.59 | 0.00 | 164.64 | 0.00 | 0.00 | 4,738.23 |
| | | | **Total APR-25** | **15,873.97** | **0.00** | **608.49** | **0.00** | **0.00** | **16,482.46** |
| MAY-25 | 05/01/2025 | 26016626 | SIGNATURE RESERVATION SERVICE | 93.73 | 0.00 | 2.62 | 0.00 | 0.00 | 96.35 |
| | 05/07/2025 | TD3401336 | DIGITAL PFP | 316.38 | 0.00 | 7.91 | 0.00 | 0.00 | 324.29 |
| | 05/07/2025 | TC3401336 | TA COMMISSION SERVICE CHARGE | 3.70 | 0.00 | 0.10 | 0.00 | 0.00 | 3.80 |
| | 05/07/2025 | TP3401336 | AAA PROGRAM COMMISSION | 8.63 | 0.00 | 0.21 | 0.00 | 0.00 | 8.84 |
| | 05/08/2025 | 33484037 | NSF RETURN CHRG ACH041525 | 100.00 | 0.00 | 3.20 | 0.00 | 0.00 | 103.20 |
| | 05/09/2025 | 33490690 | WYNDHAM REWARDS 5% ADJUSTMENT Chargeback Credit | -52.24 | 0.00 | 0.00 | 0.00 | 0.00 | -52.24 |
| | 05/14/2025 | 33491532 | RevIQ- Service Apr-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 5.13 | 0.00 | 0.00 | 182.13 |
| | 05/27/2025 | 22187843 | WYNDHAM REWARDS FREE NIGHTS RE | -100.00 | 0.00 | 0.00 | 0.00 | 0.00 | -100.00 |
| | 05/27/2025 | 22187489 | WYNREWARDS ENROLLMENT FEE CR | -23.59 | 0.00 | 0.00 | 0.00 | 0.00 | -23.59 |
| | 05/27/2025 | 33513988 | GDS INTERNET CONNECTIVITY FEE April 2025 | 922.25 | 0.00 | 20.75 | 0.00 | 0.00 | 943.00 |
| | 05/27/2025 | 22187488 | WYNREWARDS 5% INCREASE: 0.50% | 43.49 | 0.00 | 0.97 | 0.00 | 0.00 | 44.46 |
| | 05/27/2025 | 22187452 | WYNDHAM REWARDS 5% | 458.69 | 0.00 | 10.32 | 0.00 | 0.00 | 469.01 |
| | 05/31/2025 | 46797279 | Accrual-ROYALTY FEE | 4,648.79 | 0.00 | 95.30 | 0.00 | 0.00 | 4,744.09 |
| | 05/31/2025 | 46797278 | Accrual-RESERVATION FEE | 2,066.13 | 0.00 | 42.36 | 0.00 | 0.00 | 2,108.49 |
| | 05/31/2025 | 46797280 | Accrual-MARKETING FEE | 2,066.13 | 0.00 | 42.36 | 0.00 | 0.00 | 2,108.49 |
| | 05/31/2025 | 46762357 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 46.00 | 0.00 | 0.00 | 2,290.00 |
| | | | **Total MAY-25** | **12,973.09** | **0.00** | **277.23** | **0.00** | **0.00** | **13,250.32** |
| JUN-25 | 06/03/2025 | 33534640 | RevIQ- Service May-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 3.36 | 0.00 | 0.00 | 180.36 |
| | 06/03/2025 | TD3408548 | DIGITAL PFP | 167.59 | 0.00 | 1.93 | 0.00 | 0.00 | 169.52 |
| | 06/03/2025 | TM3408548 | MEMBER BENEFIT COMMISSION | 31.52 | 0.00 | 0.36 | 0.00 | 0.00 | 31.88 |
| | 06/03/2025 | TC3408548 | TA COMMISSION SERVICE CHARGE | 4.73 | 0.00 | 0.05 | 0.00 | 0.00 | 4.78 |
| | 06/03/2025 | 11377549 | GUEST SATISFACTION- WYNREWARDS | 100.00 | 0.00 | 1.15 | 0.00 | 0.00 | 101.15 |
| | 06/24/2025 | 33539259 | SIGNATURE RESERVATION SERVICE Adjusted Billing for Jan-Apr 2025 | 6.06 | 0.00 | 0.01 | 0.00 | 0.00 | 6.07 |
| | 06/25/2025 | 22190269 | WYNREWARDS ENROLLMENT FEE CR | -23.31 | 0.00 | 0.00 | 0.00 | 0.00 | -23.31 |
| | 06/25/2025 | 22190238 | WYNREWARDS 5% INCREASE: 0.50% | 78.50 | 0.00 | 0.63 | 0.00 | 0.00 | 79.13 |
| | 06/25/2025 | 22190270 | WYNDHAM REWARDS 5% | 808.03 | 0.00 | 6.46 | 0.00 | 0.00 | 814.49 |
| | 06/26/2025 | 33544989 | GDS INTERNET CONNECTIVITY FEE May 2025 | 120.75 | 0.00 | 0.91 | 0.00 | 0.00 | 121.66 |
| | 06/30/2025 | 46805969 | OPERA CLOUD SUPPORT | 2,240.20 | 0.00 | 12.32 | 0.00 | 0.00 | 2,252.52 |

| | Date | Ref | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 06/30/2025 | 33549407 | OPERA CLOUD SUPPORT Foundation | 116.00 | 0.00 | 0.64 | 0.00 | 0.00 | 116.64 |
| | 06/30/2025 | 46832435 | Accrual-MARKETING FEE | 1,142.46 | 0.00 | 6.28 | 0.00 | 0.00 | 1,148.74 |
| | 06/30/2025 | 46832433 | Accrual-RESERVATION FEE | 1,142.46 | 0.00 | 6.28 | 0.00 | 0.00 | 1,148.74 |
| | 06/30/2025 | 46832434 | Accrual-ROYALTY FEE | 2,570.53 | 0.00 | 14.14 | 0.00 | 0.00 | 2,584.67 |
| | | | **Total JUN-25** | **8,682.52** | **0.00** | **54.52** | **0.00** | **0.00** | **8,737.04** |
| JUL-25 | 07/01/2025 | 22191883 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 3.75 | 0.00 | 0.00 | 753.75 |
| | 07/24/2025 | 22192690 | WYNREWARDS 5% INCREASE: 0.50% | 63.96 | 0.00 | 0.00 | 0.00 | 0.00 | 63.96 |
| | 07/24/2025 | 22192691 | WYNREWARDS ENROLLMENT FEE CR | -70.13 | 0.00 | 0.00 | 0.00 | 0.00 | -70.13 |
| | 07/24/2025 | 22192692 | WYNDHAM REWARDS 5% | 709.63 | 0.00 | 0.00 | 0.00 | 0.00 | 709.63 |
| | 07/29/2025 | 33564117 | GDS INTERNET CONNECTIVITY FEE June 2025 | 57.42 | 0.00 | 0.00 | 0.00 | 0.00 | 57.42 |
| | 07/31/2025 | 46858474 | OPERA CLOUD ADDITIONAL OFFERIN | 116.00 | 0.00 | 0.00 | 0.00 | 0.00 | 116.00 |
| | 07/31/2025 | 46872433 | Actual-MARKETING FEE | 1,235.29 | 0.00 | 0.00 | 0.00 | 0.00 | 1,235.29 |
| | 07/31/2025 | 46872431 | Actual-RESERVATION FEE | 1,235.29 | 0.00 | 0.00 | 0.00 | 0.00 | 1,235.29 |
| | 07/31/2025 | 46858343 | OPERA CLOUD SUPPORT | 2,240.20 | 0.00 | 0.00 | 0.00 | 0.00 | 2,240.20 |
| | 07/31/2025 | 46872432 | Actual-ROYALTY FEE | 2,779.40 | 0.00 | 0.00 | 0.00 | 0.00 | 2,779.40 |
| | | | **Total JUL-25** | **9,117.06** | **0.00** | **3.75** | **0.00** | **0.00** | **9,120.81** |
| AUG-25 | 08/05/2025 | TR3422941 | TMC / CONSORTIA PFP FEES | 18.74 | 0.00 | 0.00 | 0.00 | 0.00 | 18.74 |
| | 08/05/2025 | TC3422941 | TA COMMISSION SERVICE CHARGE | 8.04 | 0.00 | 0.00 | 0.00 | 0.00 | 8.04 |
| | 08/05/2025 | TA3422941 | TRAVEL AGENT COMMISSIONS | 53.56 | 0.00 | 0.00 | 0.00 | 0.00 | 53.56 |
| | | | **Total AUG-25** | **80.34** | **0.00** | **0.00** | **0.00** | **0.00** | **80.34** |
| | | | **Total Outstanding:** | **155,151.42** | **11.50** | **8,645.77** | **31,479.89** | **0.00** | **132,328.80** |



Howard Johnson International, Inc.
22 Sylvan Way
Parsippany, NJ 07054

**PAYMENT OPTIONS**

**BY WIRE TRANSFER**: Please ensure all transfers costs are settled by yourselves. Please quote the invoice and account number with payment and transfer to:

| | | |
|---|---|---|
| Bank | : | Bank of America, N.A. |
| Branch Address | : | 100 West 33rd Street<br>New York, NY 10001 |
| Account Name | : | Howard Johnson International, Inc. |
| Bank Account Number | : | 4426450683 |
| ABA | : | 026009593 |
| Swift Code | : | BOFAUS3N |

**REMIT CHECKS TO:**

Howard Johnson International, Inc.
15013 Collections Center Drive
Chicago, IL 60693

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

**Additional Information:**

Thank you in advance for your prompt payment and continued business
Please note accrual invoices on your account are estimates and can't be paid until actual revenues are reported
Please ensure you promptly submit your actual revenues and rooms sold in Wynpay

**Contact information:**

For supporting invoice details please visit WynPay and/or Wyndham Community.  For questions please call 1-855-849-3487 or email Financial.Services@wyndham.com

## Billing Glossary

| Catcode Description | Long Description |
|---|---|
| AAA PROGRAM COMMISSION | Commissions related to the AAA global sales program (iata 0092562). Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| CONTINUING EDUCATION FEE | Annual continuing education fee as outlined in your Franchise Disclosure Document. The fee provides access to the Wyndham University training system, training content, and other training opportunities. In Wyndham University, you can also access learning journeys for other hotels roles for added develop into other responsibilities. For questions please contact WyndhamU@wyndham.com. |
| DIGITAL PFP | Commissions related to bookings that are part of the digital pay for performance (DPFP) program. The DPFP is a program designed to reinvest funds into our digital media program to deliver direct bookings to our franchisees. DPFP-eligible channels include Paid Search, Meta, Feeds, Display, Local, and Facebook Retargeting. Please Note: The DPFP commission is not charged on every digital media driven booking. For example, bookings through select member benefits programs (e.g. AAA and AARP) as well as bookings by Platinum, Diamond, and Titanium rewards members, are not charged. For questions please contact central.commissions@wyndham.com. |
| GDS INTERNET CONNECTIVITY FEE | GDS & Internet Connectivity Fees are charged per consumed booking based on the fees outlined in your agreement or subsequent communication. No GDS and internet connectivity fees are due on cancelled or no-show reservations provided they are updated in the reservation system. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Finance" category. For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487 |
| GM CERTIFICATION/HMP | GM Certification/Hospitality Management Program for new and transfer GMs, second attendees from the same site for the same class, and post-90 day-integration-period attendees. The hotel's GM of Record must complete this training no later ninety (90) days after the hotel's opening date. Any replacement GM must complete this training within ninety (90) days after assuming the GM role. The complete course description, including cost can be located in Wyndham University. For questions please contact WyndhamU@wyndham.com. |
| GOVERNMENT RFP PROGRAM | Annual fee for participating in government RFP program. For questions related to this charge, please contact whg_gso_coe@wyndham.com |
| GUEST SATISFACTION | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of a manual check. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| GUEST SATISFACTION-WYNREWARDS | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of Wyndham Rewards points. The invoice is the cost of the Wyndham Rewards points. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| MARKETING FEE | Recurring fee for the advertising and marketing activities of the system, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| MEMBER BENEFIT COMMISSION | Commissions related to Global Sales member benefits program. The Member Benefits Program establishes partnerships with member loyalty and affinity based organizations by providing those organizations' with a proprietary discount. Accounts include but are not limited to AARP, American Legion, Wyndham Destinations, American Farm Bureaus to name a few. This program is used to help keep WHR top of mind with these organizations in order to drive revenue through Wyndham Direct channels. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| Missed Valid Enrollment Fee | The Missed Valid Enrollment Fee is charged when your property enrolls 33% or less than your Quarterly Valid Enrollment Target for two consecutive quarters. Backup for this invoice can be found at the following location: Wyndham Community > Quick Links > Wyndham Rewards eDesk > Loyalty Fee Discount/Increase Detail Report. For questions, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| NSF RETURN CHRG | Fee imposed for a payment that was submitted but there was non-sufficient funds to cover the amount. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com. In the EMEA region please contact operations.emea@wyndham.com or your financial services representative at Financial.Services@Wyndham.com |
| OPERA CLOUD ADDITIONAL OFFERINGS | A fee covering the cost of licenses for additional tools (e.g., RevIQ and OTAI) as noted within your Master Information Technology Agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| OPERA CLOUD SUPPORT | A fee for HTCS first level support services as detailed in your property management system agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| RATE SHOPS | Fee for rate shop subscription. The subscription was previously OTA Insight and currently is Lighthouse. For questions related to this invoice please open a RMAssist case through Wyndham Community. |
| RESERVATION FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| ROYALTY FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| RevIQ - Start Up | RevIQ revenue management system one time set-up fee per the terms of your executed RevIQ agreement. For questions, please contact reviq@wyndham.com |
| RevIQ- Service | RevIQ revenue management system monthly subscription fee fee per the terms of your executed RevIQ agreement. For questions, please contact reviq@wyndham.com |
| SIGNATURE RESERVATION CREDIT | Credit for hotels on the Signature Reservation Services call transfer program that allows hotels to have reservation calls handled by Contact Center. These credits are issued due to the hotel receiving free promotional months of service. For questions and supporting detail related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |
| SIGNATURE RESERVATION SERVICE | Fee for hotels on the Signature Reservation Services (SRS) call transfer program that allows hotels to have reservation calls handled by our contact center reservation representatives. SRS fees are based on the booking only. If no reservation is made, there is no cost to you. On each reservation made, the fee is a % of GRR or a maximum fee (both outlined in the agreement), whichever is less. Backup for this invoice can be found at the following location Wyndham Community-> Hotel Management -> Reports and filter for "SRS" category. For questions related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |

Case 2:26-cv-03980-JXN-AME   Document 1   Filed 04/15/26   Page 132 of 155 PageID: 132

## Billing Glossary

| Catcode Description | Long Description |
|---|---|
| TA COMMISSION SERVICE CHARGE | A 1.5% commission service charge based on total commissionable revenue processed for the given month.  Supporting detail for this invoice can be found on your travel agent commission invoice backup that can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance".  For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| TMC / CONSORTIA PFP FEES | Pay for Performance  (PFP) program fees related to Global Sales negotiated TMC/Consortia contracts.  WHR's GSO has negotiated pay for performance fees that are applicable to certain bookings booked by our various TMC/Consortia partners.  These PFP fees typically range from 2%-5% of room revenue and may be assessed on all business or discretionary business only that is booked by these partners, including on non-commissionable rates.  The payment of these fees provides WHR higher level biasing in GDS and various marketing opportunities. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance".  For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| TRAVEL AGENT COMMISSIONS | Commissions related to standard travel agent bookings via GDS, brand.com, voice, internet, or other third party channels for commissionable rate plans.  Additional revenues were delivered to your property as a result of these bookings.  Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance".  For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| WR MISSING STAY ADMIN FEE | Fee imposed if your property fails to properly post a Member's Earning Stay within 10 days of the Member's check-out date and Member Services must resolve the Member's request for their missing points, you will be subject to a Missing Stay Administration Fee.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% | Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% ADJUSTMENT | Adjustments for Wyndham Rewards 5% member fee.  Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS BONUS POINTS | Cost of Wyndham Rewards points awarded to members as result of your property's participation in a select bonus point offer(s).  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS FREE NIGHTS REIMB | Reimbursement for actualized free night stay.  Reimbursement is based on your hotel's occupancy and ADR of the day the Free Night is consumed.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAMREWARDS PURCHASE POINTS | Purchase Points Rewards (PPR) tool to buy and issue Wyndham Rewards points to members for marketing and loyalty purposes only.  Refer to the PPR  tool for the cost per point.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNREWARDS 5% INCREASE: 0.50% | The Wyndham Rewards Loyalty Program assesses a 5% fee on all nights for which member earn points. This Increase is for hotels that missed their Quarterly Valid Enrollment Target, achieving 66% or less of their target during the prior quarter. This means the net Loyalty Program Charge for this quarter is 5.50%. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to this fee, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| WYNREWARDS ENROLLMENT FEE CR | A credit is applied towards the Loyalty Program Charge for all new Member Enrollment Stays.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |

# **Exhibit H**

**WYNDHAM**

**HOTELS & RESORTS**

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

September 22, 2025

**VIA ELECTRONIC MAIL AND UPS**
amie.fielding@sohopmc.com

Ms. Amie Fielding
5858 International Drive LLC
9150 Baymeadows Rd.
Jacksonville, FL 32256

**Re:** **NOTICE OF CONTINUING OPERATIONAL, MONETARY, INSURANCE AND TRAINING DEFAULT relating to Howard Johnson® by Wyndham Unit #09575-25157-08 located in Orlando, FL (the "Facility")**

Dear Ms. Fielding:

I write on behalf of Howard Johnson International, Inc.("we," "us," or "our") regarding the Franchise Agreement dated March 30, 2024, between 5858 International Drive LLC ("you" or "your") and us (the "Agreement"), to advise that you are failing to meet your operational, monetary, insurance and training obligations under the terms of the Agreement. We will address each matter in turn.

**Continuing Operational Default**

You will recall that, on August 14, 2025 (the "Notice"), we sent you a notice of default because of your failure to meet your obligations under the terms of the Agreement by failing to operate the Facility on a continuous, year-round basis. The Notice informed you of your failure to maintain the Facility in accordance with Section 3.2.1, as we were advised that the City of Orlando deemed the Facility unsafe for occupancy, resulting in an order for all individuals to vacate the Facility.

We remind you that Section 3.2.1 of the Agreement reads, in pertinent part, as follows: "You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those required by System Standards or specified on the PIP) to the public in compliance with all federal, state, and local laws, regulations and ordinance, as well as System Standards. You will keep the Facility in a clean, neat, and sanitary condition."

Furthermore, Section 3.11 of the Agreement states, "You will use reasonable efforts to protect, maintain and promote the name "Howard Johnson" or "Howard Johnson by Wyndham" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System."

Your failure to maintain the Facility in compliance with the applicable local laws, regulations, and/or ordinances is a breach of Section 3.2.1 of the Agreement and seriously impacts the goodwill of the Howard Johnson System.

**Continuing Monetary Default**

Additionally, we advised you in the notices dated July 7, 2025, and August 14, 2025, that you were in default for your failure to meet your financial obligations to us. The notice required you to cure the monetary default within thirty (30) days. However, you did not cure your default within the time permitted. Please be advised that as of the date of this notice, your account is now past due in the amount of $141,076.38. We have enclosed an itemized statement detailing the past due fees.

**Insurance Default**

         
   

Ms. Amie Fielding
September 22, 2025
Page 2

Additionally, we have not received confirmation that you have obtained and delivered proof to us of the minimum insurance coverage required by us. This is a material default under the Agreement. To date you have failed to provide us with evidence of such. Should you need to review the minimum insurance requirements, please refer to Brand Standard Nos. 100.01.17 and 100.01.22.

**Training Default**

Lastly, the Facility's General Manager is not in compliance with the requirement to complete human trafficking prevention and awareness training, as described in Section 100.02.38 of the Standards.

As a kind reminder, pursuant to Section 3.3 of the Franchise Agreement, "the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs…we designate as mandatory for franchisees or general managers respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement." Your failure to comply with Section 3.3 and the Standards is a default of your obligations under the terms of the Agreement.

At this time, your General Manager should immediately log onto Wyndham University through Wyndham Community to view and complete the training requirements.

**Consequences of Uncured Defaults**

As you are aware, the Facility's access to our central reservations system has already been suspended since April 30, 2025, for outstanding monetary issues, and August 14, 2025, for outstanding operational issues. We have now added insurance and training to the list of reasons for this suspension. The Facility's access to our central reservation system will remain suspended until all defaults have been cured to our satisfaction.

Under the terms of the Agreement, you have thirty (30) days to cure your defaults. If you fail to cure your defaults we reserve all rights under the terms of the Agreement, including, but not limited to, the termination of the Agreement and your right to operate in the Howard Johnson System.

If we terminate the Agreement as a result of your uncured defaults, you must pay us Liquidated Damages in the amount of $528,000, in accordance with Section 12.1 of the Agreement. You must also pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. You must also repay the outstanding Development Incentive or similar loan as of the Termination Date. This carries a principal balance of $373,333.33 as of the date of this letter.

This notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default. By copy of this notice, we are also informing your Guarantors of your default.

We hope you will take this opportunity to resolve your defaults. If you have any questions regarding your default or how it can be timely cured, please contact our Operations Support Desk at osd@wyndham.com or at (855) 849-3487.

Sincerely,

*Dina DiFranco*

Dina DiFranco
Senior Manager
Contracts Compliance

Enclosure

cc:  Shmuel Bonnardel (Guarantor) - 2827 Forest Mill Lane, Jacksonville, FL 32257; sam@roreinvest.com
     Hardik Patel (Guarantor) - 1135 E King Ave, Kingsland, GA 31548; hpatel@namishllc.com
     Dylan Amin (Guarantor) - 300 Warren Mason Blvd, Brunswick, GA 31520
     Dylan Jag Pathirana (Guarantor) 5950 Canoga Ave., Suite 500, Woodland Hills, CA 91367, jp@landdeveloper.net
     Anthony Pizzuto
     Doug Emann
     Suzanne Fenimore

Case 2:26-cv-03980-JXN-AME  Document 1  Filed 04/15/26  Page 136 of 155 PageID:



5858 INTERNATIONAL DRIVE LLC
5858 International Dr,
-, Orlando,
FL 32819-8204, United States

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

Howard Johnson International, Inc.
22 Sylvan Way
Parsippany, NJ 07054

Payment Terms: 30 Days from date of invoice          Account Number   09575-25157-08-HOJ          Statement as of: 22-SEP-2025

| Period | Invoice Date | Invoice Number | Invoice Description | Amount Billed (USD) | Tax | Finance Charges | Amount Applied/ Credited | Adjustment | Total (USD) |
|---|---|---|---|---|---|---|---|---|---|
| JUL-24 | 07/31/2024 | 46439196 | Actual-ROYALTY FEE | 8,596.20 | 0.00 | 260.66 | 8,596.20 | 0.00 | 260.66 |
| | | | **Total JUL-24** | **8,596.20** | **0.00** | **260.66** | **8,596.20** | **0.00** | **260.66** |
| AUG-24 | 08/22/2024 | 33191615 | GDS INTERNET CONNECTIVITY FEE July 2024 | 2,182.25 | 0.00 | 224.27 | 0.00 | 0.00 | 2,406.52 |
| | 08/31/2024 | 46454168 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 320.88 | 0.00 | 0.00 | 2,564.88 |
| | 08/31/2024 | 46467041 | Actual-RESERVATION FEE | 3,512.47 | 0.00 | 303.55 | 2,751.64 | 0.00 | 1,064.38 |
| | 08/31/2024 | 46467042 | Actual-MARKETING FEE | 3,512.47 | 0.00 | 505.65 | 0.00 | 0.00 | 4,018.12 |
| | 08/31/2024 | 46467043 | Actual-ROYALTY FEE | 7,903.06 | 0.00 | 403.07 | 7,903.06 | 0.00 | 403.07 |
| | | | **Total AUG-24** | **19,354.25** | **0.00** | **1,757.42** | **10,654.70** | **0.00** | **10,456.97** |
| OCT-24 | 10/01/2024 | 26015694 | SIGNATURE RESERVATION SERVICE | 97.78 | 0.00 | 13.28 | 0.00 | 0.00 | 111.06 |
| | 10/04/2024 | 11291180 | GUEST SATISFACTION- WYNREWARDS | 15.00 | 0.00 | 2.01 | 0.00 | 0.00 | 17.01 |
| | 10/04/2024 | 22177818 | WR MISSING STAY ADMIN FEE | 50.00 | 0.00 | 6.73 | 0.00 | 0.00 | 56.73 |
| | 10/04/2024 | 11287587 | GUEST SATISFACTION | 825.69 | 0.00 | 110.66 | 0.00 | 0.00 | 936.35 |
| | 10/07/2024 | TA3351014 | TRAVEL AGENT COMMISSIONS | 5.53 | 0.00 | 0.75 | 0.00 | 0.00 | 6.28 |
| | 10/07/2024 | TM3351014 | MEMBER BENEFIT COMMISSION | 17.30 | 0.00 | 2.30 | 0.00 | 0.00 | 19.60 |
| | 10/07/2024 | TD3351014 | DIGITAL PFP | 303.53 | 0.00 | 40.18 | 0.00 | 0.00 | 343.71 |
| | 10/07/2024 | TC3351014 | TA COMMISSION SERVICE CHARGE | 3.43 | 0.00 | 0.43 | 0.00 | 0.00 | 3.86 |
| | 10/23/2024 | 33221601 | GDS INTERNET CONNECTIVITY FEE September 2024 | 1,725.50 | 0.00 | 227.79 | 0.00 | 0.00 | 1,953.29 |
| | 10/24/2024 | 22178335 | WYNREWARDS ENROLLMENT FEE CR | -2.34 | 0.00 | 0.00 | 0.00 | 0.00 | -2.34 |
| | 10/24/2024 | 22178405 | WYNDHAM REWARDS BONUS POINTS | 90.25 | 0.00 | 11.87 | 0.00 | 0.00 | 102.12 |
| | 10/24/2024 | 22178239 | WYNDHAM REWARDS FREE NIGHTS RE | -521.85 | 0.00 | 0.00 | 0.00 | 0.00 | -521.85 |
| | 10/24/2024 | 22178336 | WYNDHAM REWARDS 5% | 1,968.38 | 0.00 | 258.85 | 0.00 | 0.00 | 2,227.23 |
| | 10/31/2024 | 46520952 | Actual-ROYALTY FEE | 8,132.36 | 0.00 | 1,093.16 | 0.00 | 0.00 | 9,225.52 |
| | 10/31/2024 | 46512596 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 287.22 | 0.00 | 0.00 | 2,531.22 |
| | 10/31/2024 | 46520951 | Actual-MARKETING FEE | 3,614.38 | 0.00 | 513.23 | 0.00 | 0.00 | 4,127.61 |
| | 10/31/2024 | 46520950 | Actual-RESERVATION FEE | 3,614.38 | 0.00 | 513.23 | 0.00 | 0.00 | 4,127.61 |
| | | | **Total OCT-24** | **22,183.32** | **0.00** | **3,081.69** | **0.00** | **0.00** | **25,265.01** |
| DEC-24 | 12/06/2024 | 33254261 | GM CERTIFICATION/HMP Khushbu Patel - VHMP - 11/24 | 2,000.00 | 0.00 | 120.53 | 1,049.21 | 0.00 | 1,071.32 |

| | Date | Invoice | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2024 | 46585823 | Actual-MARKETING FEE | 4,031.08 | 0.00 | 303.31 | 1,588.82 | 0.00 | 2,745.57 |
| | 12/31/2024 | 46585824 | Actual-ROYALTY FEE | 9,069.92 | 0.00 | 430.18 | 6,316.47 | 0.00 | 3,183.63 |
| | 12/31/2024 | 46585822 | Actual-RESERVATION FEE | 4,031.08 | 0.00 | 449.47 | 0.00 | 0.00 | 4,480.55 |
| | | | **Total DEC-24** | **19,132.08** | **0.00** | **1,303.49** | **8,954.50** | **0.00** | **11,481.07** |
| JAN-25 | 01/31/2025 | 46620847 | Actual-MARKETING FEE | 3,911.30 | 0.00 | 74.23 | 3,274.49 | 0.00 | 711.04 |
| | | | **Total JAN-25** | **3,911.30** | **0.00** | **74.23** | **3,274.49** | **0.00** | **711.04** |
| MAR-25 | 03/01/2025 | 26016128 | SIGNATURE RESERVATION SERVICE | 474.69 | 0.00 | 35.13 | 0.00 | 0.00 | 509.82 |
| | 03/04/2025 | TR3387080 | TMC / CONSORTIA PFP FEES | 4.37 | 0.00 | 0.33 | 0.00 | 0.00 | 4.70 |
| | 03/04/2025 | TD3387080 | DIGITAL PFP | 308.61 | 0.00 | 22.36 | 0.00 | 0.00 | 330.97 |
| | 03/04/2025 | TP3387080 | AAA PROGRAM COMMISSION | 2.99 | 0.00 | 0.22 | 0.00 | 0.00 | 3.21 |
| | 03/04/2025 | TA3387080 | TRAVEL AGENT COMMISSIONS | 17.50 | 0.00 | 1.26 | 0.00 | 0.00 | 18.76 |
| | 03/04/2025 | TC3387080 | TA COMMISSION SERVICE CHARGE | 5.10 | 0.00 | 0.38 | 0.00 | 0.00 | 5.48 |
| | 03/04/2025 | TM3387080 | MEMBER BENEFIT COMMISSION | 8.00 | 0.00 | 0.57 | 0.00 | 0.00 | 8.57 |
| | 03/06/2025 | 33339531 | SIGNATURE RESERVATION CREDIT SRS Invoice Adjustment | -36.34 | 0.00 | 0.00 | 0.00 | 0.00 | -36.34 |
| | 03/07/2025 | 11309412 | GUEST SATISFACTION- WYNREWARDS | 98.00 | 0.00 | 6.96 | 0.00 | 0.00 | 104.96 |
| | 03/07/2025 | 11310189 | GUEST SATISFACTION | 55.00 | 0.00 | 3.90 | 0.00 | 0.00 | 58.90 |
| | 03/13/2025 | 33360757 | GOVERNMENT RFP PROGRAM | 6.00 | 0.00 | 0.44 | 0.00 | 0.00 | 6.44 |
| | 03/26/2025 | 22182810 | WYNREWARDS ENROLLMENT FEE CR | -6.50 | 0.00 | 0.00 | 0.00 | 0.00 | -6.50 |
| | 03/26/2025 | 22183193 | WYNDHAM REWARDS FREE NIGHTS RE | -146.54 | 0.00 | 0.00 | 0.00 | 0.00 | -146.54 |
| | 03/26/2025 | 22182809 | WYNREWARDS 5% INCREASE: 0.50% | 153.86 | 0.00 | 10.60 | 0.00 | 0.00 | 164.46 |
| | 03/26/2025 | 22182808 | WYNDHAMREWARDS PURCHASE POINTS | 15,000.00 | 0.00 | 1,035.00 | 0.00 | 0.00 | 16,035.00 |
| | 03/26/2025 | 33384866 | RevIQ - Start Up Feb-2025-RevIQ STND ($177 USD) | 177.00 | 11.50 | 13.00 | 0.00 | 0.00 | 201.50 |
| | 03/26/2025 | 33389495 | GDS INTERNET CONNECTIVITY FEE February 2025 | 1,550.50 | 0.00 | 106.98 | 0.00 | 0.00 | 1,657.48 |
| | 03/26/2025 | 22182857 | WYNDHAM REWARDS 5% | 1,537.32 | 0.00 | 106.08 | 0.00 | 0.00 | 1,643.40 |
| | 03/31/2025 | 46678015 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 149.22 | 0.00 | 0.00 | 2,393.22 |
| | 03/31/2025 | 46693318 | Actual-MARKETING FEE | 3,086.76 | 0.00 | 205.25 | 0.00 | 0.00 | 3,292.01 |
| | 03/31/2025 | 46693137 | Actual-ROYALTY FEE | 6,945.21 | 0.00 | 461.86 | 0.00 | 0.00 | 7,407.07 |
| | 03/31/2025 | 33415353 | RATE SHOPS 2-2025 Active (Non-RMS) PCB NAMER | 75.00 | 0.00 | 4.99 | 0.00 | 0.00 | 79.99 |
| | 03/31/2025 | 46679009 | CONTINUING EDUCATION FEE | 600.00 | 0.00 | 39.90 | 0.00 | 0.00 | 639.90 |
| | 03/31/2025 | 46693136 | Actual-RESERVATION FEE | 3,086.76 | 0.00 | 205.25 | 0.00 | 0.00 | 3,292.01 |
| | | | **Total MAR-25** | **35,247.29** | **11.50** | **2,409.68** | **0.00** | **0.00** | **37,668.47** |
| APR-25 | 04/01/2025 | 26016391 | SIGNATURE RESERVATION SERVICE | 473.48 | 0.00 | 27.70 | 0.00 | 0.00 | 501.18 |
| | 04/02/2025 | 33430386 | RATE SHOPS 2-2025 Active (Non-RMS) PCB NAMER | -75.00 | 0.00 | 0.00 | 0.00 | 0.00 | -75.00 |
| | 04/02/2025 | TM3394208 | MEMBER BENEFIT COMMISSION | 14.98 | 0.00 | 0.86 | 0.00 | 0.00 | 15.84 |
| | 04/02/2025 | TC3394208 | TA COMMISSION SERVICE CHARGE | 5.53 | 0.00 | 0.33 | 0.00 | 0.00 | 5.86 |
| | 04/02/2025 | TA3394208 | TRAVEL AGENT COMMISSIONS | 21.90 | 0.00 | 1.27 | 0.00 | 0.00 | 23.17 |
| | 04/02/2025 | TD3394208 | DIGITAL PFP | 178.98 | 0.00 | 10.37 | 0.00 | 0.00 | 189.35 |
| | 04/03/2025 | 22184957 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 48.77 | 0.00 | 0.00 | 798.77 |
| | 04/04/2025 | 33431052 | RevIQ- Service Mar-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 11.41 | 0.00 | 0.00 | 188.41 |

| Date | Ref # | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 04/07/2025 | 11333918 | GUEST SATISFACTION- WYNREWARDS | 113.00 | 0.00 | 6.27 | 0.00 | 0.00 | 119.27 |
| 04/10/2025 | 33433479 | NSF RETURN CHRG ACH031525 | 100.00 | 0.00 | 6.15 | 0.00 | 0.00 | 106.15 |
| 04/23/2025 | 33441957 | GDS INTERNET CONNECTIVITY FEE March 2025 | 1,597.75 | 0.00 | 87.89 | 0.00 | 0.00 | 1,685.64 |
| 04/24/2025 | 22185446 | WYNDHAM REWARDS 5% | 1,605.31 | 0.00 | 87.49 | 0.00 | 0.00 | 1,692.80 |
| 04/24/2025 | 22185783 | WYNDHAM REWARDS FREE NIGHTS RE | -133.18 | 0.00 | 0.00 | 0.00 | 0.00 | -133.18 |
| 04/24/2025 | 22185445 | WYNREWARDS 5% INCREASE: 0.50% | 161.23 | 0.00 | 8.79 | 0.00 | 0.00 | 170.02 |
| 04/30/2025 | 46725312 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 115.56 | 0.00 | 0.00 | 2,359.56 |
| 04/30/2025 | 46733450 | Actual-MARKETING FEE | 2,032.70 | 0.00 | 104.69 | 0.00 | 0.00 | 2,137.39 |
| 04/30/2025 | 46733449 | Actual-ROYALTY FEE | 4,573.59 | 0.00 | 235.53 | 0.00 | 0.00 | 4,809.12 |
| 04/30/2025 | 46733448 | Actual-RESERVATION FEE | 2,032.70 | 0.00 | 104.69 | 0.00 | 0.00 | 2,137.39 |
| | | **Total APR-25** | **15,873.97** | **0.00** | **857.77** | **0.00** | **0.00** | **16,731.74** |
| MAY-25 05/01/2025 | 26016626 | SIGNATURE RESERVATION SERVICE | 93.73 | 0.00 | 4.07 | 0.00 | 0.00 | 97.80 |
| 05/07/2025 | TD3401336 | DIGITAL PFP | 316.38 | 0.00 | 12.81 | 0.00 | 0.00 | 329.19 |
| 05/07/2025 | TC3401336 | TA COMMISSION SERVICE CHARGE | 3.70 | 0.00 | 0.16 | 0.00 | 0.00 | 3.86 |
| 05/07/2025 | TP3401336 | AAA PROGRAM COMMISSION | 8.63 | 0.00 | 0.34 | 0.00 | 0.00 | 8.97 |
| 05/08/2025 | 33484037 | NSF RETURN CHRG ACH041525 | 100.00 | 0.00 | 4.75 | 0.00 | 0.00 | 104.75 |
| 05/09/2025 | 33490690 | WYNDHAM REWARDS 5% ADJUSTMENT Chargeback Credit | -52.24 | 0.00 | 0.00 | 0.00 | 0.00 | -52.24 |
| 05/14/2025 | 33491532 | RevIQ- Service Apr-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 7.87 | 0.00 | 0.00 | 184.87 |
| 05/27/2025 | 22187843 | WYNDHAM REWARDS FREE NIGHTS RE | -100.00 | 0.00 | 0.00 | 0.00 | 0.00 | -100.00 |
| 05/27/2025 | 33513988 | GDS INTERNET CONNECTIVITY FEE April 2025 | 922.25 | 0.00 | 35.04 | 0.00 | 0.00 | 957.29 |
| 05/27/2025 | 22187489 | WYNREWARDS ENROLLMENT FEE CR | -23.59 | 0.00 | 0.00 | 0.00 | 0.00 | -23.59 |
| 05/27/2025 | 22187452 | WYNDHAM REWARDS 5% | 458.69 | 0.00 | 17.43 | 0.00 | 0.00 | 476.12 |
| 05/27/2025 | 22187488 | WYNREWARDS 5% INCREASE: 0.50% | 43.49 | 0.00 | 1.64 | 0.00 | 0.00 | 45.13 |
| 05/31/2025 | 46797280 | Accrual-MARKETING FEE | 2,066.13 | 0.00 | 74.39 | 0.00 | 0.00 | 2,140.52 |
| 05/31/2025 | 46797278 | Accrual-RESERVATION FEE | 2,066.13 | 0.00 | 74.39 | 0.00 | 0.00 | 2,140.52 |
| 05/31/2025 | 46797279 | Accrual-ROYALTY FEE | 4,648.79 | 0.00 | 167.36 | 0.00 | 0.00 | 4,816.15 |
| 05/31/2025 | 46762357 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 80.78 | 0.00 | 0.00 | 2,324.78 |
| | | **Total MAY-25** | **12,973.09** | **0.00** | **481.03** | **0.00** | **0.00** | **13,454.12** |
| JUN-25 06/03/2025 | 33534640 | RevIQ- Service May-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 6.10 | 0.00 | 0.00 | 183.10 |
| 06/03/2025 | TD3408548 | DIGITAL PFP | 167.59 | 0.00 | 4.53 | 0.00 | 0.00 | 172.12 |
| 06/03/2025 | TM3408548 | MEMBER BENEFIT COMMISSION | 31.52 | 0.00 | 0.85 | 0.00 | 0.00 | 32.37 |
| 06/03/2025 | TC3408548 | TA COMMISSION SERVICE CHARGE | 4.73 | 0.00 | 0.12 | 0.00 | 0.00 | 4.85 |
| 06/03/2025 | 11377549 | GUEST SATISFACTION- WYNREWARDS | 100.00 | 0.00 | 2.70 | 0.00 | 0.00 | 102.70 |
| 06/24/2025 | 33539259 | SIGNATURE RESERVATION SERVICE Adjusted Billing for Jan-Apr 2025 | 6.06 | 0.00 | 0.10 | 0.00 | 0.00 | 6.16 |
| 06/25/2025 | 22190269 | WYNREWARDS ENROLLMENT FEE CR | -23.31 | 0.00 | 0.00 | 0.00 | 0.00 | -23.31 |
| 06/25/2025 | 22190270 | WYNDHAM REWARDS 5% | 808.03 | 0.00 | 18.98 | 0.00 | 0.00 | 827.01 |
| 06/25/2025 | 22190238 | WYNREWARDS 5% INCREASE: 0.50% | 78.50 | 0.00 | 1.85 | 0.00 | 0.00 | 80.35 |
| 06/26/2025 | 33544989 | GDS INTERNET CONNECTIVITY FEE May 2025 | 120.75 | 0.00 | 2.78 | 0.00 | 0.00 | 123.53 |
| 06/30/2025 | 46805969 | OPERA CLOUD SUPPORT | 2,240.20 | 0.00 | 47.04 | 0.00 | 0.00 | 2,287.24 |

| | Date | Ref | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 06/30/2025 | 33549407 | OPERA CLOUD SUPPORT Foundation | 116.00 | 0.00 | 2.44 | 0.00 | 0.00 | 118.44 |
| | 06/30/2025 | 46832435 | Accrual-MARKETING FEE | 1,142.46 | 0.00 | 23.99 | 0.00 | 0.00 | 1,166.45 |
| | 06/30/2025 | 46832434 | Accrual-ROYALTY FEE | 2,570.53 | 0.00 | 53.98 | 0.00 | 0.00 | 2,624.51 |
| | 06/30/2025 | 46832433 | Accrual-RESERVATION FEE | 1,142.46 | 0.00 | 23.99 | 0.00 | 0.00 | 1,166.45 |
| | | | **Total JUN-25** | **8,682.52** | **0.00** | **189.45** | **0.00** | **0.00** | **8,871.97** |
| JUL-25 | 07/01/2025 | 22191883 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 15.38 | 0.00 | 0.00 | 765.38 |
| | 07/24/2025 | 22192690 | WYNREWARDS 5% INCREASE: 0.50% | 63.96 | 0.00 | 0.58 | 0.00 | 0.00 | 64.54 |
| | 07/24/2025 | 22192691 | WYNREWARDS ENROLLMENT FEE CR | -70.13 | 0.00 | 0.00 | 0.00 | 0.00 | -70.13 |
| | 07/24/2025 | 22192692 | WYNDHAM REWARDS 5% | 709.63 | 0.00 | 6.39 | 0.00 | 0.00 | 716.02 |
| | 07/29/2025 | 33564117 | GDS INTERNET CONNECTIVITY FEE June 2025 | 57.42 | 0.00 | 0.37 | 0.00 | 0.00 | 57.79 |
| | 07/31/2025 | 46858474 | OPERA CLOUD ADDITIONAL OFFERIN | 116.00 | 0.00 | 0.64 | 0.00 | 0.00 | 116.64 |
| | 07/31/2025 | 46872433 | Actual-MARKETING FEE | 1,235.29 | 0.00 | 6.79 | 0.00 | 0.00 | 1,242.08 |
| | 07/31/2025 | 46872431 | Actual-RESERVATION FEE | 1,235.29 | 0.00 | 6.79 | 0.00 | 0.00 | 1,242.08 |
| | 07/31/2025 | 46858343 | OPERA CLOUD SUPPORT | 2,240.20 | 0.00 | 12.32 | 0.00 | 0.00 | 2,252.52 |
| | 07/31/2025 | 46872432 | Actual-ROYALTY FEE | 2,779.40 | 0.00 | 15.29 | 0.00 | 0.00 | 2,794.69 |
| | | | **Total JUL-25** | **9,117.06** | **0.00** | **64.55** | **0.00** | **0.00** | **9,181.61** |
| AUG-25 | 08/05/2025 | TR3422941 | TMC / CONSORTIA PFP FEES | 18.74 | 0.00 | 0.00 | 0.00 | 0.00 | 18.74 |
| | 08/05/2025 | TA3422941 | TRAVEL AGENT COMMISSIONS | 53.56 | 0.00 | 0.00 | 0.00 | 0.00 | 53.56 |
| | 08/05/2025 | TC3422941 | TA COMMISSION SERVICE CHARGE | 8.04 | 0.00 | 0.00 | 0.00 | 0.00 | 8.04 |
| | 08/25/2025 | 33593230 | ROYALTY RECONCILIATION | 17.07 | 0.00 | 0.00 | 0.00 | 0.00 | 17.07 |
| | 08/25/2025 | 33600344 | ADVERTISING/MARKETING RECONCIL | 7.60 | 0.00 | 0.00 | 0.00 | 0.00 | 7.60 |
| | 08/25/2025 | 33597216 | RESERVATION RECONCILIATION | 7.60 | 0.00 | 0.00 | 0.00 | 0.00 | 7.60 |
| | 08/26/2025 | 22194774 | WYNREWARDS 5% INCREASE: 0.50% | 29.40 | 0.00 | 0.00 | 0.00 | 0.00 | 29.40 |
| | 08/26/2025 | 22194775 | WYNDHAM REWARDS 5% | 293.99 | 0.00 | 0.00 | 0.00 | 0.00 | 293.99 |
| | 08/27/2025 | 33608258 | GDS INTERNET CONNECTIVITY FEE July 2025 | 37.62 | 0.00 | 0.00 | 0.00 | 0.00 | 37.62 |
| | 08/31/2025 | 46919953 | Accrual-MARKETING FEE | 964.79 | 0.00 | 0.00 | 0.00 | 0.00 | 964.79 |
| | 08/31/2025 | 46919951 | Accrual-ROYALTY FEE | 2,170.78 | 0.00 | 0.00 | 0.00 | 0.00 | 2,170.78 |
| | 08/31/2025 | 46900493 | OPERA CLOUD SUPPORT | 2,240.20 | 0.00 | 0.00 | 0.00 | 0.00 | 2,240.20 |
| | 08/31/2025 | 46900831 | OPERA CLOUD ADDITIONAL OFFERIN | 116.00 | 0.00 | 0.00 | 0.00 | 0.00 | 116.00 |
| | 08/31/2025 | 46919950 | Accrual-RESERVATION FEE | 964.79 | 0.00 | 0.00 | 0.00 | 0.00 | 964.79 |
| | | | **Total AUG-25** | **6,930.18** | **0.00** | **0.00** | **0.00** | **0.00** | **6,930.18** |
| SEP-25 | 09/04/2025 | TD3430270 | DIGITAL PFP | 13.54 | 0.00 | 0.00 | 0.00 | 0.00 | 13.54 |
| | 09/08/2025 | 22196569 | WR MISSING STAY ADMIN FEE | 50.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 |
| | | | **Total SEP-25** | **63.54** | **0.00** | **0.00** | **0.00** | **0.00** | **63.54** |
| | | | **Total Outstanding:** | **162,064.80** | **11.50** | **10,479.97** | **31,479.89** | **0.00** | **141,076.38** |



Howard Johnson International, Inc.
22 Sylvan Way
Parsippany, NJ 07054

**PAYMENT OPTIONS**

**BY WIRE TRANSFER**: Please ensure all transfers costs are settled by yourselves. Please quote the invoice and account number with payment and transfer to:

| | | |
|---|---|---|
| Bank | : | Bank of America, N.A. |
| Branch Address | : | 100 West 33rd Street New York, NY 10001 |
| Account Name | : | Howard Johnson International, Inc. |
| Bank Account Number | : | 4426450683 |
| ABA | : | 026009593 |
| Swift Code | : | BOFAUS3N |

**REMIT CHECKS TO:**

Howard Johnson International, Inc.
15013 Collections Center Drive
Chicago, IL 60693

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

**Additional Information:**

Thank you in advance for your prompt payment and continued business
Please note accrual invoices on your account are estimates and can't be paid until actual revenues are reported
Please ensure you promptly submit your actual revenues and rooms sold in Wynpay

**Contact information:**

For supporting invoice details please visit WynPay and/or Wyndham Community.  For questions please call 1-855-849-3487 or email Financial.Services@wyndham.com

## Billing Glossary

| Catcode Description | Long Description |
|---|---|
| AAA PROGRAM COMMISSION | Commissions related to the AAA global sales program (iata 0092562). Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| ADVERTISING/MARKETING RECONCILIATION | Reconciliation of recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| CONTINUING EDUCATION FEE | Annual continuing education fee as outlined in your Franchise Disclosure Document. The fee provides access to the Wyndham University training system, training content, and other training opportunities. In Wyndham University, you can also access learning journeys for other hotels roles for added develop into other responsibilities. For questions please contact WyndhamU@wyndham.com. |
| DIGITAL PFP | Commissions related to bookings that are part of the digital pay for performance (DPFP) program. The DPFP is a program designed to reinvest funds into our digital media program to deliver direct bookings to our franchisees. DPFP-eligible channels include Paid Search, Meta, Feeds, Display, Local, and Facebook Retargeting. Please Note: The DPFP commission is not charged on every digital media driven booking. For example, bookings through select member benefits programs (e.g. AAA and AARP) as well as bookings by Platinum, Diamond, and Titanium rewards members, are not charged. For questions please contact central.commissions@wyndham.com. |
| GDS INTERNET CONNECTIVITY FEE | GDS & Internet Connectivity Fees are charged per consumed booking based on the fees outlined in your agreement or subsequent communication. No GDS and internet connectivity fees are due on cancelled or no-show reservations provided they are updated in the reservation system. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Finance" category. For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487 |
| GM CERTIFICATION/HMP | GM Certification/Hospitality Management Program for new and transfer GMs, second attendees from the same site for the same class, and post-90 day-integration-period attendees. The hotel's GM of Record must complete this training no later ninety (90) days after the hotel's opening date. Any replacement GM must complete this training within ninety (90) days after assuming the GM role. The complete course description, including cost can be located in Wyndham University. For questions please contact WyndhamU@wyndham.com. |
| GOVERNMENT RFP PROGRAM | Annual fee for participating in government RFP program. For questions related to this charge, please contact whg_gso_coe@wyndham.com |
| GUEST SATISFACTION | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of a manual check. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| GUEST SATISFACTION-WYNREWARDS | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of Wyndham Rewards points. The invoice is the cost of the Wyndham Rewards points. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| MARKETING FEE | Recurring fee for the advertising and marketing activities of the system, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| MEMBER BENEFIT COMMISSION | Commissions related to Global Sales member benefits program. The Member Benefits Program establishes partnerships with member loyalty and affinity based organizations by providing those organizations' with a proprietary discount. Accounts include but are not limited to AARP, American Legion, Wyndham Destinations, American Farm Bureaus to name a few. This program is used to help keep WHR top of mind with these organizations in order to drive revenue through Wyndham Direct channels. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| Missed Valid Enrollment Fee | The Missed Valid Enrollment Fee is charged when your property enrolls 33% or less than your Quarterly Valid Enrollment Target for two consecutive quarters. Backup for this invoice can be found at the following location: Wyndham Community > Quick Links > Wyndham Rewards eDesk > Loyalty Fee Discount/Increase Detail Report. For questions, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| NSF RETURN CHRG | Fee imposed for a payment that was submitted but there was non-sufficient funds to cover the amount. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com. In the EMEA region please contact operations.emea@wyndham.com or your financial services representative at Financial.Services@Wyndham.com |
| OPERA CLOUD ADDITIONAL OFFERINGS | A fee covering the cost of licenses for additional tools (e.g., RevIQ and OTAI) as noted within your Master Information Technology Agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| OPERA CLOUD SUPPORT | A fee for HTCS first level support services as detailed in your property management system agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| RATE SHOPS | Fee for rate shop subscription. The subscription was previously OTA Insight and currently is Lighthouse. For questions related to this invoice please open a RMAssist case through Wyndham Community. |
| RESERVATION FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| RESERVATION RECONCILIATION | Reconciliation of recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| ROYALTY FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| ROYALTY RECONCILIATION | Reconciliation of recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| RevIQ - Start Up | RevIQ revenue management system one time set-up fee per the terms of your executed RevIQ agreement. For questions, please contact reviq@wyndham.com |
| RevIQ- Service | RevIQ revenue management system monthly subscription fee fee per the terms of your executed RevIQ agreement. For questions, please contact reviq@wyndham.com |

## Billing Glossary

| Catcode Description | Long Description |
| --- | --- |
| SIGNATURE RESERVATION CREDIT | Credit for hotels on the Signature Reservation Services call transfer program that allows hotels to have reservation calls handled by Contact Center. These credits are issued due to the hotel receiving free promotional months of service. For questions and supporting detail related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |
| SIGNATURE RESERVATION SERVICE | Fee for hotels on the Signature Reservation Services (SRS) call transfer program that allows hotels to have reservation calls handled by our contact center reservation representatives. SRS fees are based on the booking only. If no reservation is made, there is no cost to you. On each reservation made, the fee is a % of GRR or a maximum fee (both outlined in the agreement), whichever is less. Backup for this invoice can be found at the following location Wyndham Community-> Hotel Management -> Reports and filter for "SRS" category. For questions related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |
| TA COMMISSION SERVICE CHARGE | A 1.5% commission service charge based on total commissionable revenue processed for the given month. Supporting detail for this invoice can be found on your travel agent commission invoice backup that can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| TMC / CONSORTIA PFP FEES | Pay for Performance (PFP) program fees related to Global Sales negotiated TMC/Consortia contracts. WHR's GSO has negotiated pay for performance fees that are applicable to certain bookings booked by our various TMC/Consortia partners. These PFP fees typically range from 2%-5% of room revenue and may be assessed on all business or discretionary business only that is booked by these partners, including on non-commissionable rates. The payment of these fees provides WHR higher level biasing in GDS and various marketing opportunities. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| TRAVEL AGENT COMMISSIONS | Commissions related to standard travel agent bookings via GDS, brand.com, voice, internet, or other third party channels for commissionable rate plans. Additional revenues were delivered to your property as a result of these bookings. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| WR MISSING STAY ADMIN FEE | Fee imposed if your property fails to properly post a Member's Earning Stay within 10 days of the Member's check-out date and Member Services must resolve the Member's request for their missing points, you will be subject to a Missing Stay Administration Fee. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% | Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% ADJUSTMENT | Adjustments for Wyndham Rewards 5% member fee. Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS BONUS POINTS | Cost of Wyndham Rewards points awarded to members as result of your property's participation in a select bonus point offer(s). Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS FREE NIGHTS REIMB | Reimbursement for actualized free night stay. Reimbursement is based on your hotel's occupancy and ADR of the day the Free Night is consumed. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAMREWARDS PURCHASE POINTS | Purchase Points Rewards (PPR) tool to buy and issue Wyndham Rewards points to members for marketing and loyalty purposes only. Refer to the PPR tool for the cost per point. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNREWARDS 5% INCREASE: 0.50% | The Wyndham Rewards Loyalty Program assesses a 5% fee on all nights for which member earn points. This Increase is for hotels that missed their Quarterly Valid Enrollment Target, achieving 66% or less of their target during the prior quarter. This means the net Loyalty Program Charge for this quarter is 5.50%. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to this fee, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| WYNREWARDS ENROLLMENT FEE CR | A credit is applied towards the Loyalty Program Charge for all new Member Enrollment Stays. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |

# **Exhibit I**

**WYNDHAM**
**HOTELS & RESORTS**

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

October 30, 2025

<u>**VIA ELECTRONIC MAIL AND UPS**</u>
amie.fielding@sohopmc.com

Ms. Amie Fielding
5858 International Drive LLC
9150 Baymeadows Rd.
Jacksonville, FL 32256

**Re:**    **NOTICE OF TERMINATION** of Franchise Agreement dated March 30, 2024, as amended (the "Agreement"), between 5858 International Drive LLC ("you" or "your") and Howard Johnson International, Inc. ("we", "our" or "us") for the Howard Johnson® by Wyndham System Unit #09575-25157-08 located in Orlando, FL (the "Facility")

Dear Ms. Fielding:

We write to give you formal notice of the termination of the Franchise granted under the Agreement to operate the Facility as part of the Howard Johnson System (the "Notice"). This termination is a result of your failure to satisfy your operational, monetary, insurance, and training obligations under the Agreement. We previously advised you of your defaults, most recently in our letter dated September 22, 2025, in which, among other things, we warned that the Agreement may be subject to termination if the defaults were not cured in the timeframe provided. Your prolonged failure to cure your defaults constitutes a breach of your responsibilities under the terms of the Agreement. Accordingly, the termination of the Agreement is effective as of today, October 30, 2025 (the "Termination Date").

Because the Agreement has terminated, you must perform your post-termination obligations such as the removal of all items that display or refer to Howard Johnson brand at the Facility. The de-identification procedures are specified in the enclosure to this Notice. These de-identification procedures must be completed within ten (10) days from the Termination Date.

You must also pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of date of this Notice you owe us $160,209.69 in Recurring Fees. This amount is described in more detail in the enclosed itemized statement. Additionally, you must pay us Liquidated Damages of $528,000 as specified in Section 12.1 of the Agreement. You must also repay the outstanding Development Incentive or similar loan as of the Termination Date. This carries a principal balance of $373,333.33 as of the date of this Notice.

Please know that, because the Agreement has terminated, you have also lost the right to continue to use the seamless interface version of your property management system. You must now make arrangements with the software vendor for a new license to use the property management system. Please be advised that due to the termination you will have no functionality from the system. If the Facility has a SynXis system installed and you wish to continue using an independent version of the software, please contact Sabre at 682-605-1000, or at SHSsalesrequest@sabre.com. If the Facility has an Opera system installed and you wish to continue using an independent version of the software, please contact Scott Cochran at 667-786-5519. Further, you have also lost access to additional accounts, such as Oracle Hospitality Integration Platform (OHIP) and Reporting and Analytics (R&A). Please see the enclosed Opera Cloud Termination – PMS Best Practices for next steps. If your property is planning to migrate to another property



Ms. Amie Fielding
October 30, 2025
Page Two

management system, please contact your provider to expedite the installation.  If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2504 to obtain reporting of that data.

If within the ten (10) day period described above, you do not timely remove the exterior signage which bears the Howard Johnson name and Marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us.  If you object to the removal of the signage by our independent contractor, you must notify us within ten (10) days of the Termination Date.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantors.

Should you have any questions regarding this matter, please contact Dawn Whitley, Vice President of Franchise Services, at (973) 753-7481 or at Dawn.Whitley@wyndham.com.

Sincerely,

Suzanne Fenimore
Vice President
Contracts Compliance

Enclosures

cc:  Shmuel Bonnardel (Guarantor) - 2827 Forest Mill Lane, Jacksonville, FL 3225; sam@roreinvest.com
Hardik Patel (Guarantor) - 1135 E. King Ave, Kingsland, GA 31548; hpatel@namishllc.com
Dylan Jag Pathirana (Guarantor) - 5950 Canoga Ave., Suite 500, Woodland Hills, CA 91367; jp@landdeveloper.net
Dylan Amin (Guarantor) - 300 Warren Mason Blvd, Brunswick, GA 31520
Anthony Pizzuto
Dina DiFranco
Dawn Whitley

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days after the Termination Date:**

1.      Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Howard Johnson Marks.

2.      Remove all interior signage that contains Howard Johnson Marks.

3.      Change advertising billboards to remove Howard Johnson Marks, including any department of transportation or other highway signage.

4.      Stop answering Facility telephone as a Howard Johnson facility.

5.      Remove Howard Johnson name and Marks from any domain name, advertising and brochures.

6.      Return to us or destroy all confidential operations and training manuals.

7.      Remove the Howard Johnson name and Marks from the following items:

- Guestroom supplies including door signage, ice buckets, cups etc.
- Bathroom supplies including soap, shampoo, conditioner, etc.
- Business cards and letterhead
- Registration cards, folios, guest receipts, including electronic copies
- Guestroom keys
- Uniforms and name badges

8.      Paint over or remove any distinctive Howard Johnson trade dress, paint schemes or architectural features.

9.      Remove Howard Johnson name from the Facility's listing on TripAdvisor or any other online traveler review site.

10.     It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Howard Johnson facility.

11.     We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

# Opera Cloud Termination- PMS Best Practice

**Important retrieval recommendations prior to termination of the Opera Cloud PMS.**

**WYNDHAM**
HOTELS & RESORTS

## WHAT YOU NEED TO KNOW:

This document details a list of reports and information that we recommend be generated and retrieved from Opera Cloud **before your property is terminated**.

These files can be stored locally.  It **is very important** to store **back-up copies** of any files you retrieve; otherwise you will run the risk of losing this data.

Opera Cloud property management system access will be disabled on the day of termination. Users will also lose access to Oracle Hospitality Integration Platform (OHIP) and Reporting and Analytics (R&A) accounts. This is why we highly recommend you retrieve a copy this information for your future reference.

All of the reports can be e-mailed or saved locally.  Please be aware of the notes listed for each report, and ensure any questions you may have regarding this are answered **well prior to your termination** to avoid last minute issues or confusion.

## REPORTS TO PULL FROM OPERA CLOUD:

| Report Name: | Report Name: | Notes: | |
|---|---|---|---|
| A/R Activity – All Types | aractivity | | ☐ |
| AR Detailed Aging | aragingdet | | ☐ |
| Arrivals:Detailed | res_detail | This will show all future reservations. | ☐ |
| Arrivals:Detailed | res_detail | Enter past dates to see all past reservations. | ☐ |
| Block Information | resblkinfo | Enter Future and Past Dates | ☐ |
| Credit Card History | creditcard_history | This does not show the full credit card number | ☐ |
| Day/MTD/YTD Statistics | stat_dmy_seg | Pull for each month in the past.  Filters Rate Code/Rate Code | ☐ |
| Detailed Folio | Folio_details | | ☐ |
| Financial Payments & Revenue | findeptcodes | Will show Day, MTD and YTD financial numbers | ☐ |
| Guests by Tax Type | taxexempt | | ☐ |
| History and Forecast | history_forecast | | ☐ |
| Journal by Cashier&Trans Code | finjrnlbytrans | Detailed financial Postings | ☐ |
| Journal by Cashier&Article | finjrnl_articles | | ☐ |
| Master List – Detail | ardirectdet | Detailed information on AR Accounts | ☐ |
| Membership Stays | loyalty_member_stay | Select ALL filters. | ☐ |
| Profile Address | pr_address | Check Past Stays only. This could be a very long report.  Run Profile Types individually. | ☐ |
| Profile Notes | pr_notes | | ☐ |
| Profile Production Statistics | profileproductivitystat | | ☐ |
| Reservation Cancellations | rescancel | | ☐ |
| Reservation Statistics | res_statistics2 | Ability to show Market Code, Rate Code etc. Would need a separate report for each month. | ☐ |
| Restricted List | pr_restricted | | ☐ |
| Restrictions Detail | raterest | Ability to pull past restrictions | ☐ |
| Tax Exempt | taxexempt_02 | | ☐ |

## ADDITIONAL USEFUL INFORMATION TO RETRIEVE:

In addition to the reports above, the following may also be useful.  It is also recommended that you retrieve this information for your future reference.

- Accounts Receivables Statements/Invoices
  - The path to this in Opera Cloud is: Financials> Accounts Receivables> Batch Statements. Ensure Print Invoices is checked before processing.
  - It is recommended to check 'Print Zero Balances' and 'Include Previously Printed Statements'.
  - Then click on Process Statements.

## KEEP A BACKUP



After you have retrieved this information, it is recommended that you keep more than one copy of this data in more than one location to avoid losing it in the future.

  

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

5858 INTERNATIONAL DRIVE LLC
5858 International Dr,
-, Orlando,
FL 32819-8204, United States

Howard Johnson International, Inc.
22 Sylvan Way
Parsippany, NJ 07054

Payment Terms: 30 Days from date of invoice          Account Number   09575-25157-08-HOJ          Statement as of: 30-OCT-2025

| Period | Invoice Date | Invoice Number | Invoice Description | Amount Billed (USD) | Tax | Finance Charges | Amount Applied/ Credited | Adjustment | Total (USD) |
|---|---|---|---|---|---|---|---|---|---|
| JUL-24 | 07/31/2024 | 46439196 | Actual-ROYALTY FEE | 8,596.20 | 0.00 | 260.66 | 8,596.20 | 0.00 | 260.66 |
| | | | **Total JUL-24** | **8,596.20** | **0.00** | **260.66** | **8,596.20** | **0.00** | **260.66** |
| AUG-24 | 08/22/2024 | 33191615 | GDS INTERNET CONNECTIVITY FEE July 2024 | 2,182.25 | 0.00 | 239.14 | 0.00 | 0.00 | 2,421.39 |
| | 08/31/2024 | 46467043 | Actual-ROYALTY FEE | 7,903.06 | 0.00 | 403.07 | 7,903.06 | 0.00 | 403.07 |
| | 08/31/2024 | 46467042 | Actual-MARKETING FEE | 3,512.47 | 0.00 | 558.34 | 0.00 | 0.00 | 4,070.81 |
| | 08/31/2024 | 46467041 | Actual-RESERVATION FEE | 3,512.47 | 0.00 | 314.96 | 2,751.64 | 0.00 | 1,075.79 |
| | 08/31/2024 | 46454168 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 354.54 | 0.00 | 0.00 | 2,598.54 |
| | | | **Total AUG-24** | **19,354.25** | **0.00** | **1,870.05** | **10,654.70** | **0.00** | **10,569.60** |
| OCT-24 | 10/01/2024 | 26015694 | SIGNATURE RESERVATION SERVICE | 97.78 | 0.00 | 14.75 | 0.00 | 0.00 | 112.53 |
| | 10/04/2024 | 11287587 | GUEST SATISFACTION | 825.69 | 0.00 | 123.05 | 0.00 | 0.00 | 948.74 |
| | 10/04/2024 | 11291180 | GUEST SATISFACTION- WYNREWARDS | 15.00 | 0.00 | 2.24 | 0.00 | 0.00 | 17.24 |
| | 10/04/2024 | 22177818 | WR MISSING STAY ADMIN FEE | 50.00 | 0.00 | 7.48 | 0.00 | 0.00 | 57.48 |
| | 10/07/2024 | TA3351014 | TRAVEL AGENT COMMISSIONS | 5.53 | 0.00 | 0.83 | 0.00 | 0.00 | 6.36 |
| | 10/07/2024 | TM3351014 | MEMBER BENEFIT COMMISSION | 17.30 | 0.00 | 2.56 | 0.00 | 0.00 | 19.86 |
| | 10/07/2024 | TC3351014 | TA COMMISSION SERVICE CHARGE | 3.43 | 0.00 | 0.48 | 0.00 | 0.00 | 3.91 |
| | 10/07/2024 | TD3351014 | DIGITAL PFP | 303.53 | 0.00 | 44.73 | 0.00 | 0.00 | 348.26 |
| | 10/23/2024 | 33221601 | GDS INTERNET CONNECTIVITY FEE September 2024 | 1,725.50 | 0.00 | 253.67 | 0.00 | 0.00 | 1,979.17 |
| | 10/24/2024 | 22178335 | WYNREWARDS ENROLLMENT FEE CR | -2.34 | 0.00 | 0.00 | 0.00 | 0.00 | -2.34 |
| | 10/24/2024 | 22178239 | WYNDHAM REWARDS FREE NIGHTS RE | -521.85 | 0.00 | 0.00 | 0.00 | 0.00 | -521.85 |
| | 10/24/2024 | 22178405 | WYNDHAM REWARDS BONUS POINTS | 90.25 | 0.00 | 13.22 | 0.00 | 0.00 | 103.47 |
| | 10/24/2024 | 22178336 | WYNDHAM REWARDS 5% | 1,968.38 | 0.00 | 288.38 | 0.00 | 0.00 | 2,256.76 |
| | 10/31/2024 | 46520950 | Actual-RESERVATION FEE | 3,614.38 | 0.00 | 567.45 | 0.00 | 0.00 | 4,181.83 |
| | 10/31/2024 | 46520951 | Actual-MARKETING FEE | 3,614.38 | 0.00 | 567.45 | 0.00 | 0.00 | 4,181.83 |
| | 10/31/2024 | 46512596 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 320.88 | 0.00 | 0.00 | 2,564.88 |
| | 10/31/2024 | 46520952 | Actual-ROYALTY FEE | 8,132.36 | 0.00 | 1,215.15 | 0.00 | 0.00 | 9,347.51 |
| | | | **Total OCT-24** | **22,183.32** | **0.00** | **3,422.32** | **0.00** | **0.00** | **25,605.64** |
| DEC-24 | 12/06/2024 | 33254261 | GM CERTIFICATION/HMP Khushbu Patel - VHMP - 11/24 | 2,000.00 | 0.00 | 134.79 | 1,049.21 | 0.00 | 1,085.58 |

Case 2:26-cv-03980-JXN-AME  Document 1  Filed 04/15/26  Page 148 of 155 PageID:

Case 2:26-cv-03980-JXN-AME   Document 1   Filed 04/15/26   Page 149 of 155 PageID: 149

| | Date | Invoice | Description | Amount | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2024 | 46585822 | Actual-RESERVATION FEE | 4,031.08 | 0.00 | 509.94 | 0.00 | 0.00 | 4,541.02 |
| | 12/31/2024 | 46585823 | Actual-MARKETING FEE | 4,031.08 | 0.00 | 339.94 | 1,588.82 | 0.00 | 2,782.20 |
| | 12/31/2024 | 46585824 | Actual-ROYALTY FEE | 9,069.92 | 0.00 | 471.48 | 6,316.47 | 0.00 | 3,224.93 |
| | | | **Total DEC-24** | **19,132.08** | **0.00** | **1,456.15** | **8,954.50** | **0.00** | **11,633.73** |
| JAN-25 | 01/31/2025 | 46620847 | Actual-MARKETING FEE | 3,911.30 | 0.00 | 83.78 | 3,274.49 | 0.00 | 720.59 |
| | | | **Total JAN-25** | **3,911.30** | **0.00** | **83.78** | **3,274.49** | **0.00** | **720.59** |
| MAR-25 | 03/01/2025 | 26016128 | SIGNATURE RESERVATION SERVICE | 474.69 | 0.00 | 42.25 | 0.00 | 0.00 | 516.94 |
| | 03/04/2025 | TC3387080 | TA COMMISSION SERVICE CHARGE | 5.10 | 0.00 | 0.46 | 0.00 | 0.00 | 5.56 |
| | 03/04/2025 | TP3387080 | AAA PROGRAM COMMISSION | 2.99 | 0.00 | 0.26 | 0.00 | 0.00 | 3.25 |
| | 03/04/2025 | TM3387080 | MEMBER BENEFIT COMMISSION | 8.00 | 0.00 | 0.69 | 0.00 | 0.00 | 8.69 |
| | 03/04/2025 | TA3387080 | TRAVEL AGENT COMMISSIONS | 17.50 | 0.00 | 1.52 | 0.00 | 0.00 | 19.02 |
| | 03/04/2025 | TD3387080 | DIGITAL PFP | 308.61 | 0.00 | 26.99 | 0.00 | 0.00 | 335.60 |
| | 03/04/2025 | TR3387080 | TMC / CONSORTIA PFP FEES | 4.37 | 0.00 | 0.40 | 0.00 | 0.00 | 4.77 |
| | 03/06/2025 | 33339531 | SIGNATURE RESERVATION CREDIT SRS Invoice Adjustment | -36.34 | 0.00 | 0.00 | 0.00 | 0.00 | -36.34 |
| | 03/07/2025 | 11310189 | GUEST SATISFACTION | 55.00 | 0.00 | 4.73 | 0.00 | 0.00 | 59.73 |
| | 03/07/2025 | 11309412 | GUEST SATISFACTION- WYNREWARDS | 98.00 | 0.00 | 8.43 | 0.00 | 0.00 | 106.43 |
| | 03/13/2025 | 33360757 | GOVERNMENT RFP PROGRAM | 6.00 | 0.00 | 0.53 | 0.00 | 0.00 | 6.53 |
| | 03/26/2025 | 22182809 | WYNREWARDS 5% INCREASE: 0.50% | 153.86 | 0.00 | 12.91 | 0.00 | 0.00 | 166.77 |
| | 03/26/2025 | 22182808 | WYNDHAMREWARDS PURCHASE POINTS | 15,000.00 | 0.00 | 1,260.00 | 0.00 | 0.00 | 16,260.00 |
| | 03/26/2025 | 33384866 | RevIQ - Start Up Feb-2025-RevIQ STND ($177 USD) | 177.00 | 11.50 | 15.83 | 0.00 | 0.00 | 204.33 |
| | 03/26/2025 | 33389495 | GDS INTERNET CONNECTIVITY FEE February 2025 | 1,550.50 | 0.00 | 130.24 | 0.00 | 0.00 | 1,680.74 |
| | 03/26/2025 | 22182857 | WYNDHAM REWARDS 5% | 1,537.32 | 0.00 | 129.14 | 0.00 | 0.00 | 1,666.46 |
| | 03/26/2025 | 22182810 | WYNREWARDS ENROLLMENT FEE CR | -6.50 | 0.00 | 0.00 | 0.00 | 0.00 | -6.50 |
| | 03/26/2025 | 22183193 | WYNDHAM REWARDS FREE NIGHTS RE | -146.54 | 0.00 | 0.00 | 0.00 | 0.00 | -146.54 |
| | 03/31/2025 | 46693137 | Actual-ROYALTY FEE | 6,945.21 | 0.00 | 566.04 | 0.00 | 0.00 | 7,511.25 |
| | 03/31/2025 | 46678015 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 182.88 | 0.00 | 0.00 | 2,426.88 |
| | 03/31/2025 | 33415353 | RATE SHOPS 2-2025 Active (Non-RMS) PCB NAMER | 75.00 | 0.00 | 6.12 | 0.00 | 0.00 | 81.12 |
| | 03/31/2025 | 46693318 | Actual-MARKETING FEE | 3,086.76 | 0.00 | 251.55 | 0.00 | 0.00 | 3,338.31 |
| | 03/31/2025 | 46679009 | CONTINUING EDUCATION FEE | 600.00 | 0.00 | 48.90 | 0.00 | 0.00 | 648.90 |
| | 03/31/2025 | 46693136 | Actual-RESERVATION FEE | 3,086.76 | 0.00 | 251.55 | 0.00 | 0.00 | 3,338.31 |
| | | | **Total MAR-25** | **35,247.29** | **11.50** | **2,941.42** | **0.00** | **0.00** | **38,200.21** |
| APR-25 | 04/01/2025 | 26016391 | SIGNATURE RESERVATION SERVICE | 473.48 | 0.00 | 34.80 | 0.00 | 0.00 | 508.28 |
| | 04/02/2025 | TD3394208 | DIGITAL PFP | 178.98 | 0.00 | 13.05 | 0.00 | 0.00 | 192.03 |
| | 04/02/2025 | TM3394208 | MEMBER BENEFIT COMMISSION | 14.98 | 0.00 | 1.08 | 0.00 | 0.00 | 16.06 |
| | 04/02/2025 | TC3394208 | TA COMMISSION SERVICE CHARGE | 5.53 | 0.00 | 0.41 | 0.00 | 0.00 | 5.94 |
| | 04/02/2025 | TA3394208 | TRAVEL AGENT COMMISSIONS | 21.90 | 0.00 | 1.60 | 0.00 | 0.00 | 23.50 |
| | 04/02/2025 | 33430386 | RATE SHOPS 2-2025 Active (Non-RMS) PCB NAMER | -75.00 | 0.00 | 0.00 | 0.00 | 0.00 | -75.00 |
| | 04/03/2025 | 22184957 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 60.02 | 0.00 | 0.00 | 810.02 |
| | 04/04/2025 | 33431052 | RevIQ- Service Mar-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 14.07 | 0.00 | 0.00 | 191.07 |

| | Date | Ref | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 04/07/2025 | 11333918 | GUEST SATISFACTION- WYNREWARDS | 113.00 | 0.00 | 7.97 | 0.00 | 0.00 | 120.97 |
| | 04/10/2025 | 33433479 | NSF RETURN CHRG ACH031525 | 100.00 | 0.00 | 7.65 | 0.00 | 0.00 | 107.65 |
| | 04/23/2025 | 33441957 | GDS INTERNET CONNECTIVITY FEE March 2025 | 1,597.75 | 0.00 | 111.86 | 0.00 | 0.00 | 1,709.61 |
| | 04/24/2025 | 22185446 | WYNDHAM REWARDS 5% | 1,605.31 | 0.00 | 111.57 | 0.00 | 0.00 | 1,716.88 |
| | 04/24/2025 | 22185445 | WYNREWARDS 5% INCREASE: 0.50% | 161.23 | 0.00 | 11.21 | 0.00 | 0.00 | 172.44 |
| | 04/24/2025 | 22185783 | WYNDHAM REWARDS FREE NIGHTS RE | -133.18 | 0.00 | 0.00 | 0.00 | 0.00 | -133.18 |
| | 04/30/2025 | 46733449 | Actual-ROYALTY FEE | 4,573.59 | 0.00 | 304.13 | 0.00 | 0.00 | 4,877.72 |
| | 04/30/2025 | 46725312 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 149.22 | 0.00 | 0.00 | 2,393.22 |
| | 04/30/2025 | 46733450 | Actual-MARKETING FEE | 2,032.70 | 0.00 | 135.18 | 0.00 | 0.00 | 2,167.88 |
| | 04/30/2025 | 46733448 | Actual-RESERVATION FEE | 2,032.70 | 0.00 | 135.18 | 0.00 | 0.00 | 2,167.88 |
| | | | **Total APR-25** | **15,873.97** | **0.00** | **1,099.00** | **0.00** | **0.00** | **16,972.97** |
| MAY-25 | 05/01/2025 | 26016626 | SIGNATURE RESERVATION SERVICE | 93.73 | 0.00 | 5.48 | 0.00 | 0.00 | 99.21 |
| | 05/07/2025 | TP3401336 | AAA PROGRAM COMMISSION | 8.63 | 0.00 | 0.47 | 0.00 | 0.00 | 9.10 |
| | 05/07/2025 | TD3401336 | DIGITAL PFP | 316.38 | 0.00 | 17.56 | 0.00 | 0.00 | 333.94 |
| | 05/07/2025 | TC3401336 | TA COMMISSION SERVICE CHARGE | 3.70 | 0.00 | 0.22 | 0.00 | 0.00 | 3.92 |
| | 05/08/2025 | 33484037 | NSF RETURN CHRG ACH041525 | 100.00 | 0.00 | 6.25 | 0.00 | 0.00 | 106.25 |
| | 05/09/2025 | 33490690 | WYNDHAM REWARDS 5% ADJUSTMENT Chargeback Credit | -52.24 | 0.00 | 0.00 | 0.00 | 0.00 | -52.24 |
| | 05/14/2025 | 33491532 | RevIQ- Service Apr-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 10.53 | 0.00 | 0.00 | 187.53 |
| | 05/27/2025 | 33513988 | GDS INTERNET CONNECTIVITY FEE April 2025 | 922.25 | 0.00 | 48.87 | 0.00 | 0.00 | 971.12 |
| | 05/27/2025 | 22187843 | WYNDHAM REWARDS FREE NIGHTS RE | -100.00 | 0.00 | 0.00 | 0.00 | 0.00 | -100.00 |
| | 05/27/2025 | 22187488 | WYNREWARDS 5% INCREASE: 0.50% | 43.49 | 0.00 | 2.29 | 0.00 | 0.00 | 45.78 |
| | 05/27/2025 | 22187489 | WYNREWARDS ENROLLMENT FEE CR | -23.59 | 0.00 | 0.00 | 0.00 | 0.00 | -23.59 |
| | 05/27/2025 | 22187452 | WYNDHAM REWARDS 5% | 458.69 | 0.00 | 24.31 | 0.00 | 0.00 | 483.00 |
| | 05/31/2025 | 46797278 | Accrual-RESERVATION FEE | 2,066.13 | 0.00 | 105.38 | 0.00 | 0.00 | 2,171.51 |
| | 05/31/2025 | 46797280 | Accrual-MARKETING FEE | 2,066.13 | 0.00 | 105.38 | 0.00 | 0.00 | 2,171.51 |
| | 05/31/2025 | 46762357 | OPERA CLOUD SUPPORT | 2,244.00 | 0.00 | 114.44 | 0.00 | 0.00 | 2,358.44 |
| | 05/31/2025 | 46797279 | Accrual-ROYALTY FEE | 4,648.79 | 0.00 | 237.09 | 0.00 | 0.00 | 4,885.88 |
| | | | **Total MAY-25** | **12,973.09** | **0.00** | **678.27** | **0.00** | **0.00** | **13,651.36** |
| JUN-25 | 06/03/2025 | TD3408548 | DIGITAL PFP | 167.59 | 0.00 | 7.04 | 0.00 | 0.00 | 174.63 |
| | 06/03/2025 | TM3408548 | MEMBER BENEFIT COMMISSION | 31.52 | 0.00 | 1.32 | 0.00 | 0.00 | 32.84 |
| | 06/03/2025 | TC3408548 | TA COMMISSION SERVICE CHARGE | 4.73 | 0.00 | 0.19 | 0.00 | 0.00 | 4.92 |
| | 06/03/2025 | 11377549 | GUEST SATISFACTION- WYNREWARDS | 100.00 | 0.00 | 4.20 | 0.00 | 0.00 | 104.20 |
| | 06/03/2025 | 33534640 | RevIQ- Service May-2025-RevIQ STND ($177 USD) | 177.00 | 0.00 | 8.76 | 0.00 | 0.00 | 185.76 |
| | 06/24/2025 | 33539259 | SIGNATURE RESERVATION SERVICE Adjusted Billing for Jan-Apr 2025 | 6.06 | 0.00 | 0.19 | 0.00 | 0.00 | 6.25 |
| | 06/25/2025 | 22190269 | WYNREWARDS ENROLLMENT FEE CR | -23.31 | 0.00 | 0.00 | 0.00 | 0.00 | -23.31 |
| | 06/25/2025 | 22190270 | WYNDHAM REWARDS 5% | 808.03 | 0.00 | 31.10 | 0.00 | 0.00 | 839.13 |
| | 06/25/2025 | 22190238 | WYNREWARDS 5% INCREASE: 0.50% | 78.50 | 0.00 | 3.03 | 0.00 | 0.00 | 81.53 |
| | 06/26/2025 | 33544989 | GDS INTERNET CONNECTIVITY FEE May 2025 | 120.75 | 0.00 | 4.59 | 0.00 | 0.00 | 125.34 |
| | 06/30/2025 | 33549407 | OPERA CLOUD SUPPORT Foundation | 116.00 | 0.00 | 4.18 | 0.00 | 0.00 | 120.18 |

| | Date | Reference | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 06/30/2025 | 46832435 | Accrual-MARKETING FEE | 1,142.46 | 0.00 | 41.13 | 0.00 | 0.00 | 1,183.59 |
| | 06/30/2025 | 46805969 | OPERA CLOUD SUPPORT | 2,240.20 | 0.00 | 80.64 | 0.00 | 0.00 | 2,320.84 |
| | 06/30/2025 | 46832434 | Accrual-ROYALTY FEE | 2,570.53 | 0.00 | 92.54 | 0.00 | 0.00 | 2,663.07 |
| | 06/30/2025 | 46832433 | Accrual-RESERVATION FEE | 1,142.46 | 0.00 | 41.13 | 0.00 | 0.00 | 1,183.59 |
| | | | **Total JUN-25** | **8,682.52** | **0.00** | **320.04** | **0.00** | **0.00** | **9,002.56** |
| JUL-25 | 07/01/2025 | 22191883 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 26.63 | 0.00 | 0.00 | 776.63 |
| | 07/24/2025 | 22192691 | WYNREWARDS ENROLLMENT FEE CR | -70.13 | 0.00 | 0.00 | 0.00 | 0.00 | -70.13 |
| | 07/24/2025 | 22192690 | WYNREWARDS 5% INCREASE: 0.50% | 63.96 | 0.00 | 1.54 | 0.00 | 0.00 | 65.50 |
| | 07/24/2025 | 22192692 | WYNDHAM REWARDS 5% | 709.63 | 0.00 | 17.03 | 0.00 | 0.00 | 726.66 |
| | 07/29/2025 | 33564117 | GDS INTERNET CONNECTIVITY FEE June 2025 | 57.42 | 0.00 | 1.23 | 0.00 | 0.00 | 58.65 |
| | 07/31/2025 | 46858343 | OPERA CLOUD SUPPORT | 2,240.20 | 0.00 | 45.92 | 0.00 | 0.00 | 2,286.12 |
| | 07/31/2025 | 46858474 | OPERA CLOUD ADDITIONAL OFFERIN | 116.00 | 0.00 | 2.38 | 0.00 | 0.00 | 118.38 |
| | 07/31/2025 | 46872433 | Actual-MARKETING FEE | 1,235.29 | 0.00 | 25.32 | 0.00 | 0.00 | 1,260.61 |
| | 07/31/2025 | 46872432 | Actual-ROYALTY FEE | 2,779.40 | 0.00 | 56.98 | 0.00 | 0.00 | 2,836.38 |
| | 07/31/2025 | 46872431 | Actual-RESERVATION FEE | 1,235.29 | 0.00 | 25.32 | 0.00 | 0.00 | 1,260.61 |
| | | | **Total JUL-25** | **9,117.06** | **0.00** | **202.35** | **0.00** | **0.00** | **9,319.41** |
| AUG-25 | 08/05/2025 | TA3422941 | TRAVEL AGENT COMMISSIONS | 53.56 | 0.00 | 0.56 | 0.00 | 0.00 | 54.12 |
| | 08/05/2025 | TC3422941 | TA COMMISSION SERVICE CHARGE | 8.04 | 0.00 | 0.08 | 0.00 | 0.00 | 8.12 |
| | 08/05/2025 | TR3422941 | TMC / CONSORTIA PFP FEES | 18.74 | 0.00 | 0.20 | 0.00 | 0.00 | 18.94 |
| | 08/25/2025 | 33593230 | ROYALTY RECONCILIATION | 17.07 | 0.00 | 0.14 | 0.00 | 0.00 | 17.21 |
| | 08/25/2025 | 33597216 | RESERVATION RECONCILIATION | 7.60 | 0.00 | 0.06 | 0.00 | 0.00 | 7.66 |
| | 08/25/2025 | 33600344 | ADVERTISING/MARKETING RECONCIL | 7.60 | 0.00 | 0.06 | 0.00 | 0.00 | 7.66 |
| | 08/26/2025 | 22194774 | WYNREWARDS 5% INCREASE: 0.50% | 29.40 | 0.00 | 0.22 | 0.00 | 0.00 | 29.62 |
| | 08/26/2025 | 22194775 | WYNDHAM REWARDS 5% | 293.99 | 0.00 | 2.20 | 0.00 | 0.00 | 296.19 |
| | 08/27/2025 | 33608258 | GDS INTERNET CONNECTIVITY FEE July 2025 | 37.62 | 0.00 | 0.26 | 0.00 | 0.00 | 37.88 |
| | 08/31/2025 | 46900493 | OPERA CLOUD SUPPORT | 2,240.20 | 0.00 | 11.20 | 0.00 | 0.00 | 2,251.40 |
| | 08/31/2025 | 46919950 | Accrual-RESERVATION FEE | 964.79 | 0.00 | 4.82 | 0.00 | 0.00 | 969.61 |
| | 08/31/2025 | 46919953 | Accrual-MARKETING FEE | 964.79 | 0.00 | 4.82 | 0.00 | 0.00 | 969.61 |
| | 08/31/2025 | 46900831 | OPERA CLOUD ADDITIONAL OFFERIN | 116.00 | 0.00 | 0.58 | 0.00 | 0.00 | 116.58 |
| | 08/31/2025 | 46919951 | Accrual-ROYALTY FEE | 2,170.78 | 0.00 | 10.85 | 0.00 | 0.00 | 2,181.63 |
| | | | **Total AUG-25** | **6,930.18** | **0.00** | **36.05** | **0.00** | **0.00** | **6,966.23** |
| SEP-25 | 09/04/2025 | TD3430270 | DIGITAL PFP | 13.54 | 0.00 | 0.00 | 0.00 | 0.00 | 13.54 |
| | 09/08/2025 | 22196569 | WR MISSING STAY ADMIN FEE | 50.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 |
| | 09/26/2025 | 33628079 | GDS INTERNET CONNECTIVITY FEE August 2025 | 13.86 | 0.00 | 0.00 | 0.00 | 0.00 | 13.86 |
| | 09/30/2025 | 46949724 | Accrual-MARKETING FEE | 3,261.88 | 0.00 | 0.00 | 0.00 | 0.00 | 3,261.88 |
| | 09/30/2025 | 46949723 | Accrual-ROYALTY FEE | 7,339.23 | 0.00 | 0.00 | 0.00 | 0.00 | 7,339.23 |
| | 09/30/2025 | 46933145 | OPERA CLOUD ADDITIONAL OFFERIN | 116.00 | 0.00 | 0.00 | 0.00 | 0.00 | 116.00 |
| | 09/30/2025 | 46949661 | Accrual-RESERVATION FEE | 3,261.88 | 0.00 | 0.00 | 0.00 | 0.00 | 3,261.88 |
| | 09/30/2025 | 46932230 | OPERA CLOUD SUPPORT | 2,358.01 | 0.00 | 0.00 | 0.00 | 0.00 | 2,358.01 |
| | | | **Total SEP-25** | **16,414.40** | **0.00** | **0.00** | **0.00** | **0.00** | **16,414.40** |

| | Date | Ref | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| OCT-25 | 10/01/2025 | 22198812 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 0.00 | 0.00 | 0.00 | 750.00 |
| | 10/09/2025 | 33653328 | WYNREWARDS AWARD NIGHT ADJ Reimbursement Adj Jun'24-Sept'24 | 130.45 | 0.00 | 0.00 | 0.00 | 0.00 | 130.45 |
| | 10/28/2025 | 33679431 | GDS INTERNET CONNECTIVITY FEE September 2025 | 11.88 | 0.00 | 0.00 | 0.00 | 0.00 | 11.88 |
| | | | **Total OCT-25** | **892.33** | **0.00** | **0.00** | **0.00** | **0.00** | **892.33** |
| | | | **Total Outstanding:** | **179,307.99** | **11.50** | **12,370.09** | **31,479.89** | **0.00** | **160,209.69** |



Howard Johnson International, Inc.
22 Sylvan Way
Parsippany, NJ 07054

**PAYMENT OPTIONS**

**BY WIRE TRANSFER**: Please ensure all transfers costs are settled by yourselves. Please quote the invoice and account number with payment and transfer to:

| | | |
|---|---|---|
| Bank | : | Bank of America, N.A. |
| Branch Address | : | 100 West 33rd Street<br>New York, NY 10001 |
| Account Name | : | Howard Johnson International, Inc. |
| Bank Account Number | : | 4426450683 |
| ABA | : | 026009593 |
| Swift Code | : | BOFAUS3N |

**REMIT CHECKS TO:**

Howard Johnson International, Inc.
15013 Collections Center Drive
Chicago, IL 60693

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

**Additional Information:**

Thank you in advance for your prompt payment and continued business
Please note accrual invoices on your account are estimates and can't be paid until actual revenues are reported
Please ensure you promptly submit your actual revenues and rooms sold in Wynpay

**Contact information:**

For supporting invoice details please visit WynPay and/or Wyndham Community.  For questions please call 1-855-849-3487 or email Financial.Services@wyndham.com

## Billing Glossary

| Catcode Description | Long Description |
|---|---|
| AAA PROGRAM COMMISSION | Commissions related to the AAA global sales program (iata 0092562). Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| ADVERTISING/MARKETING RECONCILIATION | Reconciliation of recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| CONTINUING EDUCATION FEE | Annual continuing education fee as outlined in your Franchise Disclosure Document. The fee provides access to the Wyndham University training system, training content, and other training opportunities. In Wyndham University, you can also access learning journeys for other hotels roles for added develop into other responsibilities. For questions please contact WyndhamU@wyndham.com. |
| DIGITAL PFP | Commissions related to bookings that are part of the digital pay for performance (DPFP) program. The DPFP is a program designed to reinvest funds into our digital media program to deliver direct bookings to our franchisees. DPFP-eligible channels include Paid Search, Meta, Feeds, Display, Local, and Facebook Retargeting. Please Note: The DPFP commission is not charged on every digital media driven booking. For example, bookings through select member benefits programs (e.g. AAA and AARP) as well as bookings by Platinum, Diamond, and Titanium rewards members, are not charged. For questions please contact central.commissions@wyndham.com. |
| GDS INTERNET CONNECTIVITY FEE | GDS & Internet Connectivity Fees are charged per consumed booking based on the fees outlined in your agreement or subsequent communication. No GDS and internet connectivity fees are due on cancelled or no-show reservations provided they are updated in the reservation system. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Finance" category. For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487 |
| GM CERTIFICATION/HMP | GM Certification/Hospitality Management Program for new and transfer GMs, second attendees from the same site for the same class, and post-90 day-integration-period attendees. The hotel's GM of Record must complete this training no later ninety (90) days after the hotel's opening date. Any replacement GM must complete this training within ninety (90) days after assuming the GM role. The complete course description, including cost can be located in Wyndham University. For questions please contact WyndhamU@wyndham.com. |
| GOVERNMENT RFP PROGRAM | Annual fee for participating in government RFP program. For questions related to this charge, please contact whg_gso_coe@wyndham.com |
| GUEST SATISFACTION | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of a manual check. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| GUEST SATISFACTION-WYNREWARDS | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of Wyndham Rewards points. The invoice is the cost of the Wyndham Rewards points. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| MARKETING FEE | Recurring fee for the advertising and marketing activities of the system, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| MEMBER BENEFIT COMMISSION | Commissions related to Global Sales member benefits program. The Member Benefits Program establishes partnerships with member loyalty and affinity based organizations by providing those organizations' with a proprietary discount. Accounts include but are not limited to AARP, American Legion, Wyndham Destinations, American Farm Bureaus to name a few. This program is used to help keep WHR top of mind with these organizations in order to drive revenue through Wyndham Direct channels. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| Missed Valid Enrollment Fee | The Missed Valid Enrollment Fee is charged when your property enrolls 33% or less than your Quarterly Valid Enrollment Target for two consecutive quarters. Backup for this invoice can be found at the following location: Wyndham Community > Quick Links > Wyndham Rewards eDesk > Loyalty Fee Discount/Increase Detail Report. For questions, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| NSF RETURN CHRG | Fee imposed for a payment that was submitted but there was non-sufficient funds to cover the amount. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com. In the EMEA region please contact operations.emea@wyndham.com or your financial services representative at Financial.Services@Wyndham.com |
| OPERA CLOUD ADDITIONAL OFFERINGS | A fee covering the cost of licenses for additional tools (e.g., RevIQ and OTAI) as noted within your Master Information Technology Agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| OPERA CLOUD SUPPORT | A fee for HTCS first level support services as detailed in your property management system agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| RATE SHOPS | Fee for rate shop subscription. The subscription was previously OTA Insight and currently is Lighthouse. For questions related to this invoice please open a RMAssist case through Wyndham Community. |
| RESERVATION FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| RESERVATION RECONCILIATION | Reconciliation of recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| ROYALTY FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| ROYALTY RECONCILIATION | Reconciliation of recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| RevIQ - Start Up | RevIQ revenue management system one time set-up fee per the terms of your executed RevIQ agreement. For questions, please contact reviq@wyndham.com |
| RevIQ- Service | RevIQ revenue management system monthly subscription fee fee per the terms of your executed RevIQ agreement. For questions, please contact reviq@wyndham.com |

Case 2:26-cv-03980-JXN-AME   Document 1   Filed 04/15/26   Page 155 of 155 PageID: 155

## Billing Glossary

| Catcode Description | Long Description |
|---|---|
| SIGNATURE RESERVATION CREDIT | Credit for hotels on the Signature Reservation Services call transfer program that allows hotels to have reservation calls handled by Contact Center.  These credits are issued due to the hotel receiving free promotional months of service. For questions and supporting detail related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |
| SIGNATURE RESERVATION SERVICE | Fee for hotels on the Signature Reservation Services (SRS) call transfer program that allows hotels to have reservation calls handled by our contact center reservation representatives. SRS fees are based on the booking only.  If no reservation is made, there is no cost to you.  On each reservation made, the fee is a % of GRR or a maximum fee (both outlined in the agreement), whichever is less. Backup for this invoice can be found at the following location Wyndham Community-> Hotel Management -> Reports and filter for "SRS" category.  For questions related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |
| TA COMMISSION SERVICE CHARGE | A 1.5% commission service charge based on total commissionable revenue processed for the given month.  Supporting detail for this invoice can be found on your travel agent commission invoice backup that can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance".  For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| TMC / CONSORTIA PFP FEES | Pay for Performance  (PFP) program fees related to Global Sales negotiated TMC/Consortia contracts.  WHR's GSO has negotiated pay for performance fees that are applicable to certain bookings booked by our various TMC/Consortia partners.  These PFP fees typically range from 2%-5% of room revenue and may be assessed on all business or discretionary business only that is booked by these partners, including on non-commissionable rates.  The payment of these fees provides WHR higher level biasing in GDS and various marketing opportunities. Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance".  For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| TRAVEL AGENT COMMISSIONS | Commissions related to standard travel agent bookings via GDS, brand.com, voice, internet, or other third party channels for commissionable rate plans.  Additional revenues were delivered to your property as a result of these bookings.  Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance".  For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| WR MISSING STAY ADMIN FEE | Fee imposed if your property fails to properly post a Member's Earning Stay within 10 days of the Member's check-out date and Member Services must resolve the Member's request for their missing points, you will be subject to a Missing Stay Administration Fee.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% | Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% ADJUSTMENT | Adjustments for Wyndham Rewards 5% member fee.  Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS BONUS POINTS | Cost of Wyndham Rewards points awarded to members as result of your property's participation in a select bonus point offer(s).  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS FREE NIGHTS REIMB | Reimbursement for actualized free night stay.  Reimbursement is based on your hotel's occupancy and ADR of the day the Free Night is consumed.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAMREWARDS PURCHASE POINTS | Purchase Points Rewards (PPR) tool to buy and issue Wyndham Rewards points to members for marketing and loyalty purposes only.  Refer to the PPR  tool for the cost per point.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNREWARDS 5% INCREASE: 0.50% | The Wyndham Rewards Loyalty Program assesses a 5% fee on all nights for which member earn points.  This Increase is for hotels that missed their Quarterly Valid Enrollment Target, achieving 66% or less of their target during the prior quarter. This means the net Loyalty Program Charge for this quarter is 5.50%. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to this fee, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| WYNREWARDS AWARD NIGHT ADJ | A manual adjustment applied for a Free Night reimbursement.   For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNREWARDS ENROLLMENT FEE CR | A credit is applied towards the Loyalty Program Charge for all new Member Enrollment Stays.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |